# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

R.K., a minor, by and through her mother and next
friend, J.K;

W.S., a minor, by and through her parent and
next friend, M.S.;

S.B., a minor, by and through his parents
and next friends, M.B and L.H.;

M.S., a minor, by and through her parent and
next friend, K.P.;

T.W., a minor, by and through her parent and       Case No. **3:21-cv-00853**
next friends, M.W.;

                                              **Chief District Judge Waverly Crenshaw**

M.K., a minor, by and through her parent
and next friend, S.K.;

E.W., a minor, by and through his parent
and next friend, J.W.; and

J.M., a minor, by and through her parent
and next friend, K.M;

and on behalf of those similarly situated,

      Plaintiffs,

v.

BILL LEE, in his official capacity as Governor
of Tennessee; PENNY SCHWINN, in her official capacity
as Capacity of the Tennessee Department of Education,

      Defendants.

**PLAINTIFFS' PRE-HEARING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs, school-age children with disabilities that render them medically vulnerable to COVID-19, by and through their parents and next friends, file this Pre-Hearing Brief.

## I.    INTRODUCTION

With Tenn. Code Ann. §14-1-104, the state legislature passed what is, charitably, a vindictive law to elevate the "rights" of persons to *avoid* Covid measures (quarantines and cloth universal masking) while removing the *actual* federal rights of children with disabilities who require such measures as reasonable accommodations to safely access the public school.

The Plaintiffs who need these reasonable accommodations include R.K., who has Down syndrome (Doc. 1, ¶¶ 1; 21); W.S., who has type-1 diabetes (*Id*. at ¶¶ 2, 22), S.B. who has severe autoimmune conditions (*Id*. at ¶¶ 3, 23); M.S., who has Jourbet Syndrome and utilizes a feeding tube (*Id*. at ¶¶ 4, 24); T.W. who has Shone's Complex, a heart disease compromising blood flow (*Id*. at ¶¶ 5, 25); M.K. who has asthma (*Id*. at ¶¶ 6, 26); E.W. who has ulcerative colitis with compromised immune system; (*Id*. at ¶¶ 7, 27); and J.M. who has primary immunodeficiency. (*Id*. at ¶¶ 8, 28).  All of these Plaintiffs require universal masking and social distancing, including *quarantining* of COVID-positive persons, as a reasonable accommodation. (*Id*. at ¶ 30).

A spate of recent cases reject state legislative intrusions into community masking as a reasonable accommodation. *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *26-27 (D.S.C. Sep. 28, 2021); *Arc of Iowa v. Reynolds* , 2021 U.S. Dist. LEXIS 172685, at *41 (S.D. Iowa Sep. 13, 2021); *Douglas Cty. Sch. Dist. Re-1 v. Douglas Cty. Health Dep't*, 2021 U.S. Dist. LEXIS 213975, at *11 (D. Colo. Oct. 26, 2021).

These cases explain that legislative "COVID incompetence," second-guessing policy decisions, and determining "how best to protect ... students" may, to some degree at least, present a different issue than tackling whether federal law is obstructed. As the Iowa District Court put it:

> "[Courts] are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers. But when Congress passes antidiscrimination laws like 'the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to [e]nsure that the mandate of federal law is achieved.'"

*Arc of Iowa* at \*41 (S.D. Iowa Sep. 13, 2021) (citations omitted).

Keenly aware of the politically-charged motivations of the law, Plaintiffs' Pre-Hearing Brief instead focuses on how Tenn. Code Ann. §14-1-104, conflicts with and is *designed* to discourage and deter masking of others as a reasonable accommodation under the federal ADA. That is, the state statute frustrates the most basic abilities of local school districts to accommodate children with disabilities through (1) quarantines for Covid-positive students and (2) individualized decisions about community masking. It even threatens local schools to lawsuits for personal injury damages and attorneys' fees, along with loss of funding for implementing these basic, key accommodations.

As shown below, Tenn. Code Ann. §14-1-104 cannot possibly withstand scrutiny of the ADA. Moreover, the American Rescue Plan Act (ARPA), requires that *local school* districts, not the state or Governor, make decisions about Covid-prevention consistent with the CDC. Having accepted billions of federal ARPA funds, ARPA now preempts the new Tennessee law as well. "[A]ny state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Perez v. Campbell*, 402 U.S. 637,652 (1971).

3

## II.    PREEMPTION GENERALLY

The Supremacy Clause makes clear that a state statute is preempted to the extent it conflicts

with federal law.  *See* U.S. CONST. art. VI, cl. 2. As a recent case involving Covid-19 and

restrictions on masking explains:

> State law conflicts with federal law either (1) when it is impossible to comply with
> both state and federal law or (2) "where 'under the circumstances of [a] particular
> case, [the challenged state law] stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress.'" *Crosby* v. *Nat'l
> Foreign Trade Council*, 530 U.S. 363, 372 73 (2000) (quoting *Hines v. Davidowitz*,
> 312 U.S. 52, 67 (1941)). These principles apply to state laws that interfere with the
> ability to comply with federal prohibitions on disability discrimination.  A state or
> local government cannot deny a modification for a person with a disability solely
> on the basis that it would violate state law.

