# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

R.K., a minor, et. al.,

      Plaintiffs,

                                      **Case No. 3:21-cv-00853**

v.                                **Chief District Judge Waverly Crenshaw**

BILL LEE, in his official capacity as Governor
of Tennessee; PENNY SCHWINN, in her official capacity
as Capacity of the Tennessee Department of Education,

      Defendants.

## PLAINTIFFS' POST-HEARING BRIEF SUPPORTING
## PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.     INTRODUCTION………………………………………………………………2

II.    THE RELIEF SOUGHT IS RETURN TO STATUS QUO BEFORE §14-1-104………………3

III.   FACTS………………………………………………………………………...4

     A.    The Restrictions in Tenn. Code Ann. §14-1-104 et. seq……………………..4

     B.    Covid-19 and At-Risk Children with Disabilities……………………………5

     C.    Universal Masking of Others As Effective Mitigation Measure………….....7

     D.    Quarantining, Contact Tracing, and Isolation As Effective Mitigation
          Measures…………………………………………………………………9

IV.   DEFENDANTS' PRELIMINARY DEFENSES………………………………………9

     A.    STANDING…………………………………………………………………9

        1.   State Law Prohibits Universal Masking Until it is Too Late...………………10

        2.   State Law Requires an Ineffective Zone-of-Danger Accommodation
            for Volunteer Children………………………………………………11

        3.   State Law Denies Quarantines, Contact Tracing and Isolation
            Decisions by School Districts ………………………………………12

     B.    THIS SUIT PROVIDES PLAINTIFFS LEGAL REDRESS ……………………………13

     C.    SOVEREIGN IMMUNITY ……………………………………………………13

        1.   *Ex Parte Young* ………………………………………………………14

        2.   Abrogation of State Immunity for Title II Public Education Claims…………15

        3.   Ripeness ………………………………………………………………17

V.    PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS………………………...18

A.     ADA and Section 504 ……………………………………………………19
B.     ARPA………………………………………………………………………25
VI.    IRREPARABLE HARM …………………………………….................………………28
VII.   EQUITIES AND PUBLIC INTEREST FACTORS FAVOR PLAINTIFFS ..……………………29
VIII.  BOND SHOULD NOT BE REQUIRED ………………………………………………..31
IX.   CONCLUSION...………………………………………………………………………31

# I.    INTRODUCTION

This case, *R.K. II*, involves students with certain disabilities[1] who, *by reason of* these disabilities, are more medically vulnerable to severe infection and/or death from COVID-19.[2]

For these students to enjoy safe passage into their existing school buildings, classrooms, and extracurricular activities, they require the reasonable accommodations of quarantines, isolations, and the ability to utilize universal masking that are made all-but-impossible under Tenn. Code Ann. §14-1-104 *et seq.* For these Plaintiffs, and others like them, COVID and the Delta variant pose devastating consequences because "children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19." *Id.*

---

[1]    The disabilities include: (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.*, bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) hypertension; (f) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (g) blood disorders (including sickle cell disease); (h) inherited metabolic disorders; (i) history of stroke; (j) neurological or developmental disability; (k) cancer or cancer treatments; and/or (l) muscular dystrophy or spinal cord injury.

[2]    Centers for Disease Control, *COVID-19: People with Certain Medical Conditions*, May 13, 2021, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Nov. 29, 2021).

Case 3:21-cv-00853   Document 41   Filed 11/29/21   Page 2 of 34 PageID #: 996

## II. THE RELIEF SOUGHT IS RETURN TO STATUS QUO BEFORE §14-1-104

To the extent Defendants argue Plaintiffs are requesting a state-wide universal mask mandate, that is incorrect. Plaintiffs seek to enjoin state legislative obstruction of local educational agencies' use of reasonable accommodations pursuant to the ADA, Section 504, and the ARPA.

First, under the ADA and Section 504, Plaintiffs require the ability to engage in the individualized interactive process about needed accommodations—including quarantines, isolation, and universal masking—with their local school districts. Local school districts must have decision-making authority about whether, and when, to quarantine and implement universal masking during the pandemic. As this Court has previously found, "[S]chool systems are in the best position to impose mitigation measures for the schools within their respective jurisdictions. *See* Tenn. Code Ann. § 49-2-203(a)(2). This includes temporary universal mask mandates, and the Court declines to disturb the schools' careful judgment in this regard." *R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *44 (M.D. Tenn. Oct. 22, 20210.[3]

Second, under the American Rescue Plan Act (ARPA), at § 2001(e)(2)(Q), it is the local school districts who must be given the authority to use ARPA funds for "[d]eveloping strategies and implementing public health protocols including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention for the reopening and

---

[3]     *See also Arc of Iowa v. Reynolds* , 2021 U.S. Dist. LEXIS 197652, at *16 (S.D. Iowa Oct. 8, 2021) ("An injunction of the enforcement of section 280.31 will not require local schools to adopt universal masking policies, but it will grant local public school districts the discretion to adopt universal masking policies in their schools to protect their disabled students."); *Disability Rights S.C. v. McMaster*, _ F.Supp.3d _, 2021 U.S. Dist. LEXIS 185495, at *13 (D.S.C. Sep. 28, 2021)("Plaintiffs note, however, they have not asked the Court to order universal masking for all students[,] but rather have merely insisted that the Court enjoin Proviso 1.108" so the School Boards and Lexington can satisfy their burden to make reasonable modifications under Title II and Section 504."). Such relief is considered "prohibitory," not "mandatory," as Plaintiffs seek a return to the status quo before the enactment of [the state law]." *Id.*

3

operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." *Id*. at §2001(e)(2)(Q), 135 Stat. 21. "It cannot be more clear that Congress intends that the local school district receiving ARP Act funds be the ultimate decider of the requirements of the safe return to in-person instruction of students within that district." *E.T. v. Morath*, 2021 U.S. Dist. LEXIS 220476, *32 (W.D. Tex. Sep. 29, 2021).

### III.   FACTS

**A.     The Restrictions in Tenn. Code Ann. §14-1-104 et. seq**

On November 11, 2021, Governor Lee signed Tenn. Code Ann. §14-1-104 *et seq.* into effect.  The stated purpose of the law is not the *health and safety* of persons like Plaintiffs in the pandemic, but "to safeguard the constitutional rights and liberty interests of persons during the COVID-19 pandemic." Tenn. Code Ann. §14-1-103. Consistent with this dubious purpose, Plaintiffs identify below the state-imposed restrictions upon at-risk children and local school districts regarding safe access to school during the pandemic.

First, the state law prohibits school districts from requiring any "person" to wear a face covering absent "severe conditions." *Id*. at §14-2-104(a).  "Severe conditions" means that the Governor must declare a state of emergency; *and* a county must have a rolling 14-day infection rate of 1,000 new infections per 100,000 residents. *Id*. at §14-1-101(20)(A), (B).  And even then, the universal masking may only be in effect for 14 days.  *Id*. at (B).

Second, the state law restricts the full range of reasonable accommodations that may be considered and offered by school districts.  If a written request for accommodation is approved by a designated school official, school districts are restricted to offering *only* a moving, zone-of-danger accommodation whereby masks are worn solely by "*persons who place themselves*" within six feet (6') of the individual seeking accommodation, but only *if* they will be in that person's

4

presence "longer than fifteen (15) minutes." *Id*. at §14-2-104(d). For persons under 12 years of age, only N95 masks may be worn in this scenario. *Id.* at (d)(2)(A).

