# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| R.K., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 3:21-cv-00853 |
| | ) | |
| v. | ) | Chief Judge Crenshaw |
| | ) | Magistrate Judge Frensley |
| GOVERNOR BILL LEE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' POST-HEARING BRIEF
## IN OPPOSITION TO PRELIMINARY INJUNCTION

---

Plaintiffs' request for preliminary injunctive relief should be denied. Plaintiffs lack standing because they have not been denied any of the relief they seek from their schools, nor have they shown that such a denial is imminent. An injunction against the Defendants is not likely to redress Plaintiffs' alleged injury: neither the Plaintiffs' principals (who can grant them masking accommodations), nor the Commissioner of Health (who has exclusive authority to issue quarantine guidelines) are party to this suit. Further, Plaintiffs have not established any legal right to COVID relief funds granted to school districts and cannot properly assert third-party standing.

Public Chapter No. 6 (112 General Assembly, Third Extraordinary Session—2021 (the "COVID Act" or "Act") expressly allows Tennessee public schools to implement a community mask mandate in response to a request for a reasonable accommodation pursuant to the Americans with Disabilities Act ("ADA").[1] *See* Tenn. Code Ann. § 14-2-104(d)(1) ("A school shall … provide a reasonable accommodation pursuant to the [ADA]."). Nor does the Act discriminate against Plaintiffs by requiring segregation. Furthermore, the Act authorizes the Commissioner of Health to issue quarantine guidelines under which schools may exclude students from campus. Tenn. Code Ann. § 14-4-101(a). Plaintiffs' hypothetical hindrances to accommodation requests fall far short of demonstrating there is no set of circumstances in which the challenged portions of the Act can be constitutionally applied, which they must to prevail on their facial challenge to the Act. *See Dean v. McWherter*, 70 F.3d 43, 45 (6th Cir. 1995).

Finally, Plaintiffs face no immediate threat of irreparable harm because they may seek and receive their requested accommodations pursuant to the Act. Further, Plaintiffs acknowledge the present trend of decreasing cases and the rapid advancements in treatments for COVID-19.

---

[1] 42 U.S.C. § 12101 *et seq.*

1

Plaintiffs have indicated that the COVID-19 vaccine is the most effective protection against serious illness or death from COVID-19, and all Plaintiffs are now eligible to receive the vaccine.

For these reasons, and for the reasons stated in Defendants' Pre-Hearing Brief in Opposition to Preliminary Injunction, (ECF 23), Defendants respectfully ask the Court to deny the preliminary injunction.

## I.  STATEMENT OF FACTS

### A.  Case Posture

Plaintiffs, eight public school students between the ages of seven and fourteen, maintain that their disabilities place them at heightened risk of severe hospitalization and death from potential COVID-19 infection relative to their peers. (Compl., ECF 1, PageID 6-9.) Plaintiffs assert claims under the ADA, Section 504, the Equal Protection Clause, and the Supremacy Clause. (*Id.*, PageID 29-37.) Defendants are Governor Bill Lee, in his official capacity (the "Governor"), and Commissioner of Education Penny Schwinn, in her official capacity (the "Commissioner"). No local school district or official is a party to this suit.

Plaintiffs brought this facial challenge to portions of the COVID Act within hours of its enactment. (Compl., ECF 1.) Plaintiffs challenge two provisions of the Act, Tenn. Code Ann. § 14-2-104 ("Section 104") and § 14-4-101("Section 101").[2] Plaintiffs contend that the Act prevents them from seeking reasonable accommodations under the ADA and Section 504 of the Rehabilitation Act ("Section 504"). (*Id.*, PageID 29-33.) Plaintiffs do not assert that they have sought and were denied an accommodation due to operation of the COVID Act. (*Id.*) Plaintiffs

---

[2] Plaintiffs' challenge includes the definitional provisions in Tenn. Code Ann. § 14-1-101, as relevant. A copy of the COVID Act is in the Record as Exhibit P-11.

2

further allege that the Act may cause school districts to lose state or federal funds for education and COVID relief. (Pls.' Trial Br., ECF 27, PageID 200-05.)

B. The COVID Act

The Tennessee General Assembly recently passed the COVID Act, and the Governor signed it into law. (COVID Act, Exh. P-11, ECF 31-1, PageID 622-633.) The Act regulates health and safety practices related to the COVID-19 pandemic. The Act's stated purpose is to "assist[] the citizens of [Tennessee] in the enforcement and protection of their rights and create[] a safe harbor for those desiring to avoid litigation." Tenn. Code Ann. § 14-1-102(1). The Act creates uniform state standards with respect to COVID-19 countermeasures, including vaccination and face coverings (or masks). *Id.*, § 14-2-101 through 14-2-104. The Act also creates health care standards regarding quarantines, monoclonal antibodies, and informed consent. *Id.*, § 14-4-101 through § 14-4-103.

1. Section 14-2-104 (Mask Mandates and Funding)

Section 104 generally regulates when schools or their governing bodies may require a person to wear a face covering while on school property. *Id.*, § 14-2-104(a). The Act provides that a school may mandate mask wearing: (1) if "severe conditions exist"[3] or (2) to "provide a reasonable accommodation pursuant to the [ADA]." *Id.*, § 14-2-104 (a, d). The Act prohibits the use of state funds to require a mask mandate "in violation of this section," i.e., outside of the ADA or severe conditions carveouts. *Id.*, § 14-2-101(e). When severe conditions exist, a school may adopt a mask mandate by submitting a written request to the school's governing body. *Id.*, § 14-

---

[3] Pursuant to the Act, "severe conditions" exist when the "governor has declared a state of emergency for COVID-19" and a "county has an average rolling fourteen-day COVID-19 infection rate of at least one thousand (1,000) new known infections for every hundred thousand (100,000) residents of the county." *Id.*, § 14-1-101(20).

3

2-104(a)(1). A mandate authorized by Section 104(a) is limited to a fourteen-day period but may be renewed if severe conditions continue to exist. *Id*., § 14-2-104(a)(3), 104(b). During such mandate, the school must provide an N95 or equivalent mask for all persons twelve or older and an "age-appropriate" mask for younger children. *Id*., § 14-2-104(a)(4-5).