*E.T. v. Morath* , No. 1:21-CV-717-LY, 2021 U.S. Dist. LEXIS 220476, at *26-27 (W.D. Tex. Sep.

29, 2021).  Federal courts enjoy equitable power to enjoin unlawful state actions.  *Id.* at 32.

Below, Plaintiffs address the reasons Tenn. Code Ann. §14-1-104 is preempted by both the

ADA and the ARPA.

## III.    ADA PREEMPTION

### A.    EVEN THE *PURPOSE* OF THE NEW STATE STATUTE CONFLICTS WITH THE ADA

Congress expressly set forth the purpose of Title II of the ADA: "to provide a clear and

comprehensive national mandate for the elimination of discrimination against individuals with

disabilities" through "clear, strong, consistent, enforceable standards addressing discrimination

against individuals with disabilities." 42 U.S.C. § 12101(b)(1)–(2).[1]  This includes provision of

---

[1]    Title II of the ADA states that "no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42
U.S.C. § 12132. This echoes § 504 of the Rehabilitation Act, which states that "[n]o otherwise
qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded
from the participation in, be denied the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II "extends
the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act of 1973] to

4

reasonable accommodations which, in turn, includes masking *by others. R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *2 (M.D. Tenn. Oct. 22, 2021); *G.S. v. Lee*, 2021 U.S. Dist. LEXIS 182934 (W.D. Tenn. Sep. 17, 2021); *S.B. v. Lee*, 2021 U.S. Dist. LEXIS 182674 (E.D. Tenn. Sep. 24, 2021); see also, *Disability Rights S.C. v. McMaster*, Civil Action No. 3:21-02728-MGL, 2021 U.S. Dist. LEXIS 185495, at *18 (D.S.C. Sep. 28, 2021) ("allowing school districts, at their discretion, to require face coverings is a reasonable modification, as the benefits of masking significantly exceed the costs.")

Under Tennessee's new statute, the stated "purpose of this title is to safeguard the constitutional rights and liberty interests of persons during the COVID-19 pandemic." Tenn. Code Ann. 14-1-103. But it is clear that the rights being "safeguarded" are the "rights" of persons to *reject* quarantines and masking. This is self-evident throughout the negatively written statute. Of course, even the Tennessee Attorney General recognizes that there *is* no such constitutional right or liberty interest against wearing a mask. In fact, the opposite is true—mask mandates *are* appropriate exercises of state power: "Here, the State's interest in protecting the safety of the public would indeed be less effectively achieved without a mandate that requires the wearing of a face covering in public during the COVID-19 pandemic."[2]

Donning a mask in protection of others does *not* infringe upon a constitutional right or liberty at all. Tennessee already requires action by children for the protection of the health and safety of other children. *See* Tenn. Code Ann. §49-6-5001 (formerly Tenn. Code Ann. §§ 49-1765 to 49-1769, enacted as 1967 Pub. Acts, c. 293 §§ 1-5) (the "Immunization Statute") (requiring

---

all actions of state and local governments," H.R. Rep. No. 101-485(II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367.

[2] https://www.tn.gov/content/dam/tn/attorneygeneral/documents/ops/2020/op20-14.pdf

5

parents to immunize children against certain diseases and provide proof of same before entering school).[3] Not even mandatory vaccines by employers infringe upon constitutional or liberty interests. *Norris v. Stanley*, 2021 U.S. Dist. LEXIS 168444, at *5 (W.D. Mich. Aug. 31, 2021).

## B. PROHIBITING QUARANTINING—THE MOST BASIC ACCOMMODATION OF ALL— IS "CATASTROPHIC" FOR CHILDREN

It should go without saying that Plaintiffs, children with increased risks from contracting COVID, must be distanced/separated from children who have tested positive for COVID. That is the most basic accommodation of all. Known as quarantining, COVID-positive children and their close contacts must be removed from contact with Plaintiffs by the school. If not, they may experience severe injury or death.

St. Jude Children's Hospital employs Dr. Diego Hijano. Dr. Hijano has a specialty in Pediatrics and Infectious Disease. He was a principal investigator for the study of the Pfizer vaccines for children under 12 years of age and a member of the team that monitors and manages the policies that keep St. Jude's staff, patients, and families safe from COVID-19. (**Exhibit A**, Dr. Diego Hijano Declaration).