Third, this same section, at §14-2-104(d)(1), creates technical barriers to even requesting an accommodation. The request must be *in writing*, by *a parent*, and it can be refused if it is not "*practicable*." *Id*. at §14-2-104(d)(1).

Fourth, the state law prohibits school districts from using "state funds" for face coverings and, if they do, "the commissioner of education may withhold future distributions of school funds...." *Id*. at §14-2-104(e).

Fifth, the state law prohibits school districts from quarantining Covid-positive children and their close contacts. *Id*. at § 14-4-101(b) ("school does not have the authority to quarantine a person or private business for purposes of COVID-19."). Under §14-4-101(a), the "commissioner of health" can determine quarantine "guidelines," but under §14-4-101(b), no local official or school can quarantine a Covid-positive child.

Sixth, the state law prohibits school districts from using funds for COVID-prevention measures. They "shall not use state funds" and, if they do, "the commissioner of education may withhold future distributions of school funds...." Tenn. Code Ann. §14-2-104(e).

Seventh, the state law creates a private right of action, a personal "injury" with compensatory damages and attorneys' fees, against persons who violate chapter 2, "Face Coverings for Schools." *Id*. at §14-6-103.

## B.     Covid-19 and At-Risk Children with Disabilities

The Plaintiffs are individuals with varying health conditions who all need reasonable accommodations of third-party masking. They include R.K., who has Down syndrome (D.E. 1, ¶¶ 1; 21); W.S., who has type-1 diabetes (*Id.* at ¶¶ 2, 22), S.B., who has severe autoimmune

5

conditions (*Id*. at ¶¶ 3, 23); M.S., who has Jourbet Syndrome and utilizes a feeding tube (*Id*. at ¶¶ 4, 24); T.W., who has Shone's Complex, a heart disease compromising blood flow (*Id*. at ¶¶ 5, 25); M.K., who has asthma (*Id*. at ¶¶ 6, 26); E.W., who has ulcerative colitis with compromised immune system; (*Id*. at ¶¶ 7, 27); and J.M., who has primary immunodeficiency. (*Id*. at ¶¶ 8, 28). To safely access in-person learning, they require universal masking and distancing from persons who have, or may spread, Covid-19. (*Id*. at ¶ 30).

The Court may take judicial notice, from *R.K. I,* of the adverse effects of Covid-19 on children with underlying health conditions.[4] With or without judicial notice, the record supports these increased adverse effects on at-risk children, like the Plaintiffs identified in this case, from

---

[4]    "Plaintiffs presented strong and persuasive expert testimony regarding the adverse effect of COVID-19 on children with underlying health conditions. Dr. Cross is a board-certified infectious disease physician who practices at Regional One Health in Memphis. (Hr'g Tr., D.E. No. 77 at 73:8-13; 76:10-12). She also was appointed by Governor Lee to the Tennessee Coronavirus Task Force. (Id. at 77:9-14). Dr. Cross, R.K.'s mother, and Dr. Elizabeth Williams, in a sworn statement, confirmed the heightened risk to disabled students. These experts noted that "at least one" child with a preexisting condition placing them at a heightened risk for serious COVID-19 infection "is present in nearly every classroom in Williamson County." (D.E. No. 4-6 ¶ 16; see also Hr'g Tr., Doc. No. 77 at 25:1-10).

Experts also remarked that the spread of the Delta variant, which is twice as contagious as prior variants, poses an especially foreboding threat to children with underlying conditions. (D.E. 4-5 ¶ 8, 4-6 ¶ 6; see also Hr'g Tr., D.E. 77 at 87:3-8). Dr. Cross and R.K.'s mother agree that the Delta variant is more contagious than prior variants and "causes more severe disease." (Hr'g Tr., Doc. No. 77 at 26:22-27:1; 87:3-8, 12-13; see also D.E. 4-6 ¶ 19). Recently, children accounted for 36% of all COVID-19 cases in Tennessee. (D.E. 4-1 at 5). And case counts continue to remain high in Williamson County. (D.E. 4-3 ¶ 9, 4-6 ¶ 6). Williamson County schools had dozens of staff members and more than one hundred students in isolation with a confirmed positive case of COVID-19 every week from September 3, 2021 through October 8, 2021. *See* Williamson County Schools, COVID-19 Numbers 2021-22 (October 8, 2021), https://www.wcs.edu/Page/8641."

*R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *8-9 (M.D. Tenn. Oct. 22, 2021)

Down syndrome to compromised heart and lungs, through Dr. Jason Yaun and Dr. Diego Hijano.[5]

(Tr. Yaun, pp. 826-827; Tr. Hijano, pp. 873-874).[6]

## C. Universal Masking of Others As An Effective Mitigation Measure

In *RK I*, the Court listed numerous scientific publications about the effectiveness of universal masking, along with supporting testimony from Dr. Sara Cross, Dr. Marilyn Augustyn and Dr. Jason Abaluck.[7]   In this case, *RK II*, Plaintiffs have presented additional physicians along

---

[5]     Dr. Yaun is the division chief of outpatient pediatrics at Lebonheur Children's Hospital. (Tr. Yaun, pp. 824-825). Dr. Hijano is a pediatric infectious disease physician and deputy medical director for occupational health at St. Jude Children's Research Hospital. (Tr. Hijano, pp. 866-867)

[6]     Plaintiffs have used the "PAGEID#" to designate the page numbers.

[7]     "Plaintiffs offered additional compelling expert testimony on the effectiveness of masks by Dr. Marilyn Augustyn and Dr. Jason Abaluck. Dr. Augustyn is a board-certified physician in both pediatrics as well as developmental and behavioral pediatrics at the Boston University School of Medicine. (Id. at 124:7-19; see also Doc. No. 59-3). Dr. Jason Abaluck is an econometrician and Professor at the Yale University School of Management. (Hr'g Tr., Doc. No. 77 at 181:1-12). [*13]  He is also the lead author of a study on COVID-19 and mask-use, The Impact of Community Masking on COVID-19: A Cluster-Randomized Trial in Bangladesh. (Id. at 181:20-25; see also Hr'g Ex. 23) (hereinafter "the Bangladesh study").

As with Dr. Cross and R.K.'s mother, Dr. Augustyn and Dr. Abaluck logically and effectively explained that masks were effective as a mitigation measure. Dr. Augustyn agreed that "[t]o avoid further closure of schools with deleterious consequences, mask wearing by children is necessary." (Hr'g Tr., Doc. No. 77 at 173:1-3 (quoting Hr'g Ex. 16)). … The Tennessee Department of Education agrees, noting that masking is [*15]  a "[p]roven mitigation" strategy and is "effective" in controlling "the spread of COVID-19." Tenn. Dept. of Ed., FAQs related to COVID-19's Effect on Tennessee Schools (Sept. 7, 2021), https://www.tn.gov/content/dam/tn/education/health-&-safety/FAQs%20for%20COVID-19%20Effect%20on%20Schools.pdf; (see also Hr'g Ex. 28). Ms. Rachel Suppé, Deputy General Counsel at the Tennessee Department of Education, testified on behalf of Governor Lee that she had no reason to doubt the effectiveness of masks in schools as a mitigation measure. (Oct. 13 Hr'g Tr. at 92:11-21; 115:18-21). And according to Dr. Cross, who was appointed by Governor Lee to Tennessee's Coronavirus Task Force, "the failure to implement a universal masking policy in schools will likely lead to extremely high rates of transmission of COVID-19 in the classroom setting." (Doc. No. 4-5 ¶¶ 4, 20; see also Hr'g Tr., Doc. No. 77 at 105:2-6)."