In response to "a written request for a reasonable accommodation to the principal or president of the school," schools are authorized under the Act to implement a mask mandate as a reasonable accommodation under the ADA. *Id*., § 14-2-104(d)(1). If the request involves a minor, the minor's "parent or legal guardian" must submit the request on the minor's behalf. *Id*. A school's principal or president evaluates the accommodation request, and any decision denying the accommodation must be put in writing along with the grounds for denial. *Id*., § 14-2-104(d)(2).

When a principal approves a request for a masking accommodation, the school must provide an "in-person educational setting in which other persons who may place or otherwise locate themselves within six feet (6') of the person receiving the reasonable accommodation for longer than fifteen (15) minutes are wearing a face covering." *Id*. Pursuant to this accommodation, a school must provide N95 or equivalent masks for persons twelve and over who are within the defined proximity to the accommodated person, and an age-appropriate mask for persons under twelve who within such proximity. *Id*., § 14-2-104(d)(2)(A-B). The Act does not prohibit a school from taking additional masking measures or implementing specific social distancing measures as part of an ADA accommodation.

2. Section 14-4-101 (Quarantines)

Section 101 gives the Tennessee Commissioner of Health "the sole authority to determine quarantine guidelines for … [a] person if the person tests positive for COVID-19." *Id*., § 14-4-101(a)(1). In relevant part, "Quarantine" is defined as the temporary "limitation or restriction of

4

a person's freedom of movement or isolation of a person, or preventing or restricting access to premises upon which the person or the cause or source of COVID-19 may be found." *Id.*, § 14-1-101(17). The Commissioner of Health must promulgate quarantine guidelines pursuant to the Uniform Administrative Procedure Act. *Id.*, § 14-4-101(c). The Act does not authorize a "local health entity or official, mayor, governmental entity, or school … to quarantine a person or private business for purposes of COVID-19," but does not say such entities cannot enforce a quarantine issued pursuant to the Commissioner of Health's guidelines. *Id.*, § 14-4-101(b). Local education agencies are not governmental entities as defined by the Act. *Id.*, § 14-1-101(8)(B).

C. <u>COVID-19</u>

COVID-19 is a highly infectious respiratory disease that is primarily transmitted through infected droplets and aerosols that are exhaled in an infected person's breath. (Hr'g Tr., ECF 35, PageID 872, 922, 941.) Droplets generally fall quickly and within 6 feet of the infected individual; aerosolized particles may travel further and hang in the air longer. (*Id.*, PageID 872.)

Children are less susceptible to severe consequences from COVID-19 than adults. (Yaun Decl., Exh. P-1, ECF 27-2, PageID 247.) More than 6.5 million children in the United States have been diagnosed with COVID-19 since March 2020. (Hr'g Tr., ECF 35, PageID 873, 915.) But because COVID-19 is mostly asymptomatic or mildly symptomatic in children, the CDC estimates that as many as 27 million children in the United States have been infected with COVID-19. (*Id.*) Fewer than 1 percent of confirmed cases of COVID-19 in children result in hospitalization, and fewer than .05% of cases result in death. (*Id.*, PageID 916.)

There is currently a "trend of decreasing [COVID-19] cases," even accounting for "signs of an uptick." (Hijano Decl., Ex. P-5, ECF 27-1, PageID 211.) The number of cases has dropped

5

statewide.[4]  Notably, Dr. Ker indicated that the levels of COVID infection in Williamson County Schools were not significant on October 1, 2021, when there were 113 students with confirmed cases in Williamson County Schools. (Ker Dep., Exh. D-3, ECF 30, PageID 510; Williamson County Schools Dashboard, Exh. D-4, PageID 517.)  On November 16, three days before the preliminary injunction hearing, the number of confirmed positive cases was down to 60.  (Exh. D-4; PageID 521.)

   D. COVID-19 Mitigation

   No current mitigation measure or combination of measures can eliminate the risk of COVID-19 infection in schools.  (Id., PageID 875.)  But some measures, including washing hands, cleaning surfaces, and installing new air filters, can help mitigate the risk of transmission.  (Compl., ECF 1, PageID 10.)  Other practices include vaccination, mask wearing, and isolating COVID-19 positive children, these are discussed below.

      1.  Availability of Vaccines and Treatments

   Since March 2020, there have been considerable medical advancements to prevent severe outcomes from COVID-19.  (Hr'g Tr., ECF 35, PageID 943-44.)  Most notable is the development and increased availability of vaccines.  In October 2021, the U.S. Food and Drug Administration ("FDA") authorized use of the Pfizer-BioNTech COVID-19 vaccine for children 5 through 11 years of age.  (Exh. D-5, ECF 30-2, PageID 526.)  FDA studies found the Pfizer-BioNTech

---

[4] (Dunn Decl., Exh. D-1, ECF 29-1, PageID 400.)  In counties where Plaintiffs reside, during the seven-day period from November 9 through 15, 2021, Knox County had a daily case rate of 15.5 new cases per 100,000 residents (Id., ECF 29-2, PageID 450); Shelby County had a daily case rate of 13.4 new cases per 100,000 residents (id., PageID 482); and Williamson County had a daily case rate of 18.2 new cases per 100,000 residents. (Id., PageID 497.)  For perspective, from September 5 through 11, 2021, the daily new case rate in Knox County was 695.3 per 100,000 residents (id., PageID 450); in Shelby County of  849.1 per 100,000 residents (id., PageID 482); and in Williamson County of 238.7 per 100,000 residents. (Id., PageID 497).

6

COVID-19 vaccine to be 90.7% effective in preventing COVID-19 infection in children 5 through 11. (*Id*.) All Plaintiffs are now eligible for vaccination. Vaccination is the most effective method of preventing severe disease and death from COVID-19. (Hr'g Tr., ECF 35, PageID 839 (Dr. Yuan); 884 (Dr. Hijano); 945 (Dr. Ker).) Vaccinated persons are less likely to be infected by COVID-19. (*Id*., PageID 884.)

Additionally, treatments for those with unusually severe cases of COVID-19 are increasingly available. Monoclonal antibodies are shown to be effective in preventing severe disease from COVID-19 infection. (*Id*., PageID 916.) Oral antiviral medications have been developed by Merck and Pfizer and prepurchased by the United States government and are awaiting FDA approval. (*Id*., PageID 917, 945.) These medications offer a promising alternative intervention to prevent hospitalization and death in those who experience COVID-19.