Dr. Hijano explains that the country remains in a critical situation in the pandemic. While Tennessee had seen a trend of decreasing COVID-19 cases, unvaccinated individuals, many of whom are children, represent a large proportion of new COVID-19 cases. (*Id*. at ¶ 11). The

---

[3] The Immunization Statute has been amended eleven (11) times since its enactment, and evolved to provide for a broader religious exemption and an exemption for homelessness. *Id.* Exemptions, however, were not enacted without meaningful consideration of the effect they might have on the public health and whether exemptions might endanger immunized residents. *See* Tennessee Senate Session 179, May 16, 1967 (emphasizing non-medical exemptions to the immunization statute would only apply under non-epidemic circumstances); Tennessee Senate Sessions 74/75, May 10, 1984 (discussing need to ensure that any exemption to the statute "protects other children")

6

medical community is seeing signs of an uptick of COVID-19 cases nationally as well as state-wide in Tennessee. (*Id*. at ¶ 12).

Stunningly, the state law *prohibits* schools from quarantining Covid-positive children and their close contacts.  Tenn. Code Ann. §14-4-101(b); (D.E. 1, Complaint, ¶ 77). That section states that a "school does not have the authority to quarantine a person or private business for purposes of COVID-19." *Id*. at ¶ 14-4-101(b).

As Dr. Hijano attests, quarantining and isolation are key basic public health measures to mitigate any infection. (Dr. Hijano, ¶ 21). Removing this power from a local school could be "catastrophic" for controlling the spread of COVID-19. (*Id*.)  Allowing individuals with COVID-19 in schools will "undoubtedly lead to large outbreaks necessitating classrooms or school closures." (*Id*.)

Similarly, not performing contact tracing in order to quarantine those who had an exposure to COVID-19 will lead to increase in COVID-19 cases among students, teachers, and staff.  (*Id*. at ¶ 22).  It will also leave children whose disabilities make them more susceptible to severe reactions or death from COVID-19 at significantly higher risk than if quarantine is permitted.  (*Id*.)

Under §14-4-101(a), the "commissioner of health" can determine quarantine "guidelines." But no local official or school can even quarantine a child.  *Id*. at (b).  True to its purpose, the state statute has elevated fake "liberties" over the health and safety of children at risk.

The local school districts *must* have the power to remove students infected with COVID-19 and to contact trace in order to protect students, particularly the most vulnerable.  The unconscionable state law must be stricken.  Where the ADA and a state law conflict with respect to reasonable accommodations and COVID, the state law is superseded by the ADA and Section 504.  *E.T. v. Morath*, 2021 U.S. Dist. LEXIS 220476, at *28 (W.D. Tex. Sep. 29, 2021) "The clear

intent of Congress is to place the authority with local school districts to decide by what means to comply with their obligations under the ADA and Section 504." *Id.*

Notably, many of the COVID cases in the public schools involve denials of *mask mandates* as reasonable accommodations. But denial of quarantining is an even more basic, and fundamental accommodation. Where a state law limits *quarantining* of positive children and their close contacts, that obviously frustrates an accommodation of being separated from these children. For example, granting a TRO against a state law that also limited quarantining, a District Court in Colorado observed:

> Defendants hardly address the issue of the Public Health Order's limitation on quarantine protocols. There is no dispute that the medical consensus is that reasonable quarantines must be required.

*Douglas Cty. Sch. Dist. Re-1 v. Douglas Cty. Health Dep't* , Civil Action, 2021 U.S. Dist. LEXIS 213975, at *12 (D. Colo. Oct. 26, 2021).

To sum up, the denial of quarantining and contact tracing is not only, as Judge Lewis put it, "Covid Incompetence," this also clearly shows how the state law conflicts with the ADA. *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *26-27 (D.S.C. Sep. 28, 2021).

## C.  DETERRING SCIENCE-BACKED COMMUNITY MASKING UNTIL IT IS TOO LATE IS NOT REASONABLE OR EFFECTIVE BECAUSE THE SCHOOLS WILL HAVE SHUT DOWN

As Dr. Hijano explains, masks reduce droplets from contagious individuals and reduce COVID transmission rates. "The overall community benefit of wearing masks derives from their combined ability to limit both exhalation and inhalation of infectious virus." (*Id*. at ¶12).

COVID-19, of course, consists of "particles," and these particles divide into "droplets," which may hang "suspended in the air for many seconds to hours," traveling in *excess* of 2 meters (6.8 inches). (*Id*. at ¶ 13). Much like "herd immunity" for vaccines, the greater number of persons

8

masking, the greater benefit of at-risk individuals.  (*Id*.)  This is particularly true for schools, where there is unique opportunity for viral spread from children and teachers and staff.  (*Id*. at ¶ 14).