*R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *10-15 (M.D. Tenn. Oct. 22, 2021)

7

with declarations from the same physicians in *RK I*. (Exs. 15 (Cross), 17 (Augustyn), 18 (Abaluck)). Unlike *RK I*, Defendants offered no testimony whatsoever (nor did they ask the Court to consider any from *RK I*) that universal masking is ineffective. Other than Dr. John Dunn, a veterinarian attesting to COVID-statistics, Defendants offer no expert witnesses at all, apparently conceding, *and rightly so*, that quarantining and masking are necessary, effective, and not a fundamental alteration.

In this case, *RK II*, Drs. Yaun and Hijano testified about the importance of universal masking. (Yaun Tr. pp. 829-30). Dr. Yaun explained the prevalence of asymptomatic and pre-symptomatic persons, which is "why it's important for everyone to be wearing masks." (*Id*. at 830). "So there's tremendous benefit for universal masking and especially tremendous benefit for the person wearing the mask protecting others in their vicinity." (*Id*. at p. 856).

Dr. Hijano testified that masking prevents infectious particles from lingering in the air: "[I]f I have COVID and I don't have a mask, then, as I said, the level of infectious particles are in the air and everyone will be at risk of getting the virus." (Hijano Tr. p. 874). Masking of children with disabilities, alone, is insufficient because "the most important thing we need to understand, that the most effective way of mitigating COVID-19 is when most people abide to the mitigation instruction. In this case, a mask." (*Id*. at p. 877; Ex. 5, Hijano Decl., ¶13 (explaining that "herd immunity" is sought.")). Indeed, the literature suggests that 40% of COVID-positive persons who may spread the virus have "no symptoms." (Hijano Tr. p. 915). In schools like Shelby County, which are crowded, have poor ventilation, low vaccination rates, and lack physical distancing, masking is the only viable strategy. (Ex. 5, Hijano Decl., ¶ 26).

**D.**     **Quarantining, Contact Tracing, and Isolation As Effective Mitigation Measures**

Tennessee is currently in a "critical situation" with COVID. (Ex. 5, Hijano Decl., ¶ 11). Isolation, contract tracing and quarantining represent "one of the oldest mitigation strategies we have to control any type of infection." (Hijano Tr. p. 880; Ex. 5, Hijano Decl., ¶ 24 (a key, basic public health strategy)). One must be able to detect the infected individual and "quickly remove them from the school and send them home until they no longer can infect anyone." (*Id.*) After that, one does *tracing* to determine who might have gotten the virus, and they are put in "*quarantine*" by staying home until they can return safely to school. (*Id.* at pp. 880-81).

## IV.     DEFENDANTS' PRELIMINARY DEFENSES

**D.     STANDING**

Defendants argue Plaintiffs lack standing[8] because there is no imminent or fairly traceable injury to the state law. (D.E. 23, Defendants' Response to PI, p. 6). That is incorrect. As in *RK I*, Plaintiffs contracting potentially life-threatening Covid-19 is sufficiently imminent because those risks are "fairly traceable" to the barriers created by the state law.[9] As in *RK I*, standing is satisfied

---

[8]     The concept of "[s]tanding 'ensure[s]' that federal courts do not exceed their authority' and 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Tenn. v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). To establish standing, a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Entvl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)); *R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *45 (M.D. Tenn. Oct. 22, 2021)

[9]     In *RK I*, Governor Lee argued lack of injury from an Executive Order permitting masking opt-outs because students with Covid "are likely staying home and thus not infecting other students." *R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *29 (M.D. Tenn. Oct. 22, 2021). This Court rejected that reasoning because: "There is no reason to believe that asymptomatic students who have COVID would stay home from school, let alone know they are infected in the first place." *Id.* The barrier to universal masking created the standing because these asymptomatic individuals would pose increased risks to the at-risk children with disabilities. *Id.*

9

where the state-imposed criteria "severely limits the accommodations [school districts] are able to provide for their students." *Id.* Below, Plaintiffs identify three imminent perils of the state law: (1) effective prohibition of universal masking; (2) creation of a non-individualized, ineffective "zone-of-danger" accommodation; and (3) denial of quarantines, isolation, and contact tracing.

### 1. State Law Prohibits Universal Masking Until It is Too Late

The limitations created by the state law imperil at-risk children with disabilities even more than the Executive Order. Whereas the Executive Order allowed children to "opt out" of universal masking, the new state law does preclude universal masking until "severe conditions" make the accommodation useless. Tenn. Code Ann. §14-2-104(a). "Severe conditions" means the Governor declares a state of emergency *and* the county has a rolling 14-day infection rate of 1,000 new infections per 100,000 residents. *Id.* at §14-1-101(20)(A), (B). This ensures a Covid storm must exist *before* masking may be implemented.

Dr. Yaun describes the metrics of 1,000 new infections per 100,000 residents on a rolling 14-day average, *Id.* at §14-1-101(20), as "extremely high rates," seen only during surges in certain areas, where hospitals would be potentially "overwhelmed with cases with ICU care," so many people ill that schools could not properly "staff their school building," and schools likely shut down. (Yaun Tr. p. 837). Per Dr. Hijano, by 300 infections per 100,000 residents, hospitals begin to be "very busy." (Hijano Tr. p. 889). By 1,000 infections, in a school setting, "you are drowning" and "there is really no other mitigation strategy other than just leave the room, close the school and stay out. That's what 1,000 to 100,000 infections in the county means." (*Id.*) [10]

---

[10] Dr. Hijano avers that 70 per 100,000 residents is a "very high risk leading to severe outbreak" pursuant to published studies. (Ex. 5, Hijano Decl., ¶31).

Using the analogy of water for Covid, Dr. Hijano says: "So basically the state is saying that schools should sit tight in the room, seeing how the water continues to rise, until they are drowning. And once they are drowning, they are able to issue a mask mandate." (*Id.*) By that point, it is too late to put in place a mitigating measure. *Id.* at 890. "[W]hen we reach that level of community transmission, it's definitely not safe for vulnerable kids to go to school." (*Id.* at 891). Without universal masking until it is too late, and with schools unable to quarantine, and only being able to offer masking of persons who "place themselves" within six feet of children with disabilities for more than fifteen minutes—this "would not be safe by any means." (Hijano Tr. p. 890).

Dr. Ker, an immunologist and mother of a child bringing the suit, testified similarly regarding the statute's threshold for "severe conditions" being that it is "completely ineffective at that point." (Ker Tr. p. 942). Using an analogy of fire for Covid instead of water, she said the state has created a situation akin to "get[ting] the garden hose out to put out your entire home that's engulfed in flames." (*Id.*)

2. **State Law Requires an Ineffective Zone-of-Danger Accommodation for Volunteer Children**

*Before* the children are drowning from Covid, or *before* the schoolhouse is engulfed with Covid, the best school districts can offer under the new statute are volunteers (those who "place themselves") near the children with disabilities. T.C.A. §14-2-104(d)(2). This non-individualized accommodation allows the wearing of masks in a moving zone, or "bubble," for volunteer children, *after* fifteen minutes of contact, and only if they come within six feet of the moving zone. *Id.*

Not only does this amount to "singling out" persons with disabilities (a "stigma"), *see* Ex. 1, Yaun Decl., ¶ 28 and Ex 26, J.W. Decl. ¶ 6, but it creates an imminent risk of transmission because Covid is spread by airborne transmission *greater* than a six-foot distance and it can linger for *hours*, not fifteen minutes, in the school setting. (Yaun Tr. p. 833; Hijano Tr. pp. 877-79; Ker

Tr. p. 940).[11]  Artificial markers of six feet and fifteen minutes are totally insufficient for the population that is a "high risk in the pandemic." (Ker Tr. p. 941).  For these highly at-risk children, there is not a minute or distance rule that is acceptable during the pandemic, particularly with the Delta variant which can linger for extended periods in the air. (*Id*.).