2. Masking

Masking is a frequently recommended mitigation measure. However, masks are not 100% effective in preventing COVID-19 transmission, and not all masks are equivalent. (*Id*. PageID 875, 901.) Dr. Hijano testified, "we know that there are some masks that are inadequate." (*Id*., PageID 901.) The "most important study" on the impact of masking to prevent COVID-19 transmission is a recent randomized and controlled study performed in Bangladesh. (Ex. C to Hijano Decl., Exh. P-4, ECF 31-1, PageID 666.) Dr. Hijano acknowledged that this study could not rule out the possibility that cloth masks have zero or small impact on symptomatic SARS-COV-2 infections. (Hr'g Tr., ECF 35, PageID 905.) He further acknowledged that cloth masks are "not particularly effective" in preventing the release of aerosolized COVID-19 particles. (*Id*., PageID 902.) The Bangladesh study found that even the wearing of surgical masks, which are more protective than cloth masks, led to no statistically significant reduction in transmission for

7

persons below fifty years old. (*Id.*, PageID 905.) N95 masks, like those that the Act requires schools to provide to certain students, are the most effective, widely available masks for reducing the transmission of COVID-19. (*Id.*, PageID 902.)

Notably, even if masking is mandated at Plaintiffs' schools, Plaintiffs will still be exposed to unmasked children. Dr. Ker testified that she allows her daughter to eat in the school lunchroom. (*Id.*, PageID 950-951.) At lunch, neither her daughter nor those in her close proximity wear a mask. (*Id.*) These exposures could lead to COVID transmission in fifteen or fewer minutes. (*Id.*, PageID 834 (Dr. Yuan); 878 (Dr. Hijano).)

    3. Quarantines

Plaintiffs state that quarantining is "the most basic accommodation of all." (Pls.' Trial Br., ECF 27, PageID 190.) Plaintiffs assert that "[a]llowing individuals with COVID-19 in schools will 'undoubtedly lead to large outbreaks necessitating classrooms or school closures.'" (*Id.*, PageID 191); Hijano Decl., Exh. P-5, ECF 27-1, PageID 213.)

Regarding quarantines before the COVID Act, Dr. Hijano testified that in his experience typically only health departments have issued quarantine orders. (Hr'g Tr., ECF 35, PageID 928.) This is consistent with pre-COVID law that gives the Commissioner of Health authority to issue quarantine orders. Tenn. Code Ann. § 68-1-201. Dr. Hijano explained that schools work in conjunction with the health department to exclude COVID-19 positive children, and healthcare providers typically only recommend isolation or quarantine in accordance with health department guidelines. (Hr'g Tr., ECF 35, PageID 928.) The declaration of Valerie Nagoshiner, the Chief of Staff at Tennessee's Department of Health shows that the Health Department is currently promulgating emergency rules that will "set forth a process by which a person with a positive

8

COVID-19 diagnosis shall be excluded from school property, including but not limited to busses, and school events." (Nagoshiner Decl., ECF 39, PageID 988.)

The Act does not speak directly to contact tracing. Regarding contact tracing, Dr. Hijano testified that "everything starts with a positive case." (Hr'g Tr., ECF 35, PageID 932.) The information needed to perform contact tracing generates from positive cases identified before any quarantines. (*Id*., PageID 931.) Dr. Hijano further testified that he has not had problems with families refusing to isolate based on contact tracing investigations. (*Id*., PageID 930.)

E. Funding

The American Rescue Plan Act of 2021 ("ARPA") awarded a third round of Elementary and Secondary School Emergency Relief ("ESSER") funding to State educational agencies. (Carney Decl., Exh. D-2, ECF 28, PageID 382.) TDOE received approximately $2 billion in this round of funding ("ESSER 3.0"), 90% of which is allocated to school districts. (*Id.*, PageID 383.)

Pursuant to ARPA, school districts receiving an ESSER 3.0 allocation musty use the funds on a limited set of approved uses and they must also develop plans for the safe return to in-person instruction. (*Id.*, PageID 383-384.) But ARPA does not require school districts to include in their plans any particular COVID-19 safety measures. (*Id.*, PageID 384); American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 FR 21195-01, 21198, 2021 WL 1561821 (Apr. 22, 2021). Since COVID-19 related knowledge, circumstances, and needs are evolving, school districts must review and revise their plans at least every six months. (Carney Decl., Exh. D-2, ECF 28, PageID 384.) Similarly, ARPA does not require that TDOE or State educational agencies adopt certain COVID-19 safety measures, instead it directs State educational agencies to detail how they will support local school districts in safely operating schools and maximizing in-person instruction. (Exh. P-10, ECF 27-6, PageID 330-332.)

9

Relevant to this litigation, many Tennessee school districts have received millions of dollars in ESSER 3.0 allocations to help develop COVID-19 safety strategies: Metro Nashville Public Schools ("MNPS") has received more than $267 million (Exh. D-2, ECF 28-1, PageID 387); Shelby County has received more than $503 million (*id*., PageID 389); Knox County has received more than $114 million (*id*., PageID 388); Williamson County Schools has received more than $5 million (*id.*, PageID 390); and Franklin Special School District has received more than $2.9 million (*id*., PageID 387). Plaintiffs have submitted declarations from MNPS officials indicating that N95 masks may be expensive to obtain, but do not offer testimony as to how the $267 million ESSER 3.0 allocation to MNPS precludes purchase of N95 masks. (*See* Battle Decl., Exh. P-20, ECF 27-4, PageID 264; Gossage Decl., Exh. P-28, ECF-27-9, PageID 378.) Nor do the officials set out a factual predicate for their claim that the Act would necessitate MNPS to purchase of 60,000 N95 masks daily. (*See* Gossage Decl., Exh. P-28, ECF-27-9, PageID 379.)

## II.     LEGAL STANDARD

### A.  Facial Challenge Standard

Plaintiffs mount a facial challenge to the validity of the Act. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt.*, 550 U.S. 330, 342 (2007). The Supreme Court has also stated plainly that, notwithstanding an apparent conflict, it will presume that federal laws do not preempt exercises of traditional state and local police powers under the Constitution's Supremacy Clause "unless that was the clear and manifest purpose

of Congress." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

B. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy" that should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (internal quotation marks omitted). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks omitted).

A district court should consider four factors to determine whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Wilson v. Williams*, 961 F.3d 829, 836 (6th Cir. 2020) (internal quotation marks omitted). In addition to demonstrating a likelihood of success on their substantive claims, a plaintiff must also establish a likelihood of success of establishing jurisdiction. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018).