In the new statute, masking of others in schools is found at Tenn. Code Ann. §14-2-104(a). Written as a negative prohibition consistent with the fake liberties guarantee, no "person" can be required to wear a face covering unless two preconditions are met:

(1) the principal submits a written request to the school board that "*all* persons on school property wear a face covering"; Tenn. Code Ann. §14-2-104(a)(1), and

(2) "severe conditions" exist. *Id*. at (a)(2). "Severe conditions" has its own specific, two-part definition.  *Id*. at §14-1-101(20).  First, the Governor must declare a state of emergency. Second, a county must have a rolling 14-day infection rate of 1,000 new infections per 100,000 residents. Id. §14-1-101(20)(A), (B).  And even then, the universal masking is only in effect for 14 days.  *Id*. at (B).

## 1.     The Levels Are Too High for Masking To Be a Reasonable Accommodation

Masking of others is a *preventive* reasonable accommodation, not a *remedial* one to be deployed after the school is already consumed by COVID-19.  It is impossible to obtain such masking as a reasonable accommodation by waiting until it is too late.

Dr. Jason Yaun is a Professor of Pediatrics at the University of Tennessee Health Science Center and pediatrician at UT Le Bonheur Pediatric Specialists.  (**Exhibit B**, Yaun Dec. ¶ 3). Using the standard of 1,000 out of 100,000 in a 14-day average, Tennessee's medical facilities will be completely overloaded, physically unable to care for all infected persons, and many schools will likely not be operational due to the number of staff and students infected. (Yaun Dec, ¶ 25).

Local schools know this.  Even the most mask-hesitant jurisdictions, like a Williamson County Board that chooses *not* to follow recommendation of its superintendent and lawyers, once

*pleaded* with the state that they were at a "crisis" breaking point to keep schools open and children safe when they reached 837 cases per 100,000 on August 24, 2021. (See Yaun Dec., fn. 10 and letter, at **Exhibit C**).

As Dr. Hijano explains, these levels of the rolling 14-day average of 1,000 cases per 100,000 residents creates a bar whereby the state law functionally bans universal masking as an *effective* accommodation or mitigation tool. (Ex. A, Hijano Dec, at ¶ 31). The rolling 14-day average of 1,000 cases per 100,000 residents is the rough equivalent of 70 new daily cases of COVID-19 per 100,000 individuals. (*Id.*). That number is too high to set as the minimum to allow schools to implement widespread use of masks. (*Id.*).

For references, a coalition of public health, epidemiology, and policy experts partnered with the Harvard Global Health Institute to standardize a risk framework across the U.S.; they consider 70 new daily cases of COVID-19 per 100,000 individuals as a situation of very high risk leading to a severe outbreak. (*Id.*). Additionally, in August of 2021, when Williamson County Schools and Franklin Special School District reached a self-declared "crisis point," and had to close a number of schools due to high rates of infection in staff and students, the rolling 14-day average was 837 infections per 100,000 in Williamson County, well below the high level of the rolling 14-day average of 1,000 cases per 100,000.[4]

The intent for the use of masks and other mitigation strategies is to avoid an outbreak or further escalation from an outbreak by instating them early on. By waiting for cases to reach an escalation of severe outbreak point, our healthcare systems will be overloaded, leading to unnecessary hospitalizations and deaths. (Hijano Dec, at ¶ 31). Thus, the levels in the new

---

[4] https://www.tn.gov/health/cedep/ncov/data/county-data-snapshot.html, then click on the drop down bar to Williamson county for new daily COVID positive case counts to compute the rolling 14-day average for August 24, 2021; *see also* Exhibit C, August 24, 2021 letter.

Tennessee law are *not a reasonable accommodation*. Waiting to reach this point in an escalation of COVID-19 cases is too late to be effective; the opposite is actually true—it is *unreasonable*, unrealistic, and dangerous. (Hijano, at ¶ 31; Yaun, at ¶¶ 25-31). Obviously, the interactive and individualized process requires proactive strategies before it is too late. Where a state law nullifies a preventive reasonable accommodation, as this law does, the Court must strike it as inconsistent with the ADA.

### 2.    Community Masking Must Remain An Option for Local Schools

As Dr. Hijano states, mitigation strategies like universal masking must remain an option. (*Id*. at ¶ 33). This allows *individualized* considerations about masking in the local school districts rather than the deadly blanket rule by the state legislature. The impact of the number of children who are fully vaccinated, including those ages 5-11, can be considered. These numbers may vary by school district, requiring flexible consideration at the local school level. Additionally, the impact of the holidays, with gatherings and travel, will also have an effect. (*Id*.).