### 3.    State Law Denies Quarantines, Contact Tracing and Isolation Decisions by School Districts

The state law is so restrictive on local school districts that they may not even impose a quarantine on COVID-positive persons.  *Id*. at §14-4-101(b) ("school does not have the authority to quarantine a person or private business for purposes of COVID-19.").  Denying schools the basic ability to *quarantine* a COVID-positive child defeats all other reasonable accommodations because schools are very vulnerable and there is an increased risk "if we allow kids, teachers or staff with a known exposure walking around." (Hijano Tr. pp. 883-884).  The contact tracing is necessary to contain the outbreak. (*Id*. at 885). While a relationship with the County Health Department is important, it is the *local school district* who sees the child daily—e.g. gastroenteritis, vomiting, diarrhea, fever, or COVID—and it is the school nurse who, with the parents, determines the action to be taken. (*Id*. at 934).

The impact of the barriers under the state law must be considered not just individually, but *cumulatively.* Dr. Ker's daughter, and others like her, need the full panoply of mitigation strategies suggested by the CDC and the AAP including masking, contract tracing, quarantining, and isolating positive cases.  (*Id*. at 938).  Without these, they are at a higher risk of danger. (*Id*. at

---

[11]    In terms of the fifteen minutes, if a teacher or other students spends minutes, multiple times a day, that can be sufficient for the spread; or if a teacher or student is looking directly at the student, as opposed to back being turned, the Delta variant can be spread much more quickly than fifteen minutes. (Hijano Tr. 879).

939). As it stands, absent the cataclysmic "severe conditions," children like Dr. Ker's daughter are forced to rely on and hope for the good fortune of other students around them choosing masks—there is no enforcement ability at the local level. (*Id*. at p. 957).

## E. THIS SUIT PROVIDES PLAINTIFFS LEGAL REDRESS

As part of standing, Defendants strangely argue this lawsuit will not provide Plaintiffs "any legal redress." (D.E. 23, Response, p. 8). But removing the state-created barriers—on universal masking, the ineffective zone-of-danger accommodation, and prohibition of quarantines, contact tracing, and isolation—will return complete control to local school districts and parents of children with disabilities. Such flexible, individualized, and interactive decision-making between parent and school district is required by both the ADA/504 and ARPA. As this Court observed in *RK I*:

> [S]chool systems are in the best position to impose mitigation measures for the schools within their respective jurisdictions. *See* Tenn. Code Ann. § 49-2-203(a)(2). This includes temporary universal mask mandates, and the Court declines to disturb the schools' careful judgment in this regard.

*R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *44 (M.D. Tenn. Oct. 22, 2021). And as Dr. Battle, the superintendent of Metro Nashville attests, the "provisions adopted by HB9077/SB9014 risk the health and safety of students, particularly those who are immunocompromised, by preventing the district from adopting policies based on scientific healthcare guidance." (Ex. 14).

## F. SOVEREIGN IMMUNITY

As Defendants acknowledge, suits against state officials in their official capacities are suits against *the state*. (D.E. 23, Response, p. 9) (citing *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). Further, as Defendants acknowledge, there are three exceptions to a state's sovereign immunity: "(1) when the state has consented to suit; (2) when the exception set forth in *Ex parte Young* applies; and (3) when Congress has clearly and expressly abrogated the state's

immunity." *Puckett v. Lexington- Fayette Urban Cnty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016). Contrary to Defendants' Response, the second and third apply here.

### 1. *Ex Parte Young*

The *Ex Parte Young* exception governs claims for prospective *injunctive* relief. Under the doctrine, "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law, regardless of whether compliance might have an ancillary effect on the state treasury." *Id.* "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Id.*

Under *Ex Parte Young*, "[s]uch officer must have some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. 123, 157 (1908). "Some connection" means "facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013). Oddly, Defendants claim Governor Lee lacks a "bare connection" to the new statute. (D.E. 23, Response, p. 10).

To the contrary, Governor Lee clearly meets the "connected to," or having "responsibility for" aspect of universal masking under the state law. In fact, the *only means* by which any local school district can possibly require universal masking hinges upon Governor Lee himself declaring a "state of emergency." T.CA. §14-1-101(20)(B). The local-decision making has been removed entirely, meaning control of universal masking is vested in the Governor. As for Commissioner Penny Schwinn, Defendants concede that she would be the person penalizing schools for violations of the new state law. (D.E. 23, Response, p. 10). That she has not done so *yet* is beside the point—Plaintiffs are seeking injunctive relief to *prevent* such irreparable harm.

## 2. Abrogation of State Immunity for Title II Public Education Claims

Under the third exception, Congress abrogated immunity under Section 504 when states accept federal funds. *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 628 (6th Cir. 2001). Defendants concede there is no sovereign immunity under Section 504. (D.E. 23, p. 9). This makes discussion under Title II of the ADA somewhat academic, although Defendants are mistaken about Title II.

Under Title II of the ADA, Defendants rely upon the older case of *Popovich v. Cuhahoga Cty Ct. of Common Pleas,* 276 F.3d 808 (6th Cir. 2002). However, *Popovich* itself has been "abrogated" by subsequent Supreme Court and Sixth Circuit case law. See *Meeks v. Schofield*, 10 F. Supp. 3d 774, 793 (M.D. Tenn. 2014) (citing abrogation of *Popovich* in *Mingus v. Butler*, 591 F.3d 474, 483 (6th Cir. 2010)).

"Congress has expressed an unequivocal desire to abrogate Eleventh Amendment immunity for violations of the ADA." *Babcock v. Michigan*, 812 F.3d 531, 534 (6th Cir. 2016) (citing 42 U.S.C. §12202) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."). But as the Sixth Circuit explained in *Mingus*, the conduct still must be considered on a case-by-case basis. *Mingus*, at pp. 482-83.

In *Mingus*, following the Supreme Court's decision in *U.S. v. Georgia,* 546 U.S. 151 (2006), a three-part test determines immunity to a suit under Title II:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010). It is possible for the "same misconduct" to violate the ADA and Fourteenth Amendment independently. *Id*. at 483. In *Mingus*, the Title II

misconduct was denying him a single-occupancy room because of his disabilities, which was also differential treatment violating the Fourteenth Amendment. *Id.* As a result, the third prong under *Georgia* was unnecessary. *Id.*

In the area of public education, it is also possible to state a Title II claim *without* stating a violation of the Fourteenth Amendment. *W.H. v. Tenn. Dep't of Educ.*, 2016 U.S. Dist. LEXIS 7206, at *27 (M.D. Tenn. Jan. 20, 2016) (citing *U.S. v. Georgia,* 546 U.S. 151, 159 (2006)). Where there is a "history of constitutional violations in a particular area and Congress has enacted legislature that is congruent with, and proportional to, those violations, such legislation may be enforceable against the states…." *Id*. (citing *Tennessee v. Lane*, 541 U.S. 509 (2004)).