III. **ARGUMENT**

A. Jurisdiction

1. Standing

A plaintiff must have standing "for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable

11

by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 149 (2010)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). To confer standing, an injury must be actual or imminent. "Imminent injury" requires more than "a realistic threat [of] harm in the reasonably near future." *Summers v. Earth Island Inst.*, 555 U.S. 488, 500 (2009).

None of Plaintiffs' challenges to the Act stem from an actual or imminent injury to Plaintiffs. Plaintiffs assert that: (1) Section 104 prevents them from receiving a reasonable accommodation of universal masking under the ADA; (2) Section 101 prevents them from receiving an accommodation of separation from persons with COVID-19; (3) the Act puts federal or state funding for local school districts at risk; (4) the Act violates Plaintiffs' rights under the Equal Protection Clause; and (5) the Act violates Plaintiffs' rights under the Supremacy Clause.

First, Plaintiffs have not shown actual injury or imminent injury from Section 104 because they do not allege that they were denied an accommodation pursuant to the Act and nothing in the Act precludes or hinders Plaintiffs from requesting and receiving masking as a reasonable accommodation on the basis of their disabilities. *See* pp. 19-21, *infra*.

Plaintiffs complain that the Act requires a written request from a parent or guardian, which they speculate could interfere with some hypothesized student's ability to obtain an accommodation. But Plaintiffs have not asserted that they intend to make an oral request for accommodation or that such a request would necessarily be denied by their schools, and all Plaintiffs to this suit are represented by parents or legal guardians. Similarly, no Plaintiff has shown that he or she is an emancipated minor. Thus, any requirement that an accommodation request be made by a minor's parent or guardian does not impair any Plaintiff. *See Spokeo*, 578

U.S. at 339 ("We have made it clear time and time again that an injury in fact must be both concrete and particularized.").

Plaintiffs also seek to manufacture tension between the Act and the ADA by suggesting that a request for a masking accommodation would be "reasonable" under the ADA but not "practicable" pursuant to the COVID Act. (*See* Pls.' Trial Br., ECF 27, PageID 196.) As discussed below, the Court should read these terms to be coextensive, but regardless, Plaintiffs have not established that *their* principals are likely to see daylight between these terms.

Plaintiffs also claim the Act contemplates segregation of disabled students, but no Plaintiff has asserted that they have been segregated by the Act, nor have they shown that they are likely to be segregated from non-disabled students. As discussed below, the Act does not contemplate or require segregation. For these reasons, the Plaintiffs have not shown any actual or imminent injury from Section 104.

Second, Plaintiffs have not shown actual or imminent injury from Section 101. There is no actual injury because no Plaintiff has identified a person who was not properly quarantined because of the Act. There is no imminent injury from Section 101 because Plaintiffs have not shown (1) that a need for quarantine at their school is imminent, or (2) that the Act precludes any required quarantine. The Act merely vests exclusive authority to quarantine COVID-positive students in the Commissioner of Health, who traditionally holds quarantine authority.[5]

---

[5] The Commissioner of Health's quarantine authority is more than sufficient to promote compliance. Tennessee law makes it a Class B misdemeanor to disregard or escape from a quarantine order. *See* Tenn. Code Ann. § 68-1-203 ("Any person who willfully disregards or evades quarantine, or violates any rule or regulation made in attempting to prevent the spread of any epidemic disease, commits a Class B misdemeanor."); Tenn. Code Ann. § 68-5-104(b) ("Any person isolated or quarantined in accordance with any statute or rule or regulation promulgated and published in accordance with statutes relating to isolation or quarantine, who willfully escapes from such isolation or quarantine, commits a Class B misdemeanor.").

Third, Plaintiffs do not assert that their school districts have lost any federal or state funds because of the Act or that any such loss of funding is imminent. Even if such loss of funding were imminent, there is no injury to *Plaintiffs*, because, at best, Plaintiffs' school districts, not Plaintiffs, have a legal claim to these funds. As discussed below, the Act merely vests the exclusive authority to quarantine COVID-positive students in the Commissioner of Health, who has traditionally held quarantine authority. Tenn. Code Ann. § 68-1-201.

Further, Plaintiffs lack third-party standing to assert that Section 104(d) violates ARPA. To have third-party standing, Plaintiffs must demonstrate that they have "a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interest." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). ARPA tasks the Secretary of Education with granting States funds for them to allocate to their local education agencies to combat learning loss and to reopen and maintain operation of school facilities. *See* Pub. L. 117-2, 135 Stat. 4, § 2001(a)-(e). Plaintiffs are not recipients of ESSER 3.0 funds and have not demonstrated that their school districts face a "hindrance" to enforcing any rights they might have under ARPA. *See Kowalski*, 543 U.S. at 130; *see also Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208-09 (6th Cir. 2011).

Fourth, Plaintiffs have not shown an injury under the Equal Protection Clause. The Equal Protection Clause "prevents states from making distinctions that (1) burden a fundamental right, (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without a rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Public education is not a fundamental right for purposes of a Fourteenth Amendment challenge. *See Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000). Disability status does not create a suspect class or quasi-suspect class for an Equal Protection analysis. *See S.S. v. E. Kent. Univ.*, 532 F.3d 445, 457

(6th Cir. 2008); *Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000). Therefore, Plaintiffs' equal protection challenge can only succeed if they establish that the Act makes a distinction between them and others without a rational basis.

The only distinction the Act makes with respect to Plaintiffs is indirectly, through the ADA. However, the Plaintiffs have no redressable injury because the Act's distinction allows Plaintiffs to request ADA accommodations, which Plaintiffs claim they seek to do. Plaintiffs have not shown or pleaded any injury resulting from this distinction in the Act.

Finally, Plaintiffs have no injury under the Supremacy Clause because the Supremacy Clause "is not the source of any federal rights and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324-25 (2015) (cleaned up). Because the Supremacy Clause does not provide Plaintiffs with an independent right, their claimed injury cannot be rooted in its purported violation. Relatedly, ARPA does not contain any rights creating language, therefore Plaintiffs' have no injury resulting from ARPA. (*See* Defs.' Pre-Hr'g Br., ECF 23, PageID 160.)