Dr. Adriene Battle, Director of Schools for Metro Nashville Public Schools ("MNPS") echoes the need for using science in order for accommodations to be *reasonable:* "MNPS believes that decision about masking should be based on science and in the best interests of all students." (**Exhibit D**, Declaration of Adrienne Battle). Dr. Battle states that the "provisions adopted by HB9077/SB9014 risk the health and safety of students, particularly those who are immunocompromised, by preventing the district from adopting policies based on scientific healthcare guidance." *Id.* "MNPS would prefer to be able to make decisions that keep students safe—especially those with disabilities that make them more medically vulnerable to COVID-19—without risking state funding for doing so." (*Id*.).

**D.      THE STATE STATUTE CONTAINS PROCEDURAL TRIPWIRES THAT VIOLATE THE ADA**

The new law does have a provision that *purports* to carve out reasonable accommodations under the ADA.  See Tenn. Code Ann. §14-2-104(d).  However, this section creates a series of preliminary obstacles that are inconsistent with the ADA.  This complicated provision begins:

(d) Notwithstanding subsection (a):

> (1) A school shall, *to the extent practicable*, provide a reasonable accommodation pursuant to the Americans with Disabilities Act (42 U.S.C. 1201 et. seq.) to a person who provides a *written request* for a reasonable accommodation to the principal or president of the school. If the person requesting a reasonable accommodation under this subsection (d) is a minor, then the person's *parent or legal guardian* must provide the written request on the minor's behalf.

*Id*. (emphases added)

First, "to the extent practicable" differs from the Department of Justice regulations implementing Title II which provide:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7); *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *17 (D.S.C. Sep. 28, 2021).  Under the state law, a school district could determine "that's not practical," even if it did not fundamentally alter the service, program, or activity.  In Knox County, for example, the school district returned to court *after the preliminary injunction was granted*, arguing that "700 students and 16 staff members have refused to wear masks." *S.B. v. Lee*, 2021 U.S. Dist. LEXIS 199552, at *11 (E.D. Tenn. Oct. 18, 2021).  Applying the ADA's legal standard, the Court rejected this as a reason for refusing masking of others. *Id.*

12

Second, requests need not be *in writing* under the ADA. "Requests for reasonable accommodation may be oral or written and do not have to be made explicitly. *E.g., Rosenfeld v. Canon Bus. Sols., Inc.*, 2011 U.S. Dist. LEXIS 115415, at *39 (D.N.J. Sep. 26, 2011).

These tripwires are inconsistent with the ADA. Under the Supremacy Clause, states may not use state laws to change or tack on requirements that frustrate the objectives of a federal law. For example, in *Felder v. Casey*, 487 U.S. 131 (1988), the plaintiff filed a §1983 action in state court, but a state law required 120 days advance notice to the government. The Supreme Court concluded that such state law notice-of-claims was preempted by §1983. *See id.* at 138.

E. THE NEW STATUTE DENIES UNIVERSAL MASKING AND REASONABLE ACCOMMODATIONS

Even *if* all of the technical obstacles are jumped—"to the extent practicable," a written request, and parent writing it—*then* the law still does not provide for students and local schools to determine that universal masking is appropriate. *Id*. at 14-2-104(d)(2). Rather, school districts can *only* offer this:

> If the principal or president approves the request, then the school shall place the person in an in-person educational setting in which other persons who may place or otherwise locate themselves within six feet (6') of the person receiving the reasonable accommodation for longer than fifteen (15) minutes are wearing a face covering provided by the school that:
>
> (A) For persons twelve (12) years of age or older, meets the U.S. National Institute for Occupational Safety and Healthy N95 classification of air filtration, meaning that the face covering filters at least ninety-five percent (95%) of airborne particles, including droplets containing COVID-19; and
>
> (B) For persons under twelve (12) years of age, but over five (5) years of age, is age-appropriate and provides air filtration similar to the face coverings descried in subdivision (d)(2)(A).

*Id*.

Legislator-crafted accommodations that ban individualized needs assessments violate the ADA. "An individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances . . . ." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001); *see Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision* , 831 F.3d 64, 76-77 (2d Cir. 2016) ("We hold that DOCCS's blanket ban on motorized wheelchairs violates the ADA and the RA because it precludes DOCCS from having to make an individualized assessment of a disabled inmate's particular needs.").

Community masking is not one-size-fits all either. It *may* involve masking of the building for children who move throughout a building by changing numerous classes, like a high school student. A different scenario, perhaps with a kindergarten child, may involving masking in the classroom, bathroom, and hallways. But creating a six-foot, 15 minute "bubble," as if teachers are standing around with stopwatches is not just foolish, it is a "blanket" accommodation that ties the hands of children and teachers. As Dr. Yaun attests, this "bubble of sorts" around a single child becomes stigmatic, rather than simply using masking. For example, denying a guide dog or a cane to a blind student, and requiring instead that she be led around by an adult, is *discriminatory*. *Fry v. Napoleon Cmty. Sch.* , 137 S. Ct. 743, 751, 197 L.Ed.2d 46, 57 (2017). Simply, the ends do not always justify the means.