Under Title II of the ADA, Plaintiffs must always identify a "service program or activity" to which they are denied access. *Id.* at 538. That phrase enjoys a "broad interpretation … to encompass[] virtually everything that a public entity does." *Babcock*, 812 F.3d at 540 (citing *Johnson v. City of Saline* , 151 F.3d 564, 569 (6th Cir. 1998)). Here, as in *RK I,* the Plaintiffs are being denied safe and equal access to the necessary in-person school programs, services, and activities because of the encumbrances created by the state law—e.g., severe obstacles to universal masking; a state-created, non-individualized, *unreasonable* accommodation; and prohibition of quarantining, isolating, and contract tracing by the school districts. *RK v. Lee*, at *39 (citing *ARC of Iowa*, 2021 U.S. Dist. LEXIS 172685, 2021 WL 4166728, at *11). As in *Mingus*, this misconduct violates *both* the ADA and Fourteenth Amendments. Or, as in *W.H.*, it satisfies the ADA without regard to the Fourteenth Amendment.

While the third prong is not necessary under *Mingus,* abrogation of state immunity for Title II claims in the area of public education is certainly valid, congruent, and proportional. The case law overwhelmingly bears this out. *W.H.* at *27 (M.D. Tenn. Jan. 20, 2016) (citing *Bowers v.*

*Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555 (3d Cir. 2007); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005); *Assn'n for Disabled Americans v. Fla. Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005); *Dean v. Univ. at Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 195 n. 9 (2d Cir. 2015); *see also*, *D.R. v. Mich. Dep't of Ed* , 2017 U.S. Dist. LEXIS 222030, at *23 (E.D. Mich. Sep. 29, 2017) ("Therefore, the Court is not persuaded to disregard the significant case law abrogating 11th Amendment immunity in the cases concerning public education. Accordingly, 11th Amendment immunity does not apply to Plaintiffs' ADA claim.").

**3.    Ripeness**

Last, Defendants briefly argue the case is not "ripe for adjudication" because Plaintiffs have neither requested nor been denied an accommodation. (D.E. 23, p. 11). This argument misses the mark.   First, the lawsuit involves legislative *obstacles to even requesting* a reasonable accommodation with local school districts.   The Governor and legislature have stolen the interactive process between individuals and school boards.   For example, unless and until the Governor approves a state of emergency, and COVID reaches catastrophic markers, the Plaintiffs are *precluded* from even seeking universal masking. Tenn. Code Ann. §14-1-101(20).   Even then, school districts cannot fund masks, or afford or provide the N95 masks that are required by the statute. *Id*. at §14-2-104(d)(2)(A); (Ex. 28, Gossage Decl.).   In fact, if a school district instructed a person to wear a more affordable *cloth* mask, they would be subject to suit for "personal injury." Tenn. Code Ann. §14-6-103.   Further, the new law is so severe that school districts cannot quarantine students, teachers and staff *known to have tested positive* for COVID, or those with whom they contacted. *Id*. at §14-4-101(b).

17

Second, J.K., the mother who testified, made it abundantly clear that her daughter requires "universal masking, contact tracing, quarantining, isolating positive cases, [and] physical distancing." (Dr. Ker Tr. p. 938). But she has experienced a "yo-yo" in Williamson County—masking in the young age group, then of all ages, but most recently, removed the mask mandate entirely. (*Id*.) Nonetheless, before the passage of the new state law, she did request universal masking at a school board meeting where masking was being determined. (*Id*. at p. 955).

## V. PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS

The primary purpose of issuing a preliminary injunction is to preserve the status quo and prevent irreparable harm until a court can make a final decision on the merits after a final hearing. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974); *Arc of Iowa v. Reynolds*, 2021 U.S. Dist. LEXIS 197652, at *11-12 (S.D. Iowa Oct. 8, 2021).

To determine whether to issue a preliminary injunction under Rule 65, federal courts must consider the following four factors: "(1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418 (2009)). "These factors are not prerequisites but are factors that are to be balanced against each other." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009); *see also R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *25 (M.D. Tenn. Oct. 22, 2021). "When the defendants are governmental entities, the equities and public interest analyses merge[.]" *Nken*, at 435; *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *23-24 (D.S.C. Sep. 28, 2021).

As this Court stated in *RK I*:

18

> The United States Constitution enshrines the principle that federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Courts have consistently found that this clause of the Constitution, better known as the Supremacy Clause, "supplies an important 'rule of decision,' which instructs that courts 'must not give effect to state laws that conflict with federal laws.'" Torres v. Precision Industries, *Inc.*, 938 F.3d 752, 754 (6th Cir. 2019) (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015)). Thus, where a state law interferes with federal law, it is invalid.

*R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *32 (M.D. Tenn. Oct. 22, 2021).

Defendants argue the Supremacy Clause does not "does not create a cause of action." (D.E. 23, Response, p. 7). That misses the point. As Plaintiffs' Complaint alleges, "Federal courts enjoy equitable powers to enjoin unlawful actions by states." (D.E. 1, Complaint, ¶ 132). "Thus, Plaintiffs' claim for preemption under the act is properly before this court not because of any private right of action under the act, but based on the equitable power of federal courts to enjoin unlawful actions by state officials." *E.T. v. Morath*, 2021 U.S. Dist. LEXIS 220476, at *28 (W.D. Tex. Nov. 10, 2021).

## A. ADA AND SECTION 504

This Court asked the parties to address, under the "Likelihood of Success" section, how the state law impacts Plaintiffs' access to educational opportunities under the ADA and Section 504. (Court, Tr. p. 970).

There are many consistencies between the barriers to safe access created by the Executive Order in *RK I* and the state law in this present case of *RK II*. As in *RK I*, the new state law weakens or nullifies the ability of *local school districts* to provide safe, fundamental, and non-discriminatory access to their public institutions under the ADA and Section 504. *R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *33 (M.D. Tenn. Oct. 22, 2021); (D.E. 1, Complaint, at ¶¶ 62-86). The children are in danger and "cannot [safely] get inside the school," as *RK I* showed:

> Section 35.150 "primarily concerns physical, or structural, impediments to public access." However, "the invisible barrier that COVID-19 places between [disabled students] and their classrooms [is] necessarily [no] different from a physical barrier that a stairwell places between wheelchair-bound students and their classrooms[.]" *Id.* "'After all, if [a] child cannot get inside the school,' for whatever the reason, then 'he cannot receive instruction there' and 'he may not achieve the sense of independence conducive to academic (or later to real-world) success.'"

*R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *36-37 (M.D. Tenn. Oct. 22, 2021) (citations omitted). Even the Defendants concede the state has taken control of the accommodation process, denying any role for the school district and parents: "a school's governing body—which plays no role in the ADA accommodation process in Section 104(d)…" (D.E. 23, Response, p. 10).[12]

As with *RK I,* "[a] universal masking requirement instituted by a school is a reasonable modification that would enable disabled students to have safe and equal access to the necessary in-person school programs, services, and activities." *R.K. I*, at *39 (citing *ARC of Iowa*, 2021 U.S. Dist. LEXIS 172685). Just as the Executive Order made "in-person learning at schools available only under conditions that are dangerous to children with disabilities," *Id*. at *42 (citing *ARC of Iowa,* *11; *S.B*., 2021 WL 4755619, at *22), so too does the new state law.

Notably, the *ARC of Iowa* case involved a state law restricting access and accommodation rights under the ADA and section 504 in the context of COVID, including the outright denial of school districts' ability to implement a mask mandate. This violated the ADA for a number of reasons: as this Court said in *RK I*, it made "learning at schools available only under conditions that are dangerous to children with disabilities." *Arc of Iowa,* 2021 U.S. Dist. Lexis 172685, at *37. Additionally, it violated the ADA's requirement that schools must provide 'reasonable

---

[12] "An individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances . . . ." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). This individualized aspect of accommodations from Title I, in *Martin*, applies equally to Title II. *Marble v. Tennessee*, 767 F. App'x 647, 651-52 (6th Cir. 2019).

modifications' to disabled students in order to provide them with equal access to school programs, services, and activities." *Id.* at *38. And third, it failed to permit schools from administering programs, services, and activities in the 'most integrated setting' appropriate to the needs of qualified disabled students." *Id.* at *40.