Additionally, an injunction against Defendants would not provide Plaintiffs with legal redress. An injury is redressable if a court order can provide "substantial and meaningful relief." *Larson v. Valente*, 456 U.S. 228, 243 (1982). Since neither Defendant has authority by virtue of their office to provide Plaintiffs with a masking accommodation or to issue a quarantine, preliminarily enjoining Defendants would not provide Plaintiffs the relief they seek. *See Okpalobi v. Foster*, 244 F.3d 405, 426-27 (5th Cir. 2001) (finding no redressability when the state officer defendants had no authority to enforce the challenged statute). Because Defendants cannot provide the masking or quarantine accommodations Plaintiffs seek, any injunction would amount to an advisory opinion on whether the Act violates federal law. Article III's "'case or controversy'

15

requirement prohibits all advisory opinions." *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011). Plaintiffs therefore lack the requisite injury and redressability elements for standing, and the Court lacks jurisdiction over this matter.

2. Sovereign immunity

Defendants, as State officials sued in their official capacities, have sovereign immunity from Plaintiffs' ADA and 42 U.S.C. § 1983 claims. "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). "Sovereign immunity protects states, as well as state officials sued in their official capacity for money damages, from suit in federal court." *Boler v. Earley*, 865 F.3d 391, 409-10 (6th Cir. 2017). "There are three exceptions to sovereign immunity: (1) when the State has consented to the suit; (2) when the *Ex parte Young*, 209 U.S. 123 (1908), exception applies; and (3) when Congress has properly abrogated a State's immunity." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008).

No exception overcomes Defendants' sovereign immunity. The State of Tennessee has not consented to suits brought in federal court. *See S & M Brands*, 527 F.3d at 507. Nor has Congress abrogated Defendants' sovereign immunity for ADA claims sounding in equal protection. *Popovich v. Cuyahoga Cnty. Court of Common Pleas, Domestic Relations Div.*, 276 F.3d 808, 812 (6th Cir. 2002) ("[C]ongressional authority under section 5 [of the Fourteenth Amendment] to enforce the Equal Protection Clause is limited and will not sustain the Disabilities Act as an exception to Eleventh Amendment state immunity."); *see also Hembree v. Office of Dist. Att'y Gen. for the 13th Judicial Dist. of Tenn.*, No. 2:18-cv-00097, 2019 WL 1437913, at *2 (M.D. Tenn. Apr. 1, 2019) ("Congress has not abrogated state immunity for purpose[s] of damages claims under . . . equal protection claims under Title II of the ADA."). Nor has Congress abrogated sovereign

16

immunity for § 1983 claims. *See Hembree*, 2019 WL 1437913, at *2 ("Congress has not abrogated state immunity for purpose[s] of damages claims under . . . 42 U.S.C. § 1983." (citing *Quern v. Jordan*, 440 U.S. 332, 350 (1979))).

The *Ex parte Young* exception does not apply to Defendants. *Ex parte Young* "does not reach state officials who lack a 'special relation to the particular statute' and '[are] not expressly directed to see to its enforcement.'" *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. at 157). The Governor does not have even a "bare connection to administering" Tenn. Code Ann. § 14-2-104(d) and is therefore not a proper defendant under *Ex parte Young*. *See id.* Although the Commissioner has "some connection with the enforcement of the act" through funding, Plaintiffs have failed to demonstrate that she has "threaten[ed] and [is] about to commence proceedings." *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996). The Act gives the Commissioner no discretion over whether to grant or deny a request for a reasonable accommodation under the ADA. *See* Tenn. Code Ann. § 14-2-104(d), (e). Moreover, neither Defendant has any authority over the quarantine provisions of Section 104, which gives the Commissioner of Health "sole authority" to issue guidelines regarding COVID-19 quarantines. Therefore, Defendants have sovereign immunity from Plaintiffs' ADA and § 1983 claims.

3. Ripeness

Because federal court jurisdiction is limited to "cases" and "controversies," a court lacks jurisdiction where a claimed injury is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). To determine whether a claim is ripe, a court considers three factors: (1) whether the alleged injury is likely to occur; (2) whether the

17

factual record is sufficiently developed to resolve the question; and (3) whether the parties will face any hardships face if the court delays resolution of the issue. *Carey v. Wolnitzek*, 614 F.3d 189, 196 (6th Cir. 2010). Plaintiffs have neither requested nor been denied a reasonable accommodation under the Act. The record is insufficient at this stage to determine whether Plaintiffs' alleged injury is likely to occur. Further, Plaintiffs have not demonstrated that they will suffer any hardships—i.e., a denial of a reasonable accommodation—if the Court delays resolving the issue for a later date. *See Carey*, 614 F.3d at 196.

B. Likelihood of Success on the Merits

1. The ADA and Section 504

Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[6]

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Because of the substantial overlap between their substantive requirements, "[courts] long have merged [the] analyses under the ADA and

---

[6] The Sixth Circuit recognizes two types of claims under Title II of the ADA: (1) intentional discrimination, and (2) failure to accommodate. *Roell v. Hamilton Cnty.*, 870 F.3d 471, 488 (6th Cir. 2017). Plaintiffs have not pleaded or shown the requisite animus for intentional discrimination. *See Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (A plaintiff must show that the alleged discrimination was "*intentionally* directed toward him or her in particular."). Although Plaintiffs suggest that the passage of the COVID Act itself was retaliatory, (Pls.' Trial Br., ECF 27, PageID 199-200), the passage of statutes is entitled to legislative immunity. *See Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998); *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951).

[Section 504]." *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 836 (6th Cir. 2020). Accordingly, the Court should consolidate its analysis under both statutes.

Plaintiffs argue that the COVID Act is preempted by the ADA and Section 504. A court may find implied conflict preemption "where it is impossible for a private party to comply with both state and federal law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), or "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (alterations and internal quotation marks omitted). The Act fits neither category.

Plaintiffs argue that the Act "*purports* to carve out reasonable accommodations under the ADA," but introduces "tripwires" that are "inconsistent with the ADA." (Pls.' Trial Br., ECF 27, PageID 196-97.) However, "[t]he mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *MD Mall Assocs., LLC v. CSX Transp., Inc.,* 715 F.3d 479, 495 (3d Cir. 2013) (quoting *Madeira v. Affordable Housing Found., Inc.,* 469 F.3d 219, 241 (2d Cir. 2006)). Rather, "[t]he principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *MD Mall Assocs., LLC,* 715 F.3d at 495 (quoting *Rath Packing Co*., 430 U.S. at 544 (Rehnquist, J., concurring in part and dissenting in part)). For these reasons, the Court should conclude that the Act poses no obstacle to the full achievement of federal purposes.