Beyond the blanket prohibition, the legislative accommodation violates the ADA for other reasons: It does not work. First, as Dr. Hijano and Dr. Yaun attest, COVID aerosols linger in the air and travel *more than* six feet. (Hijano, ¶ 22; Yaun, ¶¶ 8-9). So tying district's hands in this fashion is entirely *unreasonable*. Dr. Hijano alludes to a Covid-positive teacher in Marin, California who infected students as an example; the "attack rate" was 50%, with 80% of the

students on the two closest rows, but the back row, which was more than 20 feet away, was infected too. www.cdc.gov/mmwr/volumes/70/wr/mm7035e2.htm.

Second, COVID can be spread in a matter of a minute or seconds, not 15 minutes. (Yaun Dec. ¶ 31). Even if the 15 minutes is spread throughout the day, schools do not have stop watches on the children. And, even if they did have stopwatches, they are irrelevant because the students must be protected in the first 14 minutes.

Third, because children who have tested COVID-positive, and their close contacts, cannot be quarantined, it is no accommodation for these children to be side-by-side with at-risk children for up to 15 minutes. That is *asking* for COVID transmission and infection, but the state law ties the hands of local schools. These are the types of scientific inquiries of which Dr. Battle speaks— use of current science, not the legislators' unreasonable proclamations.

Fourth, the law prohibits cloth masks. Of course, most children do not *have* N95 masks, which are required by the statute. N95 masks cannot even be procured on a large-scale basis for systems like Metro Nashville. (**Exhibit I**, Gossage Declaration). MNPS must supply up to 60,000 students. This is unreasonable because it cannot happen for six weeks, and it would cost $95,400 (60,000 x $1.59) in comparison to cloth masks $8,400 (60,000 x $0.14). *Id.* And as shown below, the state cannot even use access state or federal funds. The law intentionally obstructs schools and children from engaging a cost effective, readily available accommodation.

## F. LAWSUIT THREATS CHILL ACCOMMODATIONS

Consistent with the state law's purpose of elevating fake liberties of avoiding cloth masks over mask mandates, the new law creates a private right of action: a personal "injury," with compensatory damages and attorneys' fees, for persons who violate chapter 2.[5] Tenn. Code Ann.

---

[5]     Chapter 2 includes "Face Coverings for Schools." Tenn. Code Ann. 14-2-104.

14-6-103.  But it is not a personal injury for those injured by the state law's *limitations*.  It is a "personal injury" for the artificial liberties of imposing quarantines and masks.

Of course, there *is* no personal injury from donning a mask. (**Exhibit E**, Augustyn Declaration; Yaun Declaration, at ¶ 21).  But asking for an accommodation orally, or to the wrong person, or without a parent, or using cloth instead of N95, or in circumstances that are "impractical" but not a "fundamental alteration," among all of the other tripwires, may result in a lawsuit for injunction, damages, and attorneys' fees.

This is a law *designed* to hurt the Plaintiffs.  It is retaliatory on its face. For example, to be adverse, a retaliatory action must be enough to dissuade a reasonable person from engaging in [a] protected activity." *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). Surely, being sued, or the threat of being sued, for inappropriately requesting an accommodation, or receiving an accommodation that is outside the legislative blanket, is enough to dissuade a reasonable person from seeking universal masking or basic quarantining.

The legislature and Governor have indeed met the purpose of the law with Tenn. Code Ann. §14-1-104.  They have knee-capped already at-risk children from obtaining the most obvious and effective accommodations short of vaccines:  quarantining children and contacts with COVID, and effectively banning community masking. The state law must be enjoined.

## IV.    FUNDING AND ARPA PREEMPTION

Congress enacted the $1.9 trillion Rescue Act to address the impact of the COVID-19 pandemic and facilitate recovery from its health and economic effects.  *See* Pub. L. No. 117-2. With regard to education, the Act provided nearly $121 billion in Elementary and Secondary School Emergency Relief funding in order to "help schools return safely to in-person instruction, maximize in-person instructional time, sustain the safe operation of schools, and address the

16

academic, social, emotional, and mental health impacts of the COVID-19 pandemic on the Nation's students."[6]

Local districts in Tennessee have been allocated billions in funding to address those needs.[7] A key purpose of the Act's school funding is to assist schools in achieving a "*safe* return to in-person instruction." Pub. L. No. 117-2, § 2001(i) (emphasis added). The word "safe" is critical. Operationally, the Act requires local school districts receiving funding to develop and make publicly available a "plan for the safe return to in-person instruction and continuity of services." *Id.* § 2001(i)(1).