Similarly, the *McMaster* case from South Carolina also addressed a state statute creating barriers to the ADA. *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495 (D.S.C. Sep. 28, 2021). This included prevention of universal masking. In contrast to Tennessee, which has the second highest proportional number of COVID-19 cases, South Carolina had the third highest proportion. *Id*. at 17-18. And as in *RK I*, the *McMaster* court concluded "wearing masks is one of the most powerful tools to thwart the transmission of COVID-19 in indoor settings, such as schools. Thus, the Court concludes allowing school districts, at their discretion, to require face coverings is a reasonable modification, as the benefits of masking significantly exceed the costs." *Id.* Because the state statute inhibited such masking, a likelihood of success of an ADA violation was shown. *Id*. at *20.

The *universal* masking section of the statute—"all persons on school property to wear a face covering"—is found at Tenn. Code Ann. §14-2-104(a)(1). This section achieves the same practical result as Iowa and South Carolina by denying universal masking until "severe conditions" exist. *Id*. at §104(a)(2). At that point, it is entirely too late.

Severe conditions require both a state of emergency and "1,000 new infections per 100,000 residents," *Id*. at §14-1-101(20)(A), (B). This is not a preventive measure *at all*, but rather a calamity where hospitals would be overwhelmed, schools could not be staffed, students are drowning, and persons must by that time "just leave the room, close the school, and stay out." (Yaun Tr. p. 837; Hijano Tr. p. 889).

Absent school districts having the ability to universally mask before the crisis point, at-risk children are placed in grave danger. They cannot even request universal masking. The state has taken away the interactive process for that accommodation, substituting an arbitrary and dangerous "severe condition" set-point. Not even the Defendants have made any effort to legitimate these metrics as being safe or scientific. Because they cannot. Figuratively, the students would be drowning or the house would be engulfed in flames. (Hijano Tr. pp. 889-90; Ker Tr. p. 942).

To answer the Court's second, and related, query of "does the Covid Act [the state law] *discriminate* against the Plaintiffs as provided in 504 and ADA," the answer is yes. (Court, Tr. p. 970). These children *require* reasonable accommodations to avoid greater illness or death. They cannot receive them under the state law. As a result, it is simply "not safe for vulnerable kids to go to school." (Hijano Tr. p. 891). Universal masking is "completely ineffective at that point." (Ker Tr. p. 942). Indeed, Williamson County Schools and the Franklin Special School District pleaded with the State that they were at a "crisis" breaking point to keep their schools open and children safe when they reached 837 cases per 100,000 on August 24, 2021. (See Ex. 1, Yaun Decl., fn. 10; Ex. 12, WCS letter; Ex. 13, FSSD letter).

*Before* the children figuratively drown, or the schoolhouse is figuratively torched, the Defendants argue that Tenn. Code Ann. §14-2-104(d)(2) provides for a reasonable accommodation of masking for students with disabilities if requested, and *if* it is approved. (D.E. 23, Response, p. 6). To be clear, this is not *universal* masking but a state created "accommodation." Under this "accommodation," school districts cannot require or enforce any masking until fifteen minutes expire. and then, only within a six-foot zone-of-proximity to the person requesting the accommodation. *Id*. at §14-2-104(d)(2). Because COVID is airborne, its transmissibility exceeds

six feet; and it takes much less than fifteen minutes to spread. (Yaun Tr. p. 833; Hijano Tr. pp. 877-79; Ker Tr. p. 940).

This is completely unacceptable for at risk children with disabilities. (Ker Tr. p. 941). Moreover, for persons under 12 years of age, only N95 masks may be worn. §14-2-104(d)(2)(A). As Metro Nashville's procurement director attests, it would not be possible to even *obtain* such N95 masks for students and it would be prohibitively expensive. (Ex. 28, Gossage Decl, ¶¶ 5-6).

There is an additional reason the state law *discriminates* by posing increased dangers to the Plaintiffs. The COVID-positive children cannot be quarantined. Tenn. Code Ann §14-4-101(b) ("school does not have the authority to quarantine a person or private business for purposes of COVID-19."). Not even the Iowa and South Carolina laws precluded school districts from isolating and quarantining COVID-positive students and those with whom they had close contact. This prohibition defeats the other accommodations by creating increased risk of COVID-positive teachers, staff and students walking around. (Hijano Tr. pp. 883-84). Contact tracing is necessary to contain the outbreak. (*Id.* at p. 885). In Tennessee, as a result of this statute, the local school nurse can send children home for diarrhea or pinkeye, *but not for COVID.*

Denial of reasonable quarantines make the schoolhouse unsafe for Plaintiffs. A District Court in Colorado found that quarantines are a "must": "Defendants hardly address the issue of the Public Health Order's limitation on quarantine protocols. There is no dispute that the medical consensus is that reasonable quarantines must be required." *Douglas Cty. Sch. Dist. Re-1 v. Douglas Cty. Health Dep't*, 2021 U.S. Dist. LEXIS 213975, at *12 (D. Colo. Oct. 26, 2021).

In addition to the substantive barriers, there are a series of technical barriers in §14-2-104(d) that obstruct the ADA and Section 504.

(d) Notwithstanding subsection (a):

> (1) A school shall, *to the extent practicable*, provide a reasonable accommodation pursuant to the Americans with Disabilities Act (42 U.S.C. 1201 et. seq.) to a person who provides a *written request* for a reasonable accommodation to the principal or president of the school. If the person requesting a reasonable accommodation under this subsection (d) is a minor, then the person's parent or legal guardian must provide the written request on the *minor's behalf*.

T.C.A. § 14-2-104(d).

First, "to the extent practicable" is a lesser standard than the ADA's standard of fundamental alteration. 28 C.F.R. §35.130(b)(7). In *RK I*, the correct standard was applied: "There is no persuasive or credible evidence that universal masking would fundamentally alter school programs. The proper inquiry here is whether the existing reasonable accommodations are effective without masking. In this Court's judgment, they are not." *R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *45 (M.D. Tenn. Oct. 22, 2021).

Second, "[r]equests for reasonable accommodation may be oral or written and do not have to be made explicitly." *Rosenfeld v. Canon Bus. Sols., Inc.*, 2011 U.S. Dist. LEXIS 115415, at *39 (D.N.J. Sep. 26, 2011).

Third, children with disabilities may self-advocate their needs to school personnel; alternatively, school personnel may, under the ADA, make requests for reasonable accommodations for students they see in need. Creating procedural obstacles to a federal statute is impermissible. *Felder v. Casey*, 487 U.S. 131 (1988).

Finally, the new law creates a private right of action: a personal "injury," with compensatory damages and attorneys' fees, for persons who violate the face covering requirements in Chapter 2. Tenn. Code Ann. §14-6-103. There *is* no personal injury from donning a mask. (Ex. 17, Augustyn Decl., ¶¶10-12; Ex. 1, Yaun Decl., ¶ 21). Asking for a COVID- accommodation orally, or to the wrong person, or without a parent, or with cloth instead of N95, or in circumstances that are "impractical" but not a "fundamental alteration," among all of the other tripwires, may

result in a lawsuit for injunction, damages, and attorneys' fees. This clearly dissuades a reasonable person from even seeking an accommodation in the first instance. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013).