    2.   Availability of a masking accommodation

Plaintiffs assert that the COVID Act conflicts with, and is superseded by, the ADA and Section 504 because it denies them the ability to obtain universal masking from their schools as

an accommodation. Under Title II of the ADA's implementing regulation, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. 35.130(b)(7)(i). Courts have interpreted the phrase "reasonable modifications" as consistent with the phrase "reasonable accommodations." *See, e.g.*, *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004) ("[Title II of the ADA] requires that public entities make reasonable accommodations for disabled individuals").

The Act specifically grants schools authority to implement mask mandates pursuant to an accommodation under the ADA. Section 104(a) generally prohibits schools from implementing mask mandates unless "severe conditions exist." Tenn. Code. Ann. § 14-2-104(a) ("[A] school or a governing body of a school shall not require a person to wear a face covering while on school property."). However, Section 104(d) states that "[n]otwithstanding subsection (a): (1) A school shall, to the extent practicable, provide a reasonable accommodation pursuant to the [ADA]…"

In interpreting the Act, the Court must give effect to each of its provisions. *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) ("It is the cardinal principal of statutory construction that it is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section."). Section 104(a) sets forth a general rule for when a school principal or president may seek a mask mandate without an ADA accommodation request. As an exception to that general rule, Section 104(d) allows a school principal or president to require masking in response to a request for a disability-related accommodation.

Applying the rules of statutory construction shows that masking is available as a disability-related accommodation, and thus the Act does not prevent Plaintiffs from safely accessing in-

20

person educational opportunities. Relatedly, because Section 104(d) is an express carveout from Section 104(a), Plaintiffs' challenges to Section 104(a) are not applicable to their claims that the Act hinders their ability to obtain a reasonable accommodation.

Plaintiffs next challenge Section 104(d)'s requirements that their parents—on their behalf— must ask for an accommodation in writing. Tenn. Code Ann. § 14-2-104(d)(1). As noted above, no Plaintiff has shown injury from these requirements. Moreover, assuming there is tension between the COVID Act and the ADA in the means of requesting an accommodation, the Act does not preclude Plaintiffs from making an accommodation request. Accordingly, Plaintiffs have not met their burden to show that there exists "no set of circumstances" under which Section 104(d) is valid. *Salerno*, 481 U.S. at 745.

Plaintiffs similarly challenge language in Section 104(d) which states that a requested masking accommodation be granted "to the extent practicable." Tenn. Code Ann. § 14-2-104(d)(1). Plaintiffs contend this language creates a different standard for accommodations than the ADA, under which an accommodation is reasonable unless it creates a "fundamental alteration" in the program or imposes an "undue financial or administrative burden." 28 C.F.R. § 35.130(b)(7)(i); 49 C.F.R. § 27.7(e). The Court should find no inherent tension between a "practicable" accommodation and a "reasonable" one. *See James v. Runyon*, No. 92-2262, 1992 WL 382311, at *4 (E.D. Penn. Dec. 9, 1992) (finding that an accommodation that "would place an undue burden on the employer" is "not possible or practicable"). The COVID Act's practicability standard should be construed as coextensive with the ADA's reasonable accommodation standard.

Finally, Plaintiffs contend that the Act discriminates against them because it would require the "segregation" of accommodated students. Pursuant to Section 104(d), a school shall provide

"an in-person educational setting" and must ensure that every person who will be within six feet of the accommodated person for more than fifteen minutes wear a school-provided mask or face covering. Tenn. Code Ann. § 14-2-104(d). The Court should construe the Act as setting a minimum requirement for mask-related accommodations. Depending on the circumstances, the Act may require the school to mask all students within the in-person educational setting of the student requesting the accommodation to comply with ADA requirements. The Act does not say that a principal cannot require more than close-contact masking, including, if necessary, masking all students within the in-person educational setting of the accommodated student. Accordingly, the Court should conclude that, contrary to Plaintiffs' contention, the Act cannot be fairly read to require the removal or separation of students receiving mask-related accommodations or the creation of separate learning environments for accommodated students.

A fair reading of Section 104(d) shows that the Act does not impair Plaintiffs' ability to seek community masking at their school as an ADA accommodation. Plaintiffs are therefore not likely to succeed on their masking accommodation claims.

3. Availability of quarantines

Plaintiffs further contend that the Act prohibits schools from excluding COVID-19 positive children from school property or events. (Pls.' Trial Br., ECF 27, PageID 190-92.) The Act vests the Commissioner of Health with sole authority over quarantine guidelines concerning any person who tests positive for COVID-19 and for closing any school because of COVID-19. Tenn. Code Ann. § 14-4-101(a). The Act further provides, "[a] local health entity or official, mayor, governmental entity, or school does not have the authority to quarantine a person or private business for purposes of COVID-19." Tenn. Code Ann. § 14-4-101(b).

22

Plaintiffs argue that granting the Commissioner of Health sole authority for establishing COVID-19 quarantine guidelines and "[r]emoving this power from a local school," (Pls.' Trial Br., ECF 27, PageID 191), serves to deny Plaintiffs the reasonable accommodations of quarantining and contact tracing, in violation of the ADA and Section 504. (*Id.*, PageID 190-92.) However, the general power to issue quarantines has long rested with the Commissioner of Health. Tenn. Code Ann. § 68-1-201(a)(1) ("The commissioner [of health] has the power to: (1) [d]eclare quarantine whenever, in the commissioner's judgment, the welfare of the public requires it."). In contrast, Plaintiffs have not established that schools have ever had authority to unilaterally issue quarantine orders. Rather, Dr. Hijano testified that schools work closely with the Department of Health in making sure COVID-19 positive children are excluded from campus. (Hr'g Tr., ECF 35, PageID 928.)

The Court should read the Act as allowing quarantines and contract tracing as safety measures. The Act does not preclude schools or local officials from excluding a person from school or public places consistent with the Commissioner of Health's order or guidelines. *See* Tenn. Code Ann. § 14-4-101; Tenn. Comp. R. & Regs. 1200-14-10-.24(1). Rather, the Act only precludes other entities from quarantining on their own authority rather than in compliance with the Commissioner of Health's guidelines. *See* Tenn. Code Ann. § 14-4-101(b). As noted above, it is a misdemeanor to violate such orders. *See* p.13 n.5 *supra*. Relatedly, the Court should find that the Act does not preclude government or school officials from tracking and maintaining data regarding COVID-19 cases necessary for contact tracing within a school or school district.