Included in those requirements, and promised by Tennessee in receiving the ARP/ESSER funds is following CDC guidance for universal and correct wearing of masks and contact tracing in combination with isolation and quarantining. (**Exhibit F**, State Plan for the American Rescue Plan Elementary and Secondary School Emergency Relief Fund, pp. 18-19; 22) (TDOE also released a template for LEAs to use in the development of their Health and Safety Plans with requirements under ARP/ESSER for following CDC guidance on quarantining and universal masking).[8]

---

[6] *See* Ex. 167 (American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21196 (Apr. 22, 2021); *see* Pub. L. No. 117-2, § 2001).

[7] *See* Ex. 166 (U.S. Dep't of Education, American Rescue Plan Elementary and Secondary School
Emergency Relief Fund – Methodology for Calculating Allocations (Revised June 25, 2021) at 3, *available at* https://oese.ed.gov/files/2021/06/Revised-ARP-ESSER-Methodology-and-Allocation-Table_6.25.21_FINAL.pdf.).

[8] *See also* Tennessee-ARP-ESSER-State-Plan-Final.pdf (ed.gov).

**A.       Tennessee is Jeopardizing Its Federal Funding**

The Act explicitly gives local school districts the authority to use their discretion in determining how to allocate up to 80% of the ESSER funding for a variety of pandemic-related purposes.  *See* Pub. L. No.  117-2, § 2001(i)(e)(2) (local educational agencies "shall use the remaining funds for any of the following:…").  This is what Dr. Battle addresses.

Among other purposes, local school districts are authorized to use the Act's funding for "developing strategies and implementing public health protocols ***including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention*** for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff."  *Id*. § 2001€(2)(Q) (emphasis added).  As discussed above in Section II.A, the CDC's guidance specifically recommends universal indoor masking in all K-12 schools.[9]

The U.S. Department of Education has issued interim final requirements providing that each school district's safe-return plan must describe "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC…," specifically including "universal and correct wearing of masks."  86 Fed. Reg. 21195, 21200.  The plan requirement "does not mandate that [a local educational agency] adopt the CDC guidance, but only requires that [it] describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance," which include both "[***u]niversal and correct wearing of masks***," and notably "***appropriate accommodations for***

---

[9] Ex. 13 at 1 (Centers for Disease Control and Prevention's ("CDC") Guidance for COVID-19 Prevention in K-12 Schools.

18

*children with disabilities* with respect to health and safety policies," among others.  *Id*. (emphasis added).

The interim requirements further provide that a local educational agency must ensure the interventions it implements will respond to the needs of all students, "and particularly those students disproportionately impacted by the COVID-19 pandemic, ***including … children with disabilities***."  *Id*. (emphasis added).

The point is that Congress, through the statutory and regulatory framework that establish the ESSER program, vested LEAs, and not States or Governors, with the authority to develop the rules for public safety in schools, and therefore there is no role for a State or Governor to interpose their own rules that interfere with the LEA programs. *See Lawrence Cnty. V Lead-Deadwood School District No. 40-1*, 469 U.S. 256 (1985).   Defendants are well-aware that their state actions interfering with LEA's authority to develop safety rules for their own districts are a violation of its commitments in accepting the ARP and ESSER funding.

Indeed, the United States Department of Education already reminded Tennessee in its August 18, 2021 correspondence to Governor Lee and Commissioner Schwinn that with the signing of Executive 84 allowing parents to opt their children out of universal masking policies implemented by LEAs, it was interfering with its LEAs requirements under ARP and ESSER funding to follow the CDC's safety recommendations for the safe operation of in-person schooling. (**Exhibit G**, August 18, 2021 Correspondence from USDOE to Tennessee). Governor Lee responded to the U.S. Department of Education's correspondence by attaching it in a tweet to his Twitter account stating: "Regarding the Biden Administration letter: Parents know better than the government what's best for their children."  (D.E. 1, ¶ 49).

In *E.T. v. Morath* , 2021 U.S. Dist. LEXIS 220476 (W.D. Tex. Sep. 29, 2021), the Plaintiffs argued that a state law prohibiting *the school districts'* ability to address "universal and correct wearing of masks" conflicts with ARPA because the LEAs enjoyed "that authority alone." The argument was well grounded:

> When a federal-funding statute expressly gives local authorities discretion over how to spend federal money, any state law that purports to restrict that discretion is preempted. *See Lawrence County v. Lead-Deadwood School Dist.*, 469 U.S. 256, 260 61 (1984). Congress choice to vest that discretion with local school districts rather than state governments is a valid exercise of Congress' power under the Spending Clause of the Constitution to impose conditions on the receipt of federal funds and thus does not raise federalism concerns. *Id*. at 269-70.

*E.T.*, at *31.  The District Court agreed, finding: "It cannot be more clear that Congress intends that the local school district receiving ARP Act funds be the ultimate decider of the requirements of the safe return to in-person instruction of students within that district." *Id*. at *32.  Dr. Battle is right.