## B.    ARPA

In addition to the ADA and Section 504, Plaintiffs contend the state statute clearly violates Section 2001(i) of the American Rescue Plan Act of 2021 (ARPA). Pub. L. No. 117-2, §20001(i), 135 Stat. 4, 23 (2021). Under §2001(i), all of the local school districts in Tennessee have been allocated billions in Elementary and Secondary School Emergency Relief (ESSER) funding to adopt safe return to in-person learning in the pandemic. *Id*.

Section 2001(e)(2)(Q) expressly gives local school districts the authority to use these ARPA ESSER funds for "[d]eveloping strategies and implementing public health protocols including, **to the greatest extent practicable**, policies in line with guidance from the Centers for Disease Control and Prevention for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." *Id*. §2001(e)(2)(Q), 135 Stat. 21 (emphasis added).[13]

Districts must describe their plans including mitigation strategies identified in the CDC guidance, and "particularly those students disproportionately impacted by the COVID-19

---

[13]    The CDC Guidance, of course, specifically recommends universal indoor masking in schools. Similarly, interim final requirements from the U.S. Department of Education require each local school district to adopt a plan for safe return to in-person instruction that describes "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC …," including specifically "[u]niversal and correct wearing of masks." See Am. Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21,195, 21,200-01 (April 22, 2021). Likewise, TDOE's own guidance updated just two months ago in September 2021, expressly states that universal masking is the most effective mitigation strategy for returning and keeping children in in-person learning environments. (Ex. 9).

pandemic, including . . . children with disabilities." *Id.* at 21,201. Plaintiffs have submitted Tennessee's plan signed by Penny Schwinn, with Eve Carney as the contact, which, at pages 17 and 22, address "Universal and correct wearing of masks" per CDC guidance and compliance with section 2001(i) of ARPA. (Ex. 10, State Plan for ARPA-ESSER).

Plaintiffs' Complaint alleges that the state law is preempted by the Supremacy Clause and the American Rescue Plan. (D.E. 1, Complaint, ¶¶ 130-132). In *E.T. v. Morath*, 2021 U.S. Dist. LEXIS 220476 (W.D. Tex. Sep. 29, 2021), the Plaintiffs argued that a state law prohibiting *the school districts'* ability to address "universal and correct wearing of masks" conflicts with ARPA because the local school districts enjoyed that authority alone. The District Court agreed: "It cannot be more clear that Congress intends that the local school district receiving ARP Act funds be the ultimate decider of the requirements of the safe return to in-person instruction of students within that district." *Id.* at *32.

Tennessee, too, has prevented *local school districts* from quarantining infected individuals. And it has prevented local school district from implementing universal masking. That command emanates from the Governor declaring a state of emergency and only under apocalyptically "*serious conditions*" created by the state legislature. This stands in contradiction to the conditions of ARPA funds, while clearly frustrating local school district's abilities to make their own decisions about use of such funds for masking, contact tracing, or other remedial measures that an individual *school district* has the sole authority to decide. If Tennessee wanted to preclude decision-making about COVID-accommodations at the school district level, it should have declined the billions of dollars of funding it took.

Under the new Tennessee statute, even if a school district *could* determine that universal masking is necessary for safety of students within a particular school, they "shall not use state

funds" and, if they do, "the commissioner of education may withhold future distributions of school funds...." Tenn. Code Ann. §14-2-104(e). For example, if a school district wanted to purchase masks and be reimbursed through ARPA funds, it could not do so. (Ex. 19, Decl. of Alyson Lerma, Ed.D). Districts must first make the purchases *with the state funds* that it is precluded from using in order to obtain reimbursement through ARPA funds. (*Id.*)

Defendants have submitted no evidence to suggest otherwise; in fact, their evidence supports Plaintiffs' position. Specifically, Defendants admit that the Tennessee Department of Education considered the fiscal impact of the new state law on ARPA ESSER funds. (Defs' Ex. 2, Carney Declaration, ¶18). According to Carney, it recognized a "potential risk of federal funding implications," but it "cannot speculate" about what will happen. (*Id.* at ¶ 19). If this were an artful dodge, Liz Alvey, the Governor's counsel, was more direct in advising legislative members immediately before the bill's passage that the "Proposed ADA accommodation in the bill is a violation of the ADA and will put us at risk of losing federal funding." (D.E. 37-1, Alvey Email). Moreover, in a letter directed to Governor Lee and Commissioner Schwinn on August 18, 2021, the U.S. Department of Education warned Tennessee that even the Governor's prior Executive Order 84 permitting opt-outs to local school district's universal masking policies was placing Tennessee's ARPA ESSER funds at risk stating:

> This State level action against science-based strategies for preventing the spread of COVID-19 appears to restrict the development of local health and safety policies and is at odds with the school district planning process embodied in the U.S. Department of Education's (Department's) interim final requirements. As you know, the American Rescue Plan Act of 2021 (ARP Act) requires each LEA that receives Elementary and Secondary School Emergency Relief (ARP ESSER) funds to adopt a plan for the safe return to in-person instruction and continuity of services. (See section 2001(i).) The Department's interim final requirements clarify that such plan "must describe…how [the LEA] will maintain the health and safety of students, educators, and other staff and the extent to which it has adopted policies, and a description of any such policies, on each of the following safety

recommendations established by the CDC…" The safety recommendations include "universal and correct wearing of masks."

(Ex. 8, Letter from USDOE Aug. 18, 2021).

This is not "speculation," but simply applying the facts to the law. Tennessee took the billions of dollars in federal ARPA and ESSER funding, promised to afford local school districts the ability to create mitigation strategies in line with current CDC guidance, particularly for at risk children with disabilities, and then the State legislature stripped local school districts of that authority. ARPA and the Supremacy Clause clearly preempt the state law.

## VI.    IRREPARABLE HARM

In addition to likelihood of success, Plaintiffs must show irreparable harm absent an injunction. *R.K. v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *49 (M.D. Tenn. Oct. 22, 2021). A state law that clamps down on universal masking, quarantining, and isolation substantially increases the Plaintiffs' children's risk of contracting COVID. For them, that means an aggravated and severe illness or possibly even death. As a result, in-person learning at schools is available only under dangerous conditions to children with these disabilities. That is "irreparable harm," and the case law bears this out.

In *RK I*, irreparable harm existed absent enjoining Executive Order No. 84 because Plaintiffs "would remain at an increased exposure to severe illness—and possibly death—merely by accessing educational opportunities in their respective school buildings." *Id*. The students were "being irreparably harmed because of the lack of a universal mask mandate." *Id*. at *51.

Similarly, in this state-wide case, Tennessee has the second highest rate of COVID. Again, for these Plaintiffs, the risk of even contracting COVID is an irreparable harm. They may not be able to successfully fight it off. See *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *21-23 (D.S.C. Sep. 28, 2021) ("the risk of the minor plaintiffs just

28

contracting COVID-19 constitutes irreparable harm."); *The Arc of Iowa*, 2021 U.S. Dist. LEXIS 172685 ("Because [the disabled] Plaintiffs have shown that [Iowa's] ban on mask mandates in schools substantially increases their risk of contracting the virus that causes COVID-19[,] and that due to their various medical conditions they are at an increased risk of severe illness or death, Plaintiffs have demonstrated that an irreparable harm exists."); *G.S.*, 2021 U.S. Dist. LEXIS 168479 ("Plaintiffs have satisfied their burden of showing that irreparable harm" because "[w]ithout the ability to implement a universal mask mandate, Plaintiffs will continue to be exposed to an increased risk of infection, hospitalization, or death because of COVID-19, or they will be forced to stay home and denied the benefits of an in-person public education.'").