Further, the Commissioner of Health is currently in the process of promulgating emergency rules that "will set forth the process by which a person with a positive COVID-19 diagnosis shall be excluded from school property, including but not limited to busses, and school events."

23

(Nagoshiner Decl., ECF 39, PageID 988.)  Neither federal or state law requires a State to place quarantine decisions with officials of a school or school district.  Rather, the power to make quarantine decisions resides with State officials absent a delegation of that authority to a local government.  *Cf. Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905) ("[The Supreme Court] has distinctly recognized the authority of a state to enact quarantine laws and health laws of every description" (internal quotation marks omitted)); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 127-28 (6th Cir. 2020) ("[T]he police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts.").  Because the COVID Act allows schools to exclude persons pursuant to the Commissioner of Health's guidelines, Plaintiffs are unlikely to succeed on the merits of this facial challenge to Section 104.

4. Schools may provide masking as a reasonable, disability-related accommodation without risking state funds.

As noted above, Plaintiffs lack standing to challenge the State's distribution of funds to which their school districts may be entitled under state or federal law.  This is especially so when a court is asked "to adjudicate an internal dispute between a local governmental entity and the very state that created it."  *Kelly v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty., Tenn.*, 836 F.2d 986, 998 (6th Cir. 1987); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.")  Under *Kelly*, the Court cannot order Tennessee or its officials to distribute state funds to a local education agency. *See* 836 F.2d at 998.

Additionally, the plain language of Section 104(e) concerns state funds.  *See* Tenn. Code. Ann. § 14-2-104(e) ("shall not use state funds").  The Court should therefore construe the Act to

24

not limit a local education agency's discretion over use of local and ESSER 3.0 funds. Accordingly, Plaintiffs' challenge based on school districts' potential loss of federal funds is not likely to succeed.

However, even assuming Plaintiffs did have standing to challenge distribution of state funds to school districts, they are not likely to succeed on their funding-based challenge to the Act. Section 104(e) only withholds state funds used "in violation of this section." The Court should interpret Tenn. Code Ann. § 14-2-104(e) as granting the Commissioner discretion to withhold future distributions of state funds only if a local education agency uses state funds to mandate or require persons to wear face coverings under circumstances other than those in subsections (a) and (d).[7] Because Section 104(d) specifically provides for the ADA accommodations at issue, Plaintiffs are not likely to succeed on the merits.

   5. Equal Protection

Plaintiffs also make an Equal Protection Clause challenge the COVID Act. As previously indicated, Plaintiffs can succeed on their equal protection challenge only if they can demonstrate that the Act lacks a rational basis. *See* p. 14 *supra*, *Johnson*, 624 F.3d at 746; *S.S.*, 532 F.3d at 457. Public education is not a fundamental right for purposes of a Fourteenth Amendment challenge. *See Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000). Disability is not a suspect class or quasi-suspect class for an Equal Protection analysis. *See S.S.*, 532 F.3d at 457; *Bartell*, 215 F.3d 559. Therefore, Plaintiffs' challenge that the COVID Act has no rational basis.

Here, Plaintiffs fall far short of establishing that the General Assembly had no rational basis to support the distinctions drawn in the act. "[T]hose attacking the rationality of the

---

[7] Plaintiffs have not demonstrated that Commissioner Schwinn will exercise that discretion and withhold state funds from local education agencies, nor do Plaintiffs cite any threat issued by Commissioner Schwinn to withhold funds.

legislative classification have the burden to negate every conceivable basis which might support it." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (internal quotation marks omitted). "[I]t is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 (1981). A court must uphold state legislation "'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Johnson*, 624 F.3d at 746 (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 315).

The Act promotes school district compliance with federal disability law, promotes in-person education, and provides guidance to school districts. *See* Tenn. Code Ann. §§ 14-1-102 (listing legislative findings for the Act); 14-2-104(d) (providing guidance for a school principal or president to provide a person with a disability a reasonable accommodation). The COVID Act is neutral on its face, it makes no express distinction between persons with disabilities and persons without disabilities. There is an implicit distinction under which the Act carves out an exception for persons who may request an accommodation under the ADA, but that carveout is required by federal law. A State's compliance with federal law necessarily has a rational basis.

Plaintiffs also claim that the Act treats private schools differently than public schools because it does not restrict private schools from implementing mask mandates. The General Assembly may have noted that religious organizations, including schools, are exempt from the ADA. 42 U.S.C. § 12187. Accordingly, excluding private religious schools would also serve the purpose of being consistent with federal law. Although the Act also excludes private secular schools, the rational basis test does not require a perfect fit. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 85 (1988) ("It of course is possible that [a State] might have enacted a

statute that more precisely serves these goals and these goals only; … however, a state statute need not be so perfectly calibrated in order to pass muster under the rational-basis test.").

"Shaping the precise contours of public health measures entails some difficult line-drawing. Our Constitution wisely leaves that task to officials directly accountable to the people." *League of Indep. Fitness Facilities & Trainers, Inc.*, 814 F. App'x at 129 (citing *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring)). To the extent Plaintiffs' challenge the Act's findings, the Court may not substitute its own determinations for that of the General Assembly's. *See Minnesota*, 449 U.S. at 470. Therefore, Plaintiffs are unlikely to succeed on their Equal Protection claims.

6. Supremacy Clause

Because neither the Supremacy Clause nor ARPA give Plaintiffs an enforceable right, Plaintiffs are not likely to succeed on their Supremacy Clause claims. *See* p. 16 *supra*; *see also* (Defs.' Pre-Hearing Opp. Br., ECF 23, PageID 159-62.)

C. Irreparable harm

"A showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Lucero v. Detroit Pub. Schs.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (quoting *Reuters Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)); see *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (stating that "even the strongest showing" on the other factors cannot justify a preliminary injunction without irreparable harm). Plaintiffs must establish that they are "likely" to suffer irreparable harm without a mask mandate, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and the threat of irreparable harm must be more than "speculative or theoretical." *Sumner Cnty. Schs.*, 942 F.3d at 327 (quotation omitted). Instead, it must be "both certain and immediate." *Id.* (quotation omitted).