But under the new Tennessee statute, Tennessee has *prevented* local school districts from quarantining infected individuals and from implementing universal masking absent the apocalyptically "*severe conditions*" and the Governor declaring a state of emergency.  This stands in contradiction to the conditions of ARPA funds, while clearly frustrating local school district's ability to make their own decisions about use of such funds for masking, contact tracing, or other remedial measures that an individual school district may decide.

**B.      Tennessee Prohibits Using State Funds Too**

Under the new Tennessee statute, even if a school district could determine that universal masking is necessary for safety of students within a particular school, they "shall not use state funds" and, if they do, "the commissioner of education may withhold future distributions of school funds...." Tenn. Code Ann. 14-2-104(e).  Similarly, under 14-6-101, known as "Anti-

Commandeering," except for emergency rules already in place, public funds shall not be allocated for a "COVID-19 countermeasure." Tenn. Code Ann. 14-6-101(a).

Even gaining access to ARPA funds requires, first, spending state and local monies. (See **Exhibit H**, Declaration of Alyson Lerma, Ed.D). In practice, if Metro Nashville wanted to purchase masks through ARPA funds, it would first have to purchase them with state and local funds. Then, it would submit this expenditure to TDOE for *reimbursement.* (*See id*.) But under the new law, TDOE must restrict state funds and, as a result, MNPS cannot make the purchases to even receive reimbursements. (*Id*.) As Dr. Battle explains, the "accommodation process set forth in HB9077/SB9014 is confusing and unfeasible. Purchasing N95 masks will be expensive and because of supply chain issues cannot be readily obtained." (Ex. D, Battle Dec). Further, Dr. Battle states "MNPS would prefer to be able to make decisions that keep students safe—especially those with disabilities that make them more medically vulnerable to COVID-19—without risking state funding for doing so." (*Id*.)

Tennessee took the billions of federal dollars with acceptance of the ARPA and ESSER funds. Accordingly, Tennessee cannot place limitations on the local school districts' ability to engage in pro-active mitigation measures. This includes quarantining, contact tracing, and, as appropriate, implementing universal masking as a strategy without the Governor's "state of emergency" or the cataclysmic conditions striking first.

## V. CONCLUSION

The legislature and the Governor intended, and achieved, the elevation of non-existent "liberties" against wearing cloth masks. In doing so, they have harmed children, lost all equities in the balance, and jeopardized the local school districts' ability to make safe decisions in a pandemic, ones that subject these Plaintiffs to injury or death. Moreover, an injunction will not

cause any harm whatsoever to Defendants because complying with federal law is "no hardship" and is always in the public interest. *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962).

It is in the public's best interest for its school districts to have full authority to respond to the pandemic by considering, *inter alia*, quarantine and contact tracing, appropriate masking, threat levels, available resources, vaccination rates, the available science, and the individualized process intended by the ADA. For all these reasons, an injunction enjoining Defendants and their officers, agents, servants, employees, and attorneys—and others who are in active concert or participation with Defendants—from implementing, giving any effect to, issuing any guidance about, instituting personal "injury" lawsuits, or withholding funding, must be ordered.

Respectfully Submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert_____

Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
Facsimile: 423.756.2233
justin@schoolandworklaw.com

**DONATI LAW, PLLC**

/s/Bryce W. Ashby
Bryce W. Ashby—TN Bar #26179
Brice M. Timmons—TN Bar #29582
Craig A. Edgington -—TN Bar #38205
1545 Union Avenue
Memphis, TN 38104
Phone: 901.278.1004
Fax: 901.278.311
Email:
bryce@donatilaw.com
brice@donatilaw.com
craig@donatilaw.com

&

**THE SALONUS FIRM, PLC**

/s Jessica F. Salonus_____
JESSICA F. SALONUS (TN Bar 28158)
139 Stonebridge Boulevard
Jackson, Tennessee 38305
Telephone: (731) 300-0970
Facsimile: 731.256.5711
jsalonus@salonusfirm.com

***ATTORNEYS FOR PLAINTIFFS***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing Plaintiffs' Supplemental Brief in Support of Motion for Temporary Restraining Order or Preliminary Injunction was served via email on this the18th day of November, 2021, on the Office of the Attorney General via ECF filing at the contact information below.

**GOVERNOR BILL LEE**
**COMMISSIONER PENNY SCHWINN**
James R. Newsom (#6683)
Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
Telephone: 615-741-2472
Jim.newsom@ag.tn.gov
*ATTORNEY FOR GOVERNOR BILL LEE AND PENNY SCHWINN,*
*IN THEIR OFFICIAL CAPACITY*

/s Jessica F. Salonus

24