## VII.    EQUITIES AND PUBLIC INTEREST FACTORS FAVOR PLAINTIFFS

"When the defendants are governmental entities, the equities and public interest analyses merge[.]" *Nken v. Holder*, 556 U.S. 418, 435 (2009); *RK,* 2021 U.S District at 204078, *52.

The public has an interest in protecting public health. *G.S.*, 2021 U.S. Dist. LEXIS 168479 at *26 (citing *Neinast*, 346 F.3d 585, 594 (6th Cir. 2003). Enforcement of the ADA is also in the public interest. *Id*. (citing *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2008)). And as this Court found in *RK I*, before the passage of the state law at issue, "the school systems have statutory authority to impose temporary universal mask mandates to protect their constituencies and to support public health." *RK v. Lee*, 2021 U.S. Dist. LEXIS 204078, at *52.

But not anymore. The Governor and the legislature have upended that authority, putting the health of students at risk.  As Dr. Battle of Metro Nashville puts it, the "provisions adopted by HB9077/SB9014 risk the health and safety of students, particularly those who are immunocompromised, by preventing the district from adopting policies based on scientific healthcare guidance." (Ex. 14).  "MNPS would prefer to be able to make decisions that keep

29

students safe—especially those with disabilities that make them more medically vulnerable to COVID-19—without risking state funding for doing so." (*Id.*).

Plaintiffs respectfully disagree that the legislature was acting in furtherance of *health and safety* in passing T.CA. §14-1-101. Rather, as the "purpose" of the law states, the legislature was attempting to elevate non-existent "liberties" in a fashion to *prevent or obstruct* science-backed health and safety measures. *Id.* at 103. Regardless, where a state statute infringes on federal laws, regardless of the health and safety motivations, the federal laws "win out":

> As noted in the TRO, "[courts] are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers." *Sak v. City of Aurelia*, 832 F. Supp. 2d 1026, 1047 (N.D. Iowa 2011) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996)). But when Congress passes antidiscrimination laws like "the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to [e]nsure that the mandate of federal law is achieved." *Id.* (quoting *Crowder*, 81 F.3d at 1485). In other words, the national public interest in enforcing the ADA wins out over the state's interest in enforcing Iowa Code section 280.31.

*Arc of Iowa v. Reynolds*, 2021 U.S. Dist. LEXIS 197652, at *30-31 (S.D. Iowa Oct. 8, 2021).

The public interest is "served by the enforcement of the ADA." *Wilborn ex rel. Wilborn v. Martin*, 965 F. Supp. 2d 834, 848 (M.D. Tenn. 2013). The public interest requires an injunction to effectuate the ADA's broad "remedial purposes." *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018). The public interest certainly does *not* lie with enforcing laws that obstruct discrimination:

> [T]he public interest does not lie with enforcement of a state law that violates the laws which Congress has passed to prevent discrimination based on disability. Moreover, there is little harm to enjoining Proviso 1.108 and permitting the public-school districts to satisfy their burden to make reasonable modifications under Title II and Section 504.
> Consequently, the Court concludes the balance of equities tips in Plaintiffs' favor and injunctive relief is in the public interest. As this argument is dispositive as to these two factors, the Court need not address the parties' other arguments. As such,

the Court will grant Plaintiffs motions for a temporary restraining order and a preliminary injunction against Governor McMaster and AG Wilson.

*Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *24 (D.S.C. Sep. 28, 2021).

Defendants submitted no testimony or evidence that the stay is causing any administrative burden or cost.  Nor did Defendants submit any evidence from a school district that the stay is causing administrative burden or costs. The Plaintiffs, however, submitted evidence from Metro Nashville showing why the stay is actually *necessary*. (Ex. 14, Decl. of Dr. Adrienne Battle; Ex. 19, Declr. of Dr. Alyson Lerma; Ex. 28, Decl. of Jeff Gossage).

## VIII.  BOND SHOULD NOT BE REQUIRED

Plaintiffs request the Court waive any security bond under Fed. R. Civ. P. 65(c). Defendants have not requested a bond. Indeed, the costs associated with filing an appeal and printing briefs and appendices are minimal.[14]

## IX.    CONCLUSION

This is not a close call.  The General Assembly designed a bill to impede the implementation of the ADA, to obstruct local school districts' decision-making related to health conditions in their communities, to make quarantining and universal masking all-but-impossible, and to enforce these barriers to safe access through funding losses and personal injury actions. Because this is inconsistent with both the ADA and 504, along with the express terms of ARPA,

---

[14]    In addition to *RK I*, bond has not been required in cases involving a state law that encumbers the ADA during the pandemic. "Because the Defendants are in no way harmed by the issuance of injunctive relief, the Court concludes the temporary restraining order and preliminary injunction should issue without bond." *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *26 (D.S.C. Sep. 28, 2021).  "The Court, having considered whether a bond is necessary in this case, concludes that, under the circumstances, it is proper to waive the bond requirement here because of the important public interest in the enforcement of the ADA and the Rehabilitation Act and the minimal potential costs Defendants might incur in appealing the Court's Order. For these reasons, the Court declines to require Plaintiffs to post security in this case." *Arc of Iowa v. Reynolds*, 2021 U.S. Dist. LEXIS 197652, at *37-38 (S.D. Iowa Oct. 8, 2021)

the offending provisions of the state law must be preempted, the authority of the local school districts returned to the status quo, and the Defendants enjoined from enforcing the state law in a manner consistent with the proposed order attached hereto.

"This is not a close call. The General Assembly's COVID measures disallowing school districts from mandating masks, as found in Proviso 1.108, discriminates against children with disabilities. Thus, with this Order, the Court will enjoin its enforcement." *Disability Rights S.C. v. McMaster*, 2021 U.S. Dist. LEXIS 185495, at *32 (D.S.C. Sep. 28, 2021).

Respectfully Submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert_____

Justin S. Gilbert (TN Bar 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
Facsimile: 423.756.2233
justin@schoolandworklaw.com

**DONATI LAW, PLLC**

/s/Bryce W. Ashby
Bryce W. Ashby (TN Bar 26179)
Brice M. Timmons (TN Bar 29582)
Craig A. Edgington (TN Bar 38205)
1545 Union Avenue
Memphis, TN 38104
Phone: 901.278.1004
Fax: 901.278.311
Email:
bryce@donatilaw.com
brice@donatilaw.com
craig@donatilaw.com


&

**THE SALONUS FIRM, PLC**
/s Jessica F. Salonus_____
JESSICA F. SALONUS (TN Bar 28158)
139 Stonebridge Boulevard
Jackson, Tennessee 38305
Telephone: (731) 300-0970
Facsimile: 731.256.5711
jsalonus@salonusfirm.com

***ATTORNEYS FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiffs' Post-Hearing Brief in Support of Motion for Preliminary Injunction was served via email on this the 29th day of November, 2021, on the Office of the Attorney General via ECF filing at the contact information below:

**GOVERNOR BILL LEE**
**COMMISSIONER PENNY SCHWINN**
James R. Newsom (#6683)
Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
Telephone: 615-741-2472
Jim.newsom@ag.tn.gov

*ATTORNEY FOR GOVERNOR BILL LEE AND PENNY SCHWINN,*
*IN THEIR OFFICIAL CAPACITY*

/s Jessica F. Salonus