As noted above, the Act does not preclude Plaintiffs from seeking and receiving accommodations from their schools. Plaintiffs have failed to demonstrate that the Act's requirement of a written request for a reasonable accommodation creates a likelihood of irreparable harm. Only one parent, Dr. Ker, testified on the subject of accommodations. Dr. Ker had not sought an ADA accommodation, either in writing or orally, on behalf of her child. (Hr'g Tr., ECF 35, PageID 949-50.) She did not testify that her ability to request an ADA accommodation had been frustrated by the Act's writing requirement, nor did she suggest that she was unable to make a written request for an ADA accommodation for her child. Dr. Jason Yaun, M.D., could not say whether any of the plaintiffs had requested disability accommodations. (*Id*., PageID 840.) Nor could he speak to the disability accommodation processes in place at any one of the public schools that the Plaintiff children attend. (*Id.*, PageID 846.) Plaintiffs fail in their burden to show actual present harm or a significant possibility of future harm from the Act's requirement of a written request for a reasonable accommodation.

Plaintiffs claim of actual present harm is also undercut by the distinct downward trend in the number of positive COVID cases in Tennessee. Recently the Sixth Circuit has directed district courts to take heed of current conditions in evaluating claims for relief based on rates of COVID infection. *See United States v. Bass,* 2021 WL 5099583, at *8, -- F. 4th -- (6th Cir., Nov. 3, 2021) ("[D]ue to the rapidly evolving conditions of the COVID-19 pandemic while this case was stayed, the underlying facts [relating to the appellant's petition for compassionate release] have substantially and materially changed.") The Tennessee Department of Health ("TDH") measures new COVID-19 infections reported daily to TDH as required by TDH Rule 1200-14-01-.02 for each county in the State. (Dunn Decl., Exh. D-1, ECF 29, PageID 395-97.) The county-level data reported by TDH confirms this drop in cases. Circumstances of COVID-19 infection have

substantially, materially, and favorably changed from the peak infection rates associated with the Delta variant of the virus.  Plaintiffs fail in their burden to show actual present harm or a likelihood of future harm from current COVID-19 rates in their communities.

Plaintiffs' contentions of actual present harm or a significant possibility of future harm are undermined by Plaintiffs' recent eligibility for vaccination against COVID-19 with the Pfizer-BioNTech pediatric vaccine.  (FDA Press Release, Exh. D-5, ECF 30-2, PageID 526-30; CDC Press Release, Exh. D-6, ECF 30-4, PageID 546.)  Dr. Yaun testified that the COVID vaccine is extremely effective in preventing hospitalization and death from COVID-19.  (Hr'g Tr., ECF 35, PageID 839.)  Dr. Ker agreed.  (*Id*., PageID 945.)  She testified that the vaccines are the most important and ameliorative measure.  (*Id.*)  Moreover, despite claiming the vaccine is less effective because of her child's disability, she testified that her child's antibody titers are monitored to determine whether the effect of the vaccines have waned.  (*Id.*, PageID 945-46.)

Moreover, Plaintiffs do not contest the current or imminent availability of medical interventions and therapies that lessen the effects of COVID-19 infection.  At-home PCR and antigen tests that can confirm the presence of COVID-19 infection are now available.  (*Id.*, PageID 944.)  Oral antivirals have been purchased by the United States government and FDA approval is imminent.  (*Id.*, PageID 945.)  Plaintiffs fail to show actual present harm or imminent future harm due to COVID-19 infection leading to hospitalization or death.

### D.  Harm to Others and the Public Interest

The Court must finally balance any harm with the public interest.  *Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that when the government opposes injunctive relief, the third and fourth factors for a preliminary injunction merge).  Here, eight students from three counties seek a statewide injunction.  The Ninth Circuit recently rejected a similarly overbroad request for a

29

nationwide injunction against U.S. Immigration and Customs Enforcement's COVID-19 policies. *See Fraihat v. U.S. Immigration & Customs Enforcement*, 16 F.4th 613, 644-47 (9th Cir. 2021) ("Plaintiffs have not demonstrated that the conditions at their individual facilities support a showing that ICE has acted with deliberate indifference or reckless disregard as to the approximately 250 immigration detention facilities nationwide."). Here, as noted above, Plaintiffs have not made a record that would justify a statewide injunction that would essentially put the Court in charge of monitoring all requests for ADA masking accommodations, ensuring proper enforcement of such accommodations, and second-guessing the Commissioner of Health (who is not even a party to these proceedings) as to quarantine decisions.

And in any event, the benefits of such injunction to Plaintiffs would be minimal at best. As previously noted, the Act does not impair Plaintiffs from seeking and obtaining their requested relief from their schools. Therefore, the Court should find that these factors benefit Defendants.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs have failed to establish that they are entitled to a preliminary injunction against the challenged portions of the COVID Act. Accordingly, Plaintiffs' Motion for a Preliminary Injunction (ECF 5) should be denied.

Respectfully submitted,

HERBERT H. SLATERY III
ATTORNEY GENERAL AND REPORTER

*/s/ Reed N. Smith*
James R. Newsom - TN Bar No. 6683
Reed N. Smith - VA Bar No. 77334*
Matthew Dowty - TN Bar No. 32078
Colleen E. Mallea - TN Bar No. 32238
*Admitted PHV*

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-3491
Jim.Newsom@ag.tn.gov
Reed.Smith@ag.tn.gov
Matthew.Dowty@ag.tn.gov
Colleen.Mallea@ag.tn.gov
*Counsel for Defendants*

31

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2021, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties as indicated below. Parties may access this filing through the Court's electronic filing system.

Brice M. Timmons
Bryce W. Ashby
Craig A. Edgington
Donati Law Firm LLP
brice@donatilaw.com
bryce@donatilaw.com
craig@donatilaw.com
*Counsel for Plaintiffs*


Jessica F. Salonus
The Salonus Firm, PLC
jsalonus@salonusfirm.com
*Counsel for Plaintiffs*


Justin S. Gilbert
Gilbert Law, PLC
justin@schoolandworklaw.com
*Counsel for Plaintiffs*


*s/ Reed N. Smith*
\*Reed Smith, VA Bar No. 77334
Acting Assistant Attorney General
*\*Admitted Pro Hac Vice*