## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

R.K., a minor, by and through her mother and )
and next friend, J.K; W.S., a minor, by and )
through her parent and next friend, M.S.; )
S.B., a minor, by and through his parents and )
next friends, M.B and L.H.; M.S., a minor, by )
and through her parent and next friend, K.P.; )
T.W., a minor, by and through her parent and )
next friend, M.W.;M.K., a minor, by and )
through her parent and next friend, S.K.; )
E.W., a minor, by and through his parent and )
next friend, J.W.; and J.M., a minor, by and )
through her parent and next friend, K.M; )
and on behalf of those similarly situated, )
)
)
    **Plaintiffs,** )
)
 **v.** )   **No: 3:21-cv-00853**
)
BILL LEE, in his official capacity as Governor )
of Tennessee; and PENNY SCHWINN, in her )
official capacity as Commissioner of the )
Tennessee Department of Education, )
)
   **Defendants.** )

## <u>MEMORANDUM OPINION</u>

On November 12, 2021, after the Tennessee General Assembly convened a special session

for only the third time in its history, Governor Bill Lee signed into law an entirely new provision in

the Tennessee Code: "Title 14 – COVID-19." Tenn. Code Ann. § 14-1-101 *et seq.* Chapter 2 of that

law sets forth "Uniform Standards" relating to vaccinations and masking, including Section 104 that,

with limited exceptions, prohibits school districts from requiring individuals to wear face coverings

while on school property. <u>Id.</u> § 14-2-104.[1] Another provision of the Act removes authority from

---

[1] For the readers's convenience, § 2-104 is set out in its entirety in the Appendix to this decision.

local health entities, officials, and schools to quarantine a person who has COVID-19. Id. § 14-4-101(b).

Within hours of the statute's passage, the parents and next friends of eight children – on behalf of themselves and all other Tennessee school children whose disabilities place them at increased risk for severe illness from COVID-19 – filed suit in this Court. They allege that the new law violates (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132 *et. seq.*; (2) Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a); and (3) the United States Constitution, specifically the Equal Protection Clause of the Fourteenth Amendment, and the Supremacy Clause set forth in Article VI, clause 2. In addition to filing a Verified Complaint (Doc. No. 1), Plaintiffs filed a "Motion for Temporary Restraining Order and Preliminary Injunction" (Doc. No. 5).

On November 19, 2021, the Court held an evidentiary hearing on Plaintiffs' Motion. Pre- and post-hearing briefs and responses have been received, the last of which was filed on December 2, 2021. (Doc. Nos. 23, 27, 41, 42, 43, 44). Based upon the evidence that has been received, and having fully considered the parties' arguments and the applicable law, the Court hereby enters the following Findings of Fact and Conclusions of Law in accordance with Rule 65 of the Federal Rules of Civil Procedure.[2]

## I. Findings of Fact

1. The children on behalf of whom suit has been filed are identified in the Verified Complaint by their initials and range in age from seven to fourteen years old. Each has been

---

[2] The Court omits from its recitation facts it deems to be immaterial to the issues presented. Further, to the extent that a finding of fact constitutes a conclusion of law, the Court so concludes; to the extent that a conclusion of law constitutes a finding of fact, the Court so finds.

identified by his or her school as a student with a disability.

2. According to the allegations in the Verified Complaint (which Defendants do not dispute for purposes of the pending motion), each Plaintiff is at risk of serious illness or death were he or she to contract COVID-19. R.K. has Down syndrome and substantially limited cognitive abilities. W.S. has Type-1 diabetes. S.B. has substantial medical conditions, including chronic lung disease and an autoimmune condition, and is required to use a feeding tube and daily inhaler. M.S. has Joubert Syndrome, a rare genetic disorder involving brain malformation that impairs her cognitively, and precludes her from standing, walking, crawling, and bearing weight. T.W. has Shone's Complex, a rare congenital heart disease, has undergone numerous open-heart surgeries, and has epilepsy. M.K. has asthma requiring an inhaler regimen. E.W. has autism and severe ulcerative colitis. J.M. suffers from primary immunodeficiency and is prone to illness. (Doc. No. 1, Cmplt. ¶¶ 21-28).

3. Plaintiffs attend classes in school districts spread across Tennessee. R.K. attends Williamson County Schools; W.S. attends school in the Franklin Special School District; S.B., M.S., T.W., and M.K. go to school in the Knox County School District; E.W. attends classes in the Collierville Municipal School District; and J.M. is in the Germantown Municipal School District.

4. Defendant Bill Lee is the Governor of Tennessee and as such has "[t]he supreme executive power of this state[.]" Tenn. Const. art. III, § 1. Defendant Penny Schwinn is the Commissioner of the Tennessee Department of Education ("TDOE") and, by statute, "is responsible for the implementation of law or policies established by the general assembly or the state board of education." Tenn. Code. Ann. § 49-1-201(a).

5. The State of Tennessee, the Office of the Governor, and TDOE are public entities within

3

the meaning of the ADA. They are also recipients of federal financial assistance within the meaning

of the Rehabilitation Act and the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2,

134 Stat. 4 (Mar. 11, 2021).

6. This far into the pandemic, it almost goes without saying that SARS-CoV-2 – the virus

that causes COVID-19 – has wreaked and continues to wreak havoc across this country in countless

ways. By the end of November 2021, more than 780,000 Americans had died from the virus, and

more than 48 million cases of the virus had been confirmed.

www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview (all websites last visited December 3,

2021).[3] By that same time, Tennessee had almost 1.3 million confirmed or probable cases, and more

than 16,600 confirmed or probable deaths from the virus.

https://www.tn.gov/health/cedep/ncov/data.html.

7. For those who do not succumb to the virus, the symptoms can range from the relatively

unnoticeable, to the mild (such as fever or chills, coughing, fatigue, muscle or body aches,

---

[3] The Centers for Disease Control ("CDC") is a federal agency under the Department of Health and Human Services. The Court can take "judicial notice of the relevant facts provided on [its] website, which are not subject to reasonable dispute." Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010). This includes statistics regarding COVID-19 compiled by the CDC, Middleton v. Andino, 488 F. Supp. 3d 261, 267 (D.S.C. 2020), the CDC's determination as to the manner and means by which the virus is spread, McGhee v. City of Flagstaff, No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at *3 (D. Ariz. May 8, 2020), preventative measures the CDC recognizes that can curb the spread of COVID-19, United States v. James, No. CR1908019001PCTDLR, 2020 WL 6081501, at *1 (D. Ariz. Oct. 15, 2020), and the CDC's designation of certain medical conditions as posing an increased risk of contracting COVID-19 or developing serious complications from the virus, see Arias v. Decker, 459 F. Supp. 3d 561, 573 (S.D.N.Y. 2020).

Regardless, even though some may question the CDC's findings, conclusions, and recommendations, the Court relies upon them not so much for the truth of what they assert, but for their very existence and that many governmental agencies, medical professionals, private and public sector businesses, and individuals have relied on the CDC's guidance in navigating the pandemic caused by what this Court has characterized as a "novel coronavirus, not just in name only." United States v. Frazier, 465 F. Supp. 3d 791, 794 (M.D. Tenn. 2020). The same holds true for the other federal and state government websites cited in this decision.

headaches, loss of taste or smell, a sore throat and/or congestion), to extreme cases requiring hospitalization and use of a ventilator. www.cdc.gov/coronavirus/2019-ncov/symptoms-testing. Thus far, more than 3.2 million individuals have been hospitalized in the United States with COVID-19, with the weekly hospital average now hovering around 5,000 to 5,500 new patients. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index. Figures for the total number of Tennesseans hospitalized for COVID-19 since the pandemic began are hard to come by, but 890 Tennesseans were hospitalized with COVID-19 on November 1, 2021, and 694 were hospitalized with the virus on November 17, 2021, and 851 were hospitalized on December 1, 2021. http://www.tn.gov/health/cedep/ncov/data/hospitalization-data/current-covid-hospitalizations.html.

8.     The virulence of the virus is due in large part to the ease with which it is transmitted. The CDC has identified "three main ways" in which COVID-19 is spread: (A) "breathing in air when close to an infected person who is exhaling small droplets and particles that contain the virus"; (b) "having these small droplets and particles that contain virus land on the eyes, nose, or mouth, especially through splashes and sprays like a cough or sneeze"and (c) "touching eyes, nose, or mouth with hands that have the virus on them." https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.

9.     The ease of transmission through tiny droplets and aerosols that land on others is only compounded by the fact that individuals may remain asymptomatic when carrying the virus. Further, for those that do eventually become ill, the incubation period can be anywhere from a couple of days to  two weeks, during which time the carrier can transmit the virus to others. In short, a person can spread the virus without even knowing that he or she has contracted COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html#:~

:text=The%20incubation%20period%20for%20COVID,from%20exposure%20to%20symptoms%20onset.&text=One%20study%20reported%20that%2097.5,SARS%2DCoV%2D2%20infection.

10.  The perniciousness of the virus is also due in part to its ability to mutate into variants. Most prevalent at this time in the United States is the Delta variant.  According to the CDC, this variant spreads faster and is more than two-times as contagious as the original strain. https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.  Furthermore, while the science behind it is still developing, early data suggest that "patients infected with the Delta variant were more likely to be hospitalized than patients infected with Alpha or the original virus that causes COVID-19."  Id.

11.  Whichever the variant, some individuals are more prone than others to catch the virus and develop serious health complications as a result.  This includes older adults, as well as those with any of a number of medical conditions, including cancer, cerebrovascular disease, certain chronic kidney or lung diseases, diabetes, certain heart conditions, Down syndrome, an immuno-compromised state, obesity, and specified mental health disorders, among other things. www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.

12.  Even though "COVID-19 tends to be milder in children compared with adults, it can make children very sick[,] cause children to be hospitalized [and] in some situations, the complications from infection can lead to death."  Id.  As with adults, having one or more of the already mentioned underlying medical conditions place children at increased risk of developing serious illness or dying, and some "[s]tudies have shown that some people with certain disabilities are more likely to get COVID-19 and have worse outcomes."  Id.  Furthermore, according to the CDC, "[c]urrent evidence suggests that children with medical complexity, with genetic, neurologic, or metabolic conditions, or with congenital heart disease can be at increased risk for severe illness

6

from COVID-19." Id. Unlike adults, however, "children who get infected with the virus that causes COVID-19 can also develop serious complications like multisystem inflammatory syndrome (MIS-C)—a condition where different body parts become inflamed, including the heart, lungs, kidneys, brain, skin, eyes, or gastrointestinal organs." Id.

13. Each of the Plaintiffs is at increased risk of contracting COVID-19, and each is at an increased risk of severe illness were he or she to contract the virus. Several (*e.g.* R.K who has Down Syndrome and W.S. who has diabetes) fall within a specific illness or condition identified by the CDC. Others have a combination of medical conditions or a complexity of conditions that place them at increased risk, including being immuno-compromised (*e.g.* S.B. and J.M.), or having heart (*e.g.* T.W.) or lung *(e.g.* S.B. and M.K.) issues.

14. Notwithstanding the scourge COVID-19 has wrought and the jeopardy it poses to those at risk, several self-help measures can be taken to curb its advance. Those measures, too, are understood and recognized by most. They include wearing a mask when indoors; social distancing; avoiding crowds and poorly ventilated spaces; washing one's hands frequently, covering coughs and sneezes; avoiding touching one's mouth or nose, cleaning and disinfecting surfaces touched frequently; quarantining when sick; contact tracing, and receiving a vaccination. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

15. "Vaccination is the leading public health prevention strategy to end the COVID-19 pandemic," www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance, and the three approved vaccines in this country (Pfizer, Moderna, and Johnson & Johnson) have proven to be very effective in preventing illness and hospitalization. Id.

16. Because no vaccine is ever 100% effective, however, it is not a panacea. To reduce the risk of contracting or spreading the Delta variant, the CDC continues to recommend that masks be

worn even by those who have been fully vaccinated in areas of high transmission, and for those who have a weakened immune system or underlying medical condition. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html?s_cid=11508:should%20i%20wear%20a%20mask%20after%20vaccination:sem.ga:p:RG:GM:gen:PTN:FY21.

17. As of December 1, 2021, almost 450 million Americans had received a COVID-19 vaccine shot. Almost 200 million of that number had been fully vaccinated, meaning that they had received two doses of either the Pfizer/BioNTech or Moderna mRNA vaccine (ideally spread 3-4 weeks apart), or one dose of the Johnson & Johnson Viral Vector vaccine. https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total. As of that same date, almost 8 million Tennesseans had received a vaccine shot, of whom a little less than 2.7 million have been fully vaccinated. This means that 56% of the people in Tennessee have received at least one COVID-19 shot, and 49.6% of the population has been fully vaccinated. https://www.tn.gov/health/cedep/ncov/covid-19-vaccine.html. Tennessee's vaccination rate, however, does not fare favorably to the rest of the country, as only eight states have a lower percentage. https://covid.cdc.gov/covid-data-tracker/#vaccination-trends&location-select=TN.

18. Children between the ages of 5 and 16 can now be vaccinated. https://www.cdc.gov/media/releases/2021/s1102-PediatricCOVID-19. However, it was not until October 29, 2021 that the FDA authorized the emergency use of the Pfizer/BioNTech vaccine (at one-third the dose) for children in the 5 to 11 age group. https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children. As with the adult vaccine, the pediatric version of the Pfizer vaccine is a two dose battery spread several weeks apart. Id. While the vaccine is being rolled out for younger children, it will obviously take some time for enough children to be vaccinated to make a substantial difference, even considering

8

that there will be many parents and guardians that will not allow their child or ward to be vaccinated for any of a number of reasons.

19.    Second behind vaccination in term of preventing the spread of COVID-19 is masking. As explained at the evidentiary hearing by Dr. Jason Yaun, an Assistant Professor and pediatrician at Le Bonheur in Memphis, and Dr. Diego R. Hijano, who specializes in pediatrics and infectious diseases at St. Jude Research Hospital also in Memphis,[4] a commonly misunderstood belief is that masks are primarily worn to prevent one from getting COVID-19. In fact, the opposite is true.

20.    Recall that one can carry the virus and be asymptomatic and that it takes several days to weeks before symptoms appear. During this time, the individual is contagious and masks significantly reduce the spread to others. Even so, studies have shown that masks also benefit those who are wearing them. As an example, Drs. Yaun and Hijano, as well as Dr. Jennifer Ker[5] pointed to a Marin County School Study. (See Hearing Transcript ("Tr.") at 46 (Yaun); at 109 (Hijano); at 130-31 (Ker)). Dr. Yaun noted other studies (such as the ABC collaborative study) that showed "tremendously low rates of school-related transmission when all children were wearing masks." (Tr. at 49).[6] Moreover, as pointed out by all three physicians, some children, because of their physical

_____

[4] Dr. Yaun is an Associate Professor in the Department of Pediatrics at the University of Tennessee Health Science Center ("UTHSC"), a board certified pediatrician at UT Le Bonheur Pediatric Specialists, and the Vice President of the Tennessee Chapter of the American Academy of Pediatrics ("AAP"). (Doc. No. 27-2, Yaun Decl. ¶ 3). Dr. Hijano is a practicing pediatrician working as an Assistant Member of the Infections Diseases Department at St. Jude, the Deputy Medical Director of Occupational Health at that institution, and an Assistant Professor of Pediatrics at UTHSC. (Doc. No. 27-1, Hijano Decl. ¶ 2).

[5] Dr. Ker is certified by the American Board of Allergy and Immunology. She practices at Heritage Medical Associates in Franklin, Tennessee.

[6] In their post-trial brief, Defendants point to what has been called "the Bangladesh study" and claim that study "found that even the wearing of surgical masks, which are more protective than cloth masks, led to no statistically significant reduction in transmission for persons below fifty years old." (Doc. No. 42 at 7-8). As this Court pointed out when addressing Governor Lee's Executive Order prohibiting masking (as discussed below), that reading of the study is simply wrong. Indeed, Dr. Hijano testified that, "[w]hat the study shows is that surgical mask perform better than cloth masks," but that "cloth masks would be better

9

or emotional disabilities, are incapable of wearing masks themselves and so are especially reliant on universal masking to protect them. (See Doc. No. 27-1, Hijano Decl. ¶ 22; Tr. at 43-44 (Yaun); Tr. at 130 (Ker). And, as pointed out by Dr. Ker, some children with certain medical conditions (such as Down Syndrome) can lose the protection afforded by vaccines. (Tr. at 126). For these reasons, Dr. Yaun would not allow his ten-year-old masked daughter to attend a social event, such as a child's birthday party if the other children in attendance were unmasked. (Tr. at 50-51). Nor would Dr. Ker permit her 13-year-old disabled daughter to attend under such circumstances. (Tr. 144-46).

21. The Marin County Study arose from an outbreak of COVID-19 infection at the Our Lady of Loretto School, an elementary school in Novato, California. That school had a universal mask mandate, and the study showed that the students adhered to the mask requirement. However, when reading to her class, one teacher would remove her mask. The teacher began feeling ill on May 19, 2021, and tested positive for COVID-19 two days later. Within days 26 individuals tested positive for the virus, including the teacher. The infection rate "in the two rows seated closest to the teacher's desk was 80% (eight of 10) and was 28% (four of 14) in the three back rows." Additionally, six of 18 students in a separate grade at the school became infected, as did eight family members of the students in those two grades. Lam-Hine T, McCurdy SA, Santora L, *et al.* OUTBREAK ASSOCIATED WITH SARS-COV-2 B.1.617.2 (DELTA) VARIANT IN AN ELEMENTARY SCHOOL — MARIN COUNTY, CALIFORNIA, MAY–JUNE 2021. MMWR Morb Mortal Wkly Rep 2021, https://www.cdc.gov/mmwr/volumes/70/wr/mm7035e2.htm.

22. In addition to vaccinations and masking, not allowing sick people to go to school or work is an important mitigation measure for obvious, logical reasons. Indeed, "[q]uarantining and

---

than no mask at all." (Tr. at 92). The proper "interpretation of the study," Dr. Hijano continued, "is not that cloth masks do not work"; rather, "cloth masks do not work as well." (Id. at 93). Defendants offered no expert testimony to provide a different interpretation of the study.

isolation are key basic public health measures to mitigate any infection," (Doc. No. 27-1, Hijano Decl. ¶ 24), and are among "the oldest mitigation strategies, (Tr. At 69 (Hijano)).

23. The CDC recommends quarantining and isolation, as follows:

• **Quarantine** if you have been in close contact (within 6 feet of someone for a cumulative total of 15 minutes or more over a 24-hour period) with someone who has COVID-19, unless you have been fully vaccinated. People who are fully vaccinated do NOT need to quarantine after contact with someone who had COVID-19 unless they have symptoms. However, fully vaccinated people should get tested 5-7 days after their exposure, even if they don't have symptoms and wear a mask indoors in public for 14 days following exposure or until their test result is negative.

• **Isolation** is used to separate people infected with COVID-19 from those who are not infected. People who are in isolation should stay home until it's safe for them to be around others. At home, anyone sick or infected should separate from others, stay in a specific "sick room" or area, and use a separate bathroom (if available).

https://www.cdc.gov/coronavirus/2019-ncov/your-health/quarantine-isolation.html#quarantine. The CDC also recommends that "local public health authorities make the final decisions about how long quarantine should last, based on local conditions and needs." Id.

24. The Tennessee Department of Health ("TDOH") has issued its own guidelines for isolation and quarantining. With regard to isolation, TDOH recommends that individuals:

Should isolate for a minimum of 10 days after onset and may be released after they are without fever for 24 hours (without fever-reducing medication) and show improvement in symptoms. Some severely ill patients should isolate for at least 20 days. Cases without symptoms should isolate through 10 days after their specimen collection date.

https://www.tn.gov/content/dam/tn/health/documents/cedep/novel-coronavirus/Isolation-Quarantine Release.pdf.

25. With regard to quarantining, TDOH has separate recommendations for those who have been vaccinated or unvaccinated, and those who have had either household or non-household close contact with an infected individual. With regard to "unvaccinated close contacts," TDOH

recommends that individuals:

> Should quarantine after exposure to a COVID-19 case according to non-household or household contact guidance. If symptoms develop, close contacts should isolate and be clinically evaluated for COVID 19, including SARS-CoV-2 testing, if indicated. Close contacts should quarantine regardless of whether the case was symptomatic. Exposure includes contact with a case during the time period beginning two days prior to case's symptom onset (or specimen collection date if case never experiences symptoms) through the end of the case's isolation period.

Id. According to TDOH's website, both it "and CDC recommend a 14-day quarantine," with some acceptable alternatives. Id. However, at least as of November 16, 2021, TDOH had instituted a "quarantine exception" for school children: "In the K-12 setting, the close contact definition excludes individuals if both the infected individual and the exposed individual(s) correctly and consistently wore well-fitting masks the entire time." Id.

26. Notwithstanding the measures that have been taken to slow the spread of COVID-19, the virus remains very much a reality in this country. That is true for Tennessee. On November 16, 2021, TDOH reported 1,650 new cases of COVID-19, 33 deaths, and 10 hospitalizations since the day before. https://www.tn.gov/health/cedep/ncov.html. Of that number, there were almost 450 individuals who contracted the virus between the ages of zero and 20. Id. For the ten days preceding, the average daily rate of new cases was approximately 1,500, with a high of 1,900 cases on November 9, and low of 713 cases on November 14, 2021. Id.

27. The rates of infections also vary wildly by county as evidenced by the number of new cases over the last 7 days per 100,000 residents as reported for the week of November 12 through November 18, 2021. For example, Davidson County had a daily case rate of 14.9; Shelby 13.7; Anderson 22.1; Carter 23.8; Cumberland 27.6; Dickson 20.4; Knox 15.6; Maury 15.1; Meigs 10.3; Rutherford 21.0; Shelby 13.7; Tipton 28.8; Warren 21.1; and Williamson 20.1.

28. There are also fluctuations and surges in the number of COVID cases at particular times,

both nationwide and in this state. For example, "during the surge of the delta variant in July and August [of this year], [Tennessee] saw a significant rise in hospitalizations, complications, and deaths in children." (Tr. at 62 (Hijano)). There was also a surge in "November/December 2020." (Id. at 103). During such surges, "hospitals were overwhelmed . . . the capacity to respond to emergency was down," and there were individuals with non-COVID conditions [who] die[d] because they couldn't get a bed in the ICU or in the hospital." (Id. at 80).

29.    The first case of COVID-19 in Tennessee was reported on March 5, 2020 and, a week later, Governor Lee declared a state of emergency. On March 17, 2020, Governor Lee urged all school districts in Tennessee to close by March 20, 2020. Ultimately, the schools in Tennessee would remain closed for the remainder of the school year. https://www.tn.gov/governor/covid-19/covid19timeline.html.

30.    On June 15, 2020, TDOE released the first "toolkit to provide districts with guidance and resources after COVID-19 school closures." https://www.tn.gov/education/news/2020/6/15/tdoe. At the time, Commissioner Schwinn stated, "We hope these toolkits provide our district and school leaders with considerations and guidance as they make the best local decisions for the upcoming school year." Id.

31.    On July 2020, Governor Lee announced that the state would recommend the reopening of schools for the 2020-2021 school years. In doing so, Governor Lee stated: "Our state is doing everything we can to work with local school districts and ensure that in-person learning is made available in a way that protects the health and safety of our students and educators, and this plan helps us accomplish that goal." https://www.tn.gov/governor/news/2020/7/28/gov--lee-unveils-safe-reopening-plan-for-tennessee-schools.html. For her part, Dr. Lisa Piercey, the Commissioner of TDOH acknowledged: "Leading health organizations, including the Centers for Disease Control and

Prevention, American Academy of Pediatrics, and National Academies of Sciences, Mathematics, and Engineering, have all stressed the importance of in-person learning for students." Id.

32. Because the rates of infection varied per county and locality and there have been fluctuations and surges in certain areas, the school districts in this state (at least before the new Title 14) made decisions regarding whether schools would be closed, and whether masks would be worn. Indeed, early on in the pandemic (March 16, 2020), TDOE advised that "local education agencies (LEAs), not the Tennessee Department of Education, have the authority and duty to make decisions regarding school closures due to a natural disaster or a serious outbreak of illness affecting or endangering students or staff." https://www.tn.gov/content/dam/tn/education/health-&-safety/ FAQforSchoolClosureCOVID-19.

33. At the start of this school year (Summer/Fall 2021), Tennessee led the nation in the number of schools closed due to COVID-19. https://www.cdc.gov/mmwr/volumes/70/wr/ mm7039e2.htm?s_cid=mm7039e2_w. Since then, the schools have reopened, although many imposed mask mandates. For example, upon recognizing that "their schools were reaching a 'crisis point' due to the rapid spread of new COVID-19 cases" in late August 2021, the Williamson County Board of Education and the Franklin Special School District "renewed implementation of universal mask mandates for all students, staff, and visitors, except for those who have a medical condition or sincerely held religious belief," which was subsequently extended "until at least mid-January 2022."[7] R.K., 2021 WL 4942871, at *7. Likewise, "[b]ased on the uptake in cases caused by the contagious Delta variant of COVID-19" the Shelby County Health Department issued a directive requiring "universal indoor masking," and this applied to the county schools as well. G.S. by & through Schwaigert v. Lee, No. 21-CV-02552-SHL-ATC, 2021 WL 4268285, at *3 (W.D. Tenn.

---

[7] After Governor Lee signed Title 14, Williamson County dropped its mask mandate.

Sept. 17, 2021). Similarly, the Nashville Metropolitan Board of Education passed a mask requirement for all students and staff on August 5, 2021. It did so, according to Dr. Adrienne Battle, the Director of Metro Nashville Public Schools ("MNPS"), "as a mitigation strategy for COVID-19 based primarily on their ability to reduce the chances that a person with the virus would transmit it to other people," and because "a universal masking policy is the most effective way of protecting all students, staff, and their families when there is high community transmission and a significant portion of our school community could not be vaccinated." (Doc. No. 27-4, Battle Decl. ¶¶ 4, 5).

34. On November 5, 2021, the CDC issued updated guidance relating to the prevention of COVID-19 for students attending classes from kindergarten to the twelfth grade. www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html. Although recognizing that the Pfizer vaccine was now approved for children over 5, the CDC also recommended, "[d]ue to the circulating and highly contagious Delta variant, universal indoor masking by all students (age 2 and older), staff, teachers, and visitors to K-12 schools, regardless of vaccination status." Id. In addition, the CDC continued to recommend "layered prevention strategies" such as social distancing (of no less than 3 feet in classrooms), screening, appropriate ventilation, quarantining when sick, and frequent hand washing, among other things.

35. Universal masking for those who attended school is also recommended by the AAP. https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/cloth-face-coverings. Also, like the CDC, the AAP's position is "that schools must continue to take a multi-pronged, layered approach to protect students, teachers, and staff," which it describes as "vaccination, universal mask use, physical distancing, ventilation when resources are available, screening, testing, hand washing, staying home and getting tested when sick, contact tracing, isolation, and quarantining." www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/

15

clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools.

36. The TDOE has also acknowledged the benefit of masking in the classroom in conjunction with other mitigation strategies. In response to the question, "what is the best way to prevent infection, isolation, and quarantine in the K-12?," the Department opined:

> Vaccination. Masking is also effective to control the spread of COVID-19 and keep schools operational, especially for those who are not eligible for vaccination. Layering these mitigation strategies with testing, cohorting, and social distancing will reduce infections and the likelihood that you need to isolate or quarantine.
>
> Multiple mitigation measures are necessary to limit the spread of COVID-19. If vaccination and masking are not prevalent in a K-12 setting, then isolation and quarantine are even more important.

https://www.tn.gov/content/dam/tn/education/health-&-safety/FAQs%20for%20COVID-19%20 Effect%20on%20Schools.pdf. That was its position, at least as of September 7, 2021. Id.

37. In its most recent guidance on November 5, 2021, the CDC recommended that "[l]ocalities should monitor community transmission, vaccination coverage, screening testing, and occurrence of outbreaks to guide decisions on the level of layered prevention strategies[.]" Id. Similarly, the AAP has recently opined:

> • It is critically important to develop strategies that can be revised and adapted depending on the level of viral transmission and test positivity rate throughout the community and schools, recognizing the differences between school districts, including urban, suburban, and rural districts.
>
> • School policies should be regularly reviewed, especially school transmission data, and adjusted to align with new information about the pandemic; administrators should refine approaches when specific policies are not working.
>
> •Schools should monitor the attendance of all students daily inclusive of in-person and virtual settings. Schools should use multi-tiered strategies to proactively support attendance for all students, as well as differentiated strategies to identify and support those at higher risk for absenteeism.
>
> • Schools should develop strategies to keep quarantining or isolating students engaged in real-time learning experiences.

16

• School districts must be in close communication and coordinate with state and/or local public health authorities, school nurses, local pediatric practitioners, and other medical experts including widely sharing district COVID-19 related policies.

https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools.

38. The new legislation in the form of "Title 14 – COVID-19" removed the ability of local Tennessee officials to monitor community variables as a guide to deciding the "leveled prevention strategies" (CDC), or consider "the level of viral transmission and test positivity rate throughout the community and schools" (AAP) by effectively banning a primary prevention strategy, *i.e.* universal masking for students attending class in school districts where it would be prudent because of the number of local COVID-19 cases.

39. Under the new law, each individual school in this state must clear a number of significant hurdles before instituting (or re-instituting) a school-wide mask mandate. First, a "severe condition" (as defined below) must exist. Second, the "principal or president of the school" must request, in writing, that the school board or other governing body adopt a mask policy. Tenn. Code Ann. § 14-2-104(a)(1). Third, the governing body can adopt such a policy, but only "on a school-by-school or campus-by-campus basis." Id. § (a)(3). Fourth, if a policy is adopted, the school is required to "provide face coverings for persons twelve (12) years of age and older that meet the U.S. National Institute for Occupational Safety and Health N95 classification of air filtration," or a similar, "age-appropriate face covering" for students between the ages of five and twelve. Id. §§ 3(a)(4), (5). Fifth, if such a policy is adopted, it can for no longer than fourteen days, unless renewed for an additional 14 days.[8] Id. § (b).

---

[8] In order for the masking policy to be renewed, all of the same requirements must exist. If not, the mask policy cannot be renewed. Id. § 3(c).

17

40. The statute seemingly recognizes the existence of the ADA by requiring that "[a] school shall, to the extent practicable, provide a reasonable accommodation pursuant to the [ADA] to a person who provides a written request for a reasonable accommodation to the principal or president of the school." Id. § (d)(1). Upon receipt of such a request:

> The principal or president of the school shall evaluate the request on behalf of the school and, to the extent practicable, provide a reasonable accommodation. The principal or president shall issue a decision approving or denying the request in writing. If the principal or president denies the request, then the grounds for denial must be provided in the principal's or president's written decision. If the principal or president approves the request, then the school shall place the person in an in-person educational setting in which other persons who may place or otherwise locate themselves within six feet (6') of the person receiving the reasonable accommodation for longer than fifteen (15) minutes are wearing a face covering provided by the school[.]

Id. § (d)(2). Again, the mask must be equivalent to an N95 mask for students over twelve, or a similar "age appropriate mask" for those over five, but under 12 years of age. Id. §§ (d)(2)(A), (B).

41. Finally with regard to face coverings in schools, the statute provides:

> (e) The governing body of a school shall not use state funds to mandate or require students to wear face coverings in violation of this section. If a school's governing body violates this subsection (e), then the commissioner of education may withhold future distributions of school funds from a local education agency in the amount of the state funds used in violation of this section, or the attorney general and reporter may initiate legal proceedings to recover all state funds used in violation of this subsection (e).

Id. § (e).

42. At least four provisions of the new statute warrant additional findings.

43. First, and as already noted, before implementing a mask mandate, a "severe condition" must exist. A severe condition means:

> (A) The governor has declared a state of emergency for COVID-19 pursuant to § 58-2-107; and

> (B) A county has an average rolling fourteen-day COVID-19 infection rate of at least

18

one thousand (1,000) new known infections for every one hundred thousand (100,000) residents of the county based on the most recent data published by the department of health. For purposes of this subdivision (20)(B), the number of new cases per one hundred thousand (100,000) persons within the last fourteen (14) days is calculated by adding the number of new cases in the county in the last fourteen (14) days divided by the population in the county by one hundred thousand (100,000).

Id. § 14-1-101(20).  According to all of the experts  who testified at the hearing, the 1,000 new infections per 100,000 residents figure is far too high to maintain public safety.  As Dr. Hijona put it, by that point the prevalence of COVID-19 in the community is "a very severe situation leading to a severe outbreak."  (Tr. 115-116).[9]  Dr. Yaun characterized it as (1) an "extremely high community transmission rate," at which time the hospitals and their ICU units would "potentially be overwhelmed"; (2)  it would be difficult if not impossible to staff schools; and (3) schools would likely have to be shut down because of the number of ill students.  (Id. at 28).  Put more bluntly, Dr. Ker opined that not allowing universal masking until that rolling 14-day average is reached "would be completely ineffective at that point," and would be "like trying to get the garden hose out to put out your entire home that's engulfed in flames.  It's just not going to work."  (Id. at 131).

44.  Second, and as also noted, the statute calls for "N95" or other "age appropriate mask" (whatever that may be).  As has been clear since the start of the pandemic, N95 mask are not easy to find.  Nor are they cheap in relation to other masks.  According to Jeff Gossage, the Director of Procurement for MNPS, the typical exam mask (i.e. the ubiquitous blue paper-like masks worn by many) costs $0.14 apiece, whereas an N95 mask costs $1.59 per unit.  Moreover, the  present global supply chain issues are affecting the ability to obtain N95 masks, meaning that it would take approximately 6 weeks to obtain a million masks, which will masks 60,000 MNPS students for 16

_____

[9]  Dr, Hijano further opined that even when there are only "around 300 cases per 100,000 individuals in a county . . . things start getting complicated. A lot of people are getting sick. Hospitals start to be very busy."  (Tr. at 77).

19

days. (Doc. No. 27-9, Gossage Dec. ¶¶ 4-6). Additionally, there is concern as to where money for the masks would even come from, particularly because the statute prohibits "the governing body of a school" from "us[ing] state funds to mandate or require students to wear face coverings[.]" Tenn. Code. Ann. § 14-2-104(e). According to Dr. Alyson Lerma, the Director of Grants for MNPS Schools, Nashville public schools are unable to directly access the emergency funds provided by Congress to combat the effect of COVID-19, and instead must either find local funds to purchase the N95 (or "equivalent"), or "submit a request for reimbursement to the Tennessee Department of Education (as the pass through entity) to reimburse MNPS" from the federal funds. (Doc. No. 27-8, Lerma Decl. ¶ 6).

45. Third, for persons receiving an accommodation, the statute requires that other individuals within six feet must wear a mask only if he or she is within the proximity of the person who requires an accommodation for more than 15 minutes. The 6-foot and 15-minute rules are merely guidelines recommended by the CDC for the general population. It must be borne in mind, however, that the 15 minute rule is the cumulative total of any 24 hour period, and that COVID-19 droplets and aerosols can travel more than 6 feet. (Tr. at 23 (Yuan), 129 (Ker)); For students with disabilities, six feet may be too short, and even ten minutes may be too long. (Tr. at 36 (Yaun); at 67-68 (Hijano); at 129-130 (Ker)).

46. Fourth, the statute gives the Commissioner of Health the "sole authority to determine quarantine guidelines," and specifically provides that "[a] local health entity, official, mayor, governmental entity or school does not have the authority to quarantine a person . . . for purposes of COVID-19." Tenn Code. Ann. § 14-4-101(b). These decisions were previously made at the local level.

47. Tennessee's addition of a new Title to its Code is not the first time the state has moved

towards banning universal mask mandates in public and charter schools statewide, notwithstanding the CDC's recommendations and assertions that the same could significantly harm school children.

48. Ten days after declaring a "continuing emergency" on August 6, 2021 that authorized out-of-state healthcare workers to practice in Tennessee, permitted practical nursing graduates to practice under supervision without examination, and allowed retired healthcare practitioners to more easily reenter the workforce, Governor Lee entered Executive Order No. 84. In that Executive Order signed August 16, 2021, Governor Lee "order[ed] that a student's parent or guardian shall have the right to opt out of any order or requirement for a student in kindergarten through twelfth-grade to wear a face covering at school, on a school bus, or at school functions, by affirmatively notifying in writing the local education agency or personnel at the student's school." Executive Order No. 84 also suspended "[a]ny law, order, rule, or regulation that would otherwise limit" its enforceability. https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee84.[10]

49. Executive Order 84 may have been applauded by some, but it did not meet with the approval of the federal district courts in this state that considered it in the context of suits filed by ADA plaintiffs requesting injunctive relief.

50. In the Western District of Tennessee, District Judge Sheryl H. Lipman found that plaintiffs had a likelihood of success on their claim that Executive Order No. 84 violated both the ADA and the Section 504. Accordingly, she preliminarily enjoined the Governor from "enforcing Executive Order No. 84 in Shelby County or allowing parents to opt out of Shelby County's mask mandate, as currently specified under Shelby County Health Order No. 25" and ordered Shelby County "to enforce its Health Orders without exception for Governor Lee's Executive Order No. 84." G.S., 2021 WL 4268285, at *14.

---

[10] Governor Lee withdrew Executive Order No. 84 upon the enactment of Title 14.

51. In the Eastern District, Judge J. Ronnie Greer was presented with a challenge not only to Executive Order No. 84, but also to the Knox County Board of Education's repeal of a universal mask mandate that had previously been in place. Like Judge Lipman, Judge Greer found that plaintiffs had established a likelihood of success on both their ADA and Rehabilitation Act claims. However, instead of merely enjoining the enforcement of Executive Order No. 84 in Knox County, Judge Greer also enjoined enforcement of the Board's repeal of its mask mandate, and affirmatively ordered the "Knox County Board of Education . . . to enforce – with immediate effect – the mask mandate that was in place in all Knox County Schools during the 2020-2021 school year, as a reasonable accommodation under the ADA for Plaintiffs and Class Plaintiffs." S.B. by & through M.B. v. Lee, No. 321CV00317JRGDCP, 2021 WL 4755619, at *28 (E.D. Tenn. Oct. 12, 2021).

52. In the Middle District, the undersigned was presented with a challenge to Executive Order No. 84 by two disabled students, one in the Williamson County School District and the other in the Franklin County Special School District. This Court, too, found that Plaintiffs had established a likelihood of success on their ADA and Rehabilitation Act claims and, accordingly, enjoined enforcement of Executive Order No. 84 in either of those two school districts. R.K., 2021 WL 4942871, at *18.

53. Upon the passage of Title 14, Governor Lee withdrew Executive Order 84. At the time, active injunctions were in effect in each of the three federal districts in Tennessee.

54. The federal courts in Tennessee were not alone in questioning the wisdom of Executive Order No. 84. In an August 18, 2021 letter addressed to both Governor Lee and Commissioner Schwinn, Dr. Miguel A. Cardona, the Secretary of Education, warned Defendants that "Tennessee's actions to block school districts from voluntarily adopting science-based strategies for preventing the spread of COVID-19 that are aligned with the guidance from the Centers for Disease Control and

Prevention (CDC) puts these goals at risk and may infringe upon a school district' s authority to adopt policies to protect students and educators as they develop their safe return to in-person instruction plans required by Federal law." https://oese.ed.gov/files/2021/08/21-007071-Letter-from-Secretary-Cardona-Tennessee.pdf. The letter also informed both Defendants that Tennessee's receipt of billions of dollars in federal funding was now at risk. Id.

55. The United States Department of Education's warning about the potential risk to federal funds was not lost on the legislature. According to a Declaration submitted on behalf of Defendants by Eve Carney, the Chief Districts and Schools Officer at TDOE, her department examined "the bills' fiscal impact," but "concluded that the bills [House Bill No. 9077 and Senate Bill No. 9014] did not directly place at risk" the emergency federal funding to schools as a result of COVID-19. (Doc. No. 28, Carney Decl. ¶ 18).[11]

56. Emergency federal funding to the states came in the form of three rounds of Elementary and Secondary School Emergency Relief ("ESSER") funding. The first round came in March 2020 in the form of the Coronavirus Aid, Relief and Security ("CARES") Act. Tennessee received $259 million of the $13.2 billion earmarked for state education assistance. (Id. ¶¶ 8, 10). Tennessee

---

[11] After the hearing in this case, Plaintiffs filed a "Motion to Admit Evidence from Liz Alvey." (Doc. No. 37). In an email to Senate Speaker Randy McNally and Senate Majority Leader Jack Johnson, Ms. Alvey, Governor Lee's Legislative Counsel, opined that the "[p]roposed ADA accommodation in the bill is a violation of the ADA and will put us at risk of losing federal funding." (Doc. No. 37-1 at 1). Plaintiffs insist that "Ms. Alvey's statement is both substantive evidence and an admission that the legislature was advised the bill does not comport with the ADA and that, now, Tennessee risks loss of funding." (Doc. No. 37-1). Defendants oppose the motion because the email is not authenticated and it offers a legal conclusion. (Doc. No. 40 at 1-2).

The Court finds is unnecessary to resolve this dispute and will deny the Motion. Based upon Ms. Carney's declaration it seems quite clear that the legislators knew, or at least reasonably should have known, that passage of the new law would jeopardize federal funds. Governor Lee certainly knew as much, given his receipt of the letter from the U.S. Department of Education relating to his Executive Order. Regardless, whether Tennessee would or would not lose federal funds under the ARPA is not an issue that the Court needs to decide in ruling on Plaintiffs' request for a preliminary injunction.

received an additional $1.1 billion in late December 2020 from the Coronavirus Response and Relief Supplemental Appropriations Act. (Id. ¶ 11). Finally in the spring of 2021, TDOE received approximately $2.48 billion from the ARPA. (Id. ¶ 12).

57. At the time Title 14 was signed into law by Governor Lee, the number of COVID-19 cases was down, at least when viewed in relation to the spikes that were seen in August and September. However, this hardly suggests that COVID-19 is making a graceful exit from Tennessee. In fact, Dr. Yaun expressed concern at the hearing that "[i]n Shelby County, for instance, the highest percentage of active cases is in our zero-to-17-year-old population. That makes up 34 percent of all active cases at a case rate of 164 per 100,000. So we're still seeing children being affected by COVID." (Tr. at 25). Similarly, Dr. Ker stated that Williamson County and "many of the counties [in Tennessee] are still in a very high transmissibility level . . . so that there is a lot of transmission of this virus still happening." (Tr. At 129).

58. As a pointed reminder of just how fast things can change in the COVID-19 world, within a week of the hearing on Plaintiffs' request for a preliminary injunction, the World Health Organization "classified a new variant, B.1.1.529, as a Variant of Concern and has named it Omicron." https://www.cdc.gov/media/releases/2021/s1126-B11-529-omicron.html. That variant has now found its way to the United States with a confirmed case reported in California on December 1, 2021. Id. One week later, the variant had been detected in 17 states spread across the country. https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html.What this variant may hold for the near- or long-term future is entirely unknown at this point.

## II. Conclusions of Law

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22

(2008).   In determining whether that showing has been made in the context of a request for a preliminary injunction, courts generally consider four factors:   "(1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest.  Vitolo v. Guzman, 999 F.3d 353, 360 (6th Cir. 2021) (citing Nken v. Holder, 556 U.S. 418, 434 (2009)).   Where, as here, the defendant is the government, the third and fourth factors merge.   Nken, 556 U.S. at 434; Daunt v. Benson, 956 F.3d 396, 422 (6th Cir. 2020).

"These factors are not prerequisites, but are factors that are to be balanced against each other."  Memphis A. Philip Randolph Inst. v. Hargett, 2 F.4th 548, 554 (6th Cir. 2021) (quoting Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002)).   That balance strikes decidedly in Plaintiffs' favor.

## A.  Likelihood of Success

"At the preliminary injunction stage, 'a plaintiff must show more than a mere possibility of success,' but need not prove his [or her] case in full.'"  Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 591 (6th Cir. 2012) (quoting Certified Restoration Dry Cleaning Network, 511 F.3d 535,543 (6th Cir. 2007)).   "'[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'"  Id. (quoting Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 402 (6th Cir.1997)).

Plaintiffs have shown more than a mere probability of success on their ADA and Section 504 claims and, because state law must yield to federal law when they conflict, they have established an

25

overall likelihood of success on the merits.[12]  Prior to explaining why this is so, the Court must address some preliminary and jurisdictional arguments raised by Defendants.

### 1. Jurisdictional and Related Arguments

Defendants argue that Plaintiff cannot establish a likelihood of success on the merits for a number of reasons unrelated to the merits of their substantive claims.  They argue Plaintiffs have no standing to bring this suit, their claims are not ripe, and they cannot obtain redress from either of the named Defendants.  Defendants also insist that they are immune from suit on the majority of Plaintiffs' claims.

Were any of these arguments meritorious, Defendants would have a point.  After all, "'the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction,'" and "'[a] party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction.'"  Waskul v. Washtenaw Cty. Cmty. Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quoting Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir. 2015)).  Much the same can be said about Defendants' other non-merits arguments "because an 'affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits[.]"  Id. (quoting Nat'l Wildlife Fed'n v. Burford, 835 F.2d 305, 328 (D.C. Cir. 1987)).

### A. Standing and Ripeness

The threshold question in every federal case is standing.  Warth v. Seldin, 422 U.S. 490, 498 (1975). "Standing to sue is a doctrine rooted in the traditional understanding of a case or

---

[12] Because of this conclusion, and because federal courts will not "decide 'questions of a constitutional nature unless absolutely necessary to a decision of the case[,]'"  Torres v. Precision Indus., Inc., 938 F.3d 752, 754 (6th Cir. 2019) (citation omitted),  the Court does not address Plaintiffs' Fourteenth Amendment Equal Protection Claims.

26

controversy" under Article III of the United States Constitution. <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016).

"[T]he irreducible constitutional minimum of standing contains three elements," <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992), that the plaintiff has the burden of establishing, <u>FW/PBS, Inc. v. Dallas</u>, 493 U.S. 215, 231. Plaintiff "must allege specific, concrete facts," <u>Warth</u>, 422 U.S. at 498, demonstrating that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo</u>, 578 U.S. at 338.

There is a "close affinity" between standing and the ripeness doctrine, <u>Warth</u>, 422 U.S. 490, 499 n.10, as both "share[ ] a foundation in Article III's case-and-controversy requirement." <u>Miller v. City of Wickliffe</u>, 852 F.3d 497, 503 (6th Cir. 2017). "Generally, a claim may not be adjudicated on its merits unless it is ripe." <u>Jackson v. City of Cleveland</u>, 925 F.3d 793, 807 (6th Cir. 2019) (citing <u>Nat'l Rifle Ass'n of Am. v. Magaw</u>, 132 F.3d 272, 284 (6th Cir. 1997)). "A claim is unripe when it is anchored in future events that may not occur as anticipated, or at all." <u>Id.</u> (citation omitted).

Defendants argue that "[b]ecause the Act allows schools to provide the reasonable accommodations in reference to masking, Plaintiffs have no actual or imminent injury." (Doc. No. 23 at 6). They also argue that Plaintiff cannot complain because, not only are Plaintiffs "not denied community masking by the Act," the statute actually "requires, schools to provide mask mandates as a reasonable accommodation under the ADA." (<u>Id.</u> at 7- 8). Defendants further contend that "this suit cannot provide Plaintiffs any legal redress," because "Defendants do not have enforcement responsibility over Section 104. Rather, the Act provides that any decision to grant or deny such accommodations is made at the local level, not by Defendants." (<u>Id.</u> at 8). Moreover, according to

Defendants, because "[n]o school district, school, or principal is a defendant in this lawsuit," the Court "can have no confidence that an injunction would get the Plaintiffs what they seek: a masking accommodation in their individual schools." (Id.).

There are many problems with these arguments, not the least of which is that they assume, presume, ignore, and misconstrue too much:

First, Defendants presume that the statute's nod and wink to the ADA and its fundamental requirement that an accommodation be reasonable means that the statute perforce complies with the ADA. One does not necessarily follow from the other, as will be made abundantly clear below.

Second, Defendants assume that the masking decisions localities purportedly are still allowed to make is sufficient in the context of the present pandemic, even forgetting the possibility that it could get worse. At the same time, Defendants ignore that the masking decision, which the statute dictates, could come far too late to be effective, particularly because the local decision can only be effectuated after a state of emergency has been declared and after the request has been run up the flagpole, as the statute requires to reach a predetermined accomodation.

Third, Defendants claim the Governor has no enforcement obligation under the statute, while ignoring or at least downplaying (1) that he must declare a state of emergency before any local decision about school-wide masking can be made, and (2) it is the Governor's constitutional duty is to faithfully execute the laws of the state of Tennessee, Tenn. Const. art. III, § 10.

Fourth, and similar to the last point, Defendants downplay the Commissioner of Education is statutory obligation to enforce Tennessee laws, Tenn. Code Ann. § 49-1-201(a), of which "Title 14 – COVID-19" is now a part.

Fifth, Defendants assume that Plaintiffs would have standing had they just sued a school district or principal, all the while ignoring that local school districts hands are tied by the very

existence of the statute. That is, localities cannot act alone, and because they cannot act alone, they cannot be the cause of the harm to Plaintiffs.

Sixth, Defendants misconstrue the relief Plaintiffs' seek by suggesting that they are clamoring for "universal masking," with the unstated premise being that what Plaintiffs really want is for each student in every Tennessee school to be masked. Instead, what Plaintiffs seek is a school district's ability to determine what is reasonable for its schools and students, and what is an appropriate accommodation under the ADA, given the local COVID-19 rates and its impact on a particular community.

Defendants' arguments relating to jurisdiction and standing are really just offshoots of the arguments raised by the Governor in response to the challenges to Executive Order No. 84. For example, in the Western District case, Governor Lee argued plaintiffs there had no standing because, even if an injunction was issued, plaintiffs would not receive the relief requested, *i.e.* "implementation of a universal mask mandate." G.S., 2021 WL 4057812, at *5. However, as Judge Lipman found, enjoining the Executive Order would reinstate Shelby County's "mask mandate applicable throughout the County," and, "[a]s such, enjoining the Executive Order would redress Plaintiffs' alleged injuries." Id. The same is true here because enjoining the new act as it pertains to masking in schools would allow school districts to revert back to a mask requirement should the circumstances warrant, without fear that they will lose funding or be otherwise punished by the state if they do so.

The situation was different in the Eastern District case because, at the time the Executive Order was issued, Knox County had already removed its mask mandate. This prompted Judge Greer to rhetorically ask:

[W]hy would a board of education bother acting to adopt a mask mandate when

> Governor Lee's executive order allows students not to comply with it? Governor
> Lee's executive order reduces any board of education's mask mandate to a mere
> paper tiger.

S.B., 2021 WL 4755619, at *8 (E.D. Tenn. Oct. 12, 2021). Judge Greer found the harm, and

therefore the traceable injury sufficient to confer standing, lay in the realization that, under the

Executive Order, "any board-approved mask mandate [wa]s a de facto no-mask mandate." Id.

The same is true with regard to the new statute, although the paper tiger is now toothless to

boot. Under the Executive Order, school districts could enter a mask mandate that parents could

choose to follow or ignore. Under the new law, school districts do not even have the power to

require masks, whatever the public safety circumstances in a particular county or city may be, unless

the Governor first declares a state of emergency. Hence, the Governor alone controls whether a

school district can use masking to protect children This, according to the unchallenged expert

testimony before the Court, is likely far too late to make a difference for public safety.

Finally, on the issue of standing and ripeness, Defendants present a single, one-paragraph

argument in which they claim that there is no "case or controversy" between the parties as required

by Article III of the Constitution. This is supposedly because the "Plaintiffs here have neither

requested nor been denied an accommodation under the Act." (Doc. No. 23 at 11). As such,

according to Defendants, "this case presents the prototypical request for an advisory opinion." (Id.).

The Court disagrees.

"The ripeness doctrine exists 'to prevent the courts, through premature adjudication, from

entangling themselves in abstract disagreements.'" Jackson v. City of Cleveland, 925 F.3d 793, 807

(6th Cir. 2019) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 (1985)).

"Application of this doctrine 'requires that the court exercise its discretion to determine if judicial

resolution would be desirable under all of the circumstances.'" Id. (quoting Brown v. Ferro Corp.,

763 F.2d 798, 801 (6th Cir. 1985)). "Of primary importance is 'whether the issues tendered are appropriate for judicial resolution,' and, if so, the degree of 'hardship to the parties if judicial relief is denied' before the claim is allowed to ripen further." Id. (quoting Young v. Klutznick, 652 F.2d 617, 625 (6th Cir. 1981)).

There is nothing premature about this case, nor do the parties have an abstract disagreement amongst themselves. The statute hamstrings local schools and impacts disabled students, or so Plaintiff's allege. Further, the potential harm to disabled students might well be incalculable given the serious health consequences COVID-19 could cause. Indeed, it would likely be an abuse of discretion for this Court not to entertain this suit at this time. Because Plaintiffs have standing and this Court has jurisdiction over a live case and controversy, the Court turns to the Defendants' immunity argument.

### B. Immunity

"From birth, the States . . . have possessed certain immunities from suit in ... federal courts." Ernst v. Rising, 427 F.3d 351, 358 (6th Cir. 2005) (citing Alden v. Maine, 527 U.S. 706, 713 (1999)). This includes claims brought in federal court by a state's own citizens. Id. (citing Hans v. Louisiana, 134 U.S. 1, 13 (1890)). And, because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," most such suits are barred. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

There are, however, several recognized exceptions to the rule that a state and its officers are immune from suit in federal court. One such exception occurs when Congress abrogates a state's immunity based upon the state's receipt of federal funds. That is precisely what Congress did in relation to Section 504. See 42 U.S.C. § 2007d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of

31

section 504 of the Rehabilitation Act of 1973[.]"); Nihiser v. Ohio E.P.A., 269 F.3d 626, 628 (6th Cir. 2001) (collecting cases) ("The U.S. Supreme Court, as well as every circuit court to address the question, has recognized Section 2000d–7 as a valid and unambiguous waiver" of Eleventh Amendment immunity). Accordingly, Defendants are not immune from suit for Plaintiffs' Section 504 claim, and Defendants do not argue otherwise.

Nor are Defendant immune from suit on Plaintiffs' ADA claim. Under the Ex Parte Young exception to immunity, "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law . . . regardless of whether compliance might have an ancillary effect on the state treasury[.]" S & M Brands, Inc. v. Cooper, 527 F.3d 500, 507–08 (6th Cir. 2008) (internal citations omitted). While this "exception does not extend . . . to any retroactive relief," it "is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." Id. at 508 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n. 14 (1983)).

To determine if Ex parte Young applies, a court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Boler v. Earley, 865 F.3d 391, 412 (6th Cir. 2017) (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002)). That is precisely the situation here.

Even though Plaintiffs seek to enjoin the ongoing alleged violation of the ADA and Section 504, Defendants insist Ex parte Young does not apply to the Governor because he has no "special relation" to the statute, and he has no "special powers of enforcement or supervision respecting mask mandates or accommodations in schools." (Doc. No. 23 at 10). Further, Defendants argue, Commissioner Schwinn is not subject to liability because "Plaintiffs do not point to any imminent

32

enforcement actions against their school districts that could justify this sort of pre-enforcement review." (Id.). In support, Defendants cite Russell v. Lundergan-Grimes, 784 F.3d 1037, 1047 (6th Cir. 2015) and Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1416 (6th Cir. 1996).

Defendants' arguments are easily dispatched, even based upon the cases on which they rely. In Russell, the Sixth Circuit confirmed that the "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law," but also noted "[e]njoining a statewide official under Young based on his obligation to enforce a law is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." 784 F.3d at 1048. Children's Healthcare is entirely inapposite to the situation here because plaintiffs did not seek to enjoin enforcement of a statute but, rather, sought to expand application of a statute, which "would turn Young inside out." 92 F.3d at 1417. Furthermore, the Sixth Circuit has held that Ex Parte Young only "requires that the state officer sued have 'some connection' with the enforcement of the allegedly unconstitutional Act," and that, [e]ven in the absence of specific state enforcement provisions" there may be a "substantial public interest in enforcing" a statute that "places a significant obligation upon the Governor to use his general authority to see that state laws are enforced[.]" Allied Artists Picture Corp. v. Rhodes, 679 F.2d 656, 665 (6th Cir. 1982); see also Hernandez v. Grisham, 499 F. Supp. 3d 1013, 1052 (D.N.M. 2020) (citing Allied Artists, among other cases in ruling that New Mexico's Governor was not immune from plaintiffs' claims because of her "heavy involvement in the State's education policy before and during COVID-19"); Doe v. Ohio, No. 2:91-CV-464, 2012 WL 12985973, at *8 (S.D. Ohio Feb. 16, 2012) (relying on Allied Artists in concluding that the governor was not immune from suit and noting (like here) "there is clearly a 'substantial public interest' at stake, i.e., providing an

appropriate public education to disabled children").

The allegations in this case and its underlying history involve far more than just the Governor's constitutional duty to enforce Tennessee laws. The new law could have been vetoed by the Governor, or could have been passed without his signature, but Governor Lee took the affirmative step of signing Title 14 into law. See Tenn. Const. Art. III, § 18; Webb v. Carter, 129 Tenn. 182, 165 S.W. 426, 449 (1914) (Williams, J., concurring) (Tennessee's "constitution does not require the Governor to either sign or veto a bill. If he holds it for more than five days without signifying either his approval or disapproval, it shall become a law."). More than that, Governor Lee did so after each of the federal districts in this state had enjoined enforcement of his Executive Order relating to masks in school. He also withdrew the Executive Order upon passage of the new statute, apparently satisfied that Title 14 achieved what he intended.

Given this history there is, in the words of Russell, more than "a realistic possibility" the Governor would take legal or administrative actions against the plaintiff's interests." 784 F.3d at 1048. In addition, Governor Lee has "some connection" to the statute sufficient for the Ex Parte Young exception to apply. See Top Flight Ent., Ltd. V. Schuette, 729 F,ed 623,634 (6th Cir. 2013) (citation omitted) ("[T]he state official sued must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which plaintiff complains."); Durham v. McWhorter, 789 F. App'x 533, 534 (6th Cir. 2020) (stating that "[s]overeign immunity prevents a plaintiff from suing state officials in federal court for 'retroactive monetary relief[,] [b]ut a plaintiff may seek a prospective injunction against state officials who have 'some connection' to an ongoing constitutional violation").

The underlying history of the legislation aside, Governor Lee's role in Title 14's enforcement is more than just passive as Defendants suggest. Rather, he alone must formally declare a "severe

condition" before individual schools can even seek the mask mandate that the statute purportedly allows.

Commissioner Schwinn's role is not merely passive, either. Rather, she has the authority to "withhold future distributions of school funds from a local education agency" where that agency violates a provision in the statute. Tenn. Code Ann. 14-2-104(e). To the extent that Defendants argue there is no case or controversy unless and until that occurs (*i.e.* the case is not ripe), that argument has already been rejected. Besides, Commissioner Schwinn has made no affirmative statement suggesting that she would not withhold funds should a local school district fail to follow the new law. See Kizer v. Reitz, 765 F.3d 601, 607-08 (6th Cir. 2014) (stating that "an allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" and, in considering such possibilities, a court can look to whether the state has disavowed any intention to enforce the law).

Summing up the immunity issue, "'Young's applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States.'" Russell, 784 F.3d at 1049 (quoting Papasan v. Allain, 478 U.S. 265, 277 (1986)). That is the situation here, and both Defendants are subject to suit under the Ex Parte Young exception to Eleventh Amendment immunity. Accordingly, the Court turns to the merits.

### 2. The ADA and Section 504

"Both the ADA and the Rehabilitation Act combat discrimination against disabled individuals," M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ., 1 F.4th 436, 452 (6th Cir. 2021), and "cover largely the same ground," R.K. *ex rel*. J.K. v. Bd. of Educ. of Scott Cty., 637 F. App'x 922, 924 (6th Cir. 2016). Specifically, Section 504 of the Rehabilitation Act provides that

"[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Title II of the ADA echoes Section 504 by providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

"Apart from § 504's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded – as opposed to 'public'– entities, the reach and requirements of both statutes are precisely the same." S.S. v. E. Ky. Univ., 532 F.3d 445, 452-53 (6th Cir. 2008) (internal brackets, quotation marks, and citation omitted). As such, the elements Plaintiffs must prove are similar, if not virtually identical. See Thompson v. Williamson Cty., 219 F.3d 555, 557 (6th Cir. 2000) ("Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act, see 42 U.S.C. § 12133, claims brought under both statutes may be analyzed together."); McPherson v. Mich. High Sch. Athletic Ass'n, Inc., 119 F.3d 453, 460 (6th Cir. 1997) ("[T]he elements of a Rehabilitation Act claim are largely similar to those of an ADA claim, with the additional requirement that the defendant be shown to receive federal financial assistance.").

"To make out a prima facie case under Title II of the ADA, a plaintiff must establish that "(1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of her disability." Dillery v. City of Sandusky, 398 F.3d 562, 567 (6th Cir. 2005) (citing

Jones v. City of Monroe, 341 F.3d 474, 477 (6th Cir.2003)).[13]   "Denial of a reasonable accommodation is a cognizable claim under Title II of the ADA," G.S. by & through Schwaigert v. Lee, No. 21-5915, 2021 WL 5411218, at *2 (6th Cir. Nov. 19, 2021), because it is yet another form of discrimination, Marble v. Tennessee, 767 F. App'x 647, 651 (6th Cir. 2019); McPherson v. Mich. High Sch. Athletic Ass'n, Inc., 119 F.3d 453, 460 (6th Cir. 1997)).

Each of the eight children on behalf of whom suit was brought is disabled for purposes of both the ADA and Section 504 because each has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Each is also otherwise qualified because he or she attends a public school, and (for purposes of the Rehabilitation Act) those schools receive federal funding. Defendants do not argue otherwise. The only real dispute is whether the children have been denied a benefit or discriminated against because of their disabilities.

As a preliminary matter, Defendants argue (much as they did regarding standing) that there is no violation of either the ADA or Section 504 because Tennessee's new COVID statute contains a reasonable accommodation provision for schools. In actuality, the language of the statute itself provides the first basis for a finding that Plaintiffs are likely to prevail on the merits because its wording evinces a lack of compliance with, or concern for, the ADA.

To begin, the statute says that "[a] school shall, to the extent practicable, provide a reasonable accommodation pursuant to the Americans with Disabilities Act," Tenn. Code. Ann. § 14-2-104(d)(1), as if public schools can opt-out of the ADA or Rehabilitation Act because they deem it "impractical." Neither schools nor Defendants have discretion to avoid compliance with the ADA or the Section 504. Instead, public entities have an affirmative obligation to make "reasonable

---

[13]  Under the Rehabilitation Act, a plaintiff must also show defendant received federal financial assistance.

37

modifications" in their services or programs to accommodate the disabled when necessary to avoid discrimination, unless it will "fundamentally alter" the service or program. 28 C.F.R. § 35.130(b)(7).

Section 104(d), which Defendants deem to be "an express carve-out" from the general anti-masking rule found in Section 104(a), (Doc. No. 42 at 21), is also problematic in terms of the ADA and its requirements. Specifically, after the statute prohibits schools from requiring masks under subsection (a) unless a written request to the school board is made and approved, and a state of emergency has been declared by the Governor, the statute goes on to provide "*notwithstanding subsection (a)*" that:

> (1) A school shall, to the extent practicable, provide a reasonable accommodation pursuant to the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) to a person who provides a written request for a reasonable accommodation to the principal or president of the school. If the person requesting a reasonable accommodation under this subsection (d) is a minor, then the person's parent or legal guardian must provide the written request on the minor's behalf.

> (2) The principal or president of the school shall evaluate the request on behalf of the school and, to the extent practicable, provide a reasonable accommodation. The principal or president shall issue a decision approving or denying the request in writing. If the principal or president denies the request, then the grounds for denial must be provided in the principal's or president's written decision. If the principal or president approves the request, then the school shall place the person in an in-person educational setting in which other persons who may place or otherwise locate themselves within six feet (6') of the person receiving the reasonable accommodation for longer than fifteen (15) minutes are wearing a face covering provided by the school that [meets or exceeds the N95 mask or is otherwise age appropriate].

Tenn. Code Ann. § 14-2-104(a),(d) (emphasis added). From this language, Defendants argue that, "[a]s an exception to th[e] general rule, Section 104(d) allows a school principal or president to require masking in response to a request for a disability-related accommodation." (Doc. No. 42 at 20). At the same time, Defendants insist that "Section 104(d) does not impede Plaintiffs from requesting a reasonable accommodation." (Doc. No. 23 at 13). Defendants present an interesting if not tortured reading of the statute. Regardless, the statute assumes power the legislature did not

38

have and fails to take into account how the ADA is intended to operate.

Contrary to Defendants' contention, Section 104(d) does impede a reasonable accommodation request because it dictates exactly what is reasonable, at least in the General Assembly's collective mind. It says that the principal "*shall*" do certain things, and "the school *shall* place the person in an in-person educational setting," with others allowed in that "educational setting" and within six feet of the disabled child, so long as they are masked and are in the setting no more than 15 minutes. That section also requires the use of N95 masks (or an age-appropriate equivalent), without providing any basis for that requirement, while at the same time withholding funds for the new requirement. Further, Section 104(d) says nothing about common areas where students are bound to congregate or pass through during the course of a given day, including hallways, bathrooms, cafeterias, and school buses.

The statute does not say where the Tennessee legislature obtained the authority to dictate what is reasonable under the ADA, nor do Defendants shed any light on the issue in their briefs. Regardless, the statute does not contemplate the interactive, individualized process required by the ADA, even though the Supreme Court has held that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances." PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001).[14] What the statute does is require a written request from the parent on behalf of a minor child, even though such formality in making the request is not necessarily required by federal law. 29 C.F.R. § 1630.2(o) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the

---

[14] Although Martin was decided in the context of public accommodations under Title III, its rationale applies to Title II claims as well. Marble, 767 F. App'x at 652; Wright v. New York State Dep't of Corr., 831 F.3d 64, 77 (2d Cir. 2016).

accommodation.").

Given all this, a casual cynic could believe that the legislature intentionally placed "tripwires" (as Plaintiffs describe them) along the path to a reasonable accommodation in order to discourage requests for the same. This cynicism would likely grow when one considers that the very first sentence in the "face coverings for schools" section of Title 14 begins with the phrase: "[n]otwithstanding Title 49 or any other law to the contrary[.]" Tenn. Code Ann. 14-2-104(a).

Title 49 deals with education in Tennessee and, among other things, establishes local school boards and their duties. Those boards have the specific duty to "manage and control all public schools established under its jurisdiction," except, apparently, when COVID-19 creeps into the schoolhouse. It is of no small moment that this Court relied upon this now-denounced language when enjoining Executive Order No. 84.

It requires no cynicism, however, to quickly conclude (notwithstanding the questionable ADA provisions in the statute) that Tennessee's new statutory scheme as it pertains to public schools is substantially likely to violate both the ADA and Section 504.

When enacting the ADA, Congress made specific findings declaring the national interest, including:

> (1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination[;]
>
> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as . . . education . . . ; and

*   *   *

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices . . .

42 U.S.C. § 12101.[15] Congress went on to provide a "broad mandate" to "effectuate [the ADA's] sweeping purpose [to] ... forbid[ ] discrimination against disabled individuals in major areas of public life[.]" Martin, 532 U.S. at 675. Among other things, Congress directed the Attorney General to promulgate appropriate regulations to implement the prohibition against discrimination. 42 U.S.C. § 12134. Two are particularly relevant here.

First, the integration mandate provides that public entities "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The appropriate "most integrated setting" is defined "to mean 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 592 (1999) (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

Second, the "reasonable modification" regulation (alluded to before) provides:

A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

28 CFR § 35.130(b)(7). Thus, "Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 910 (6th Cir. 2004). It mandates

---

[15] Similarly, in the Rehabilitation Act, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 284 (1987).

"reasonable – not fundamental or substantial – adjustments." Gati v. W. Kentucky Univ., 762 F.

App'x 246, 250–51 (6th Cir. 2019).

> In determining reasonableness of a requested modification,
>
> the burden that the requested modification would impose on the defendant (and perhaps on persons or interests whom the defendant represents) must be weighed against the benefits that would accrue to the plaintiff. This is a highly fact-specific inquiry. A modification should be deemed reasonable if it imposes no fundamental alteration in the nature of a program or undue financial and administrative burdens.

Anderson v. City of Blue Ash, 798 F.3d 338, 362 (6th Cir. 2015) (quoting Hollis v. Chestnut Bend

Homeowners Ass'n, 760 F.3d 531, 541 (6th Cir. 2014)).[16]

By any measure, Plaintiffs' requested modification consisting of unfettered application of the

ADA and Section 504 is reasonable. To be clear, Plaintiffs are not seeking a state-wide universal

mask mandate, even for children in schools. Instead, Plaintiffs seek a return to the *status quo* as it

existed prior to the enactment of Title 14, meaning that local school districts would have the

decision-making authority about whether, and when, to quarantine and implement universal masking

during the pandemic. This would allow parents, to engage in the interactive process with their local

school boards in terms of the need for masking, quarantining, and other preventive measures

depending on local metrics, just as they did before.

The reasonableness of Plaintiffs proposed modification/accommodation lies in the very fact

that it apparently worked well before it was scuttled, first by Executive Order No. 84, and then by

the enactment of Title 14. As noted, after the statewide school closure mandate was lifted, the

individual school districts were left to determine how best to reopen schools. Initially most, if not

---

[16] Although Anderson and Hollis dealt with the Fair Housing Amendment Act, which prohibits disability-based discrimination in relation to housing, the requirements for reasonable accommodation under that act and the ADA are the same. See Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth., No. 21-3090, 2021 WL 5411220, at *6 (6th Cir. Nov. 19, 2021); Oconomowoc Residential Programs, Inc. v. City of Milwaukee, 300 F.3d 775, 783 (7th Cir. 2002).

all, chose universal masking when children were allowed to return to the classroom. Later, some districts continued to require masking, while others did not. Defendants have presented no evidence that this was an unworkable solution, that it imposed "undue financial and administrative burdens," or that it constituted a "fundamental alteration" to the program, *i.e.* providing children with an education. See G.S., 2021 WL 5411218 at *3 (Sixth Circuit rejecting Governor Lee's argument that "universal mask wearing in K-12 schools is unreasonable because it 'imposes significant burdens on third parties,'" and noting that "prior to Executive Order No. 84, Plaintiffs' schools were already enforcing a universal mask mandate," which the Governor did not show to be "impractical or impossible for schools to enforce").

The reasonableness of Plaintiffs' proposed modification/accommodation is also apparent because it is a simple way for all children to safely attend schools during the pandemic. It is also the only effective way for children with disabilities like the Plaintiffs have in this case to even pass through the schoolhouse doors.

"'The hallmark of a reasonable accommodation is effectiveness.'" S.B., 2021 WL 4346232, at *15 (quoting, Wright v. N. Y. State Dep't of Corrs., 831 F.3d 64, 72 (2d Cir. 2016)). The evidence presented to the Court – which Defendants did not even try to challenge– establishes that a layered approach consisting of vaccination, masking, quarantining, contract tracing, and social distancing is required to effectively reduce the spread of COVID-19. It is the combination of these measures that make them effective and, without them, certain individuals, including those with disabilities, are at increased risk of contracting the virus and severe illness or death.

This is particularly true in the schools setting where many children are in the same building or classroom for hours on end. As this Court's findings of fact make abundantly clear:

• Vaccinations are effective, but not fool-proof. They are wholly ineffective if not

43

taken, and there is a reluctance by some to receiving the vaccine. In some areas more than others, the rates of vaccination are low.

• Masking, a hot-button topic if ever there was one, is crucial to reducing the rate of COVID-19 because of its transmission through the air via droplets and aerosols. It is a simple measure that is not costly, but is only effective if both the person sought to be protected and those around him or her are masked.

• Quarantining and contact tracing are necessary to isolate those with the virus and thereby reduce the chance that they will spread it to others. This is standard procedure during any pandemic.

• Social distancing, like masking, is essential because of the way the virus is spread. The 6 foot/15 minute rule is a general guideline, but, standing alone, does not guarantee that the virus will not spread.

In the absence of a layered approach, including masking when local conditions warrant, children with disabilities cannot safely attend school, let alone be in the integrated setting contemplated by the ADA. Remote or virtual learning is not a substitute for live, in person schooling, as both the Governor and the Commissioner of Education recognized when schools were set to reopen for the 2020-2021 school year.

It is disingenuous for Defendants to now argue that Plaintiffs cannot establish a likelihood of success on the merits because Title 14 actually allows for school-wide masking in appropriate circumstances, and otherwise provides for a "reasonable" accommodation. Under Title 14, universal masking in a particular school for a period of two weeks is only allowed when a county has an average rolling COVID-19 infection rate of 1,000 new infections for 100,000 residents. Where the legislature came up with this figure is unclear, but it ignores the reality of COVID-19, its impact on a community at that level, and the science that has developed since COVID-19 appeared in this country. Again, based upon the undisputed evidence presented to the Court, a 1,000 new infection rate benchmark is totally ineffective, if not downright dangerous. By then, infection would be at a catastrophic level, such that hospitals would be at or near the breaking point, and schools will have

44

to close because of the lack of staff and students.

The "accommodation" provided in the "carve-out" section is no better because it is not reasonable and wholly ignores the ADA integration mandate. The supposed accommodation in Tenn. Code Ann. § 14-2-104(d)(2) allows the wearing of masks in a moving zone for volunteer children, and then only after fifteen minutes of contact within six feet of the person sought to be protected. This creates a risk of transmission because the virus can spread farther than six feet, and can linger for hours in the school setting.  It also smacks of placing a disabled child in a stigmatizing bubble (even if the bubble moves as the child does), as if  he or she were wearing a badge of infamy. J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ., 877 F.3d 979, 987 (11th Cir. 2017) (noting that there are intangible consequences of discrimination "result[ing] from isolation, such as stigmatization and deprivation of opportunities for enriching interaction with fellow student"); C.C. ex rel. Ward v. State of Tennessee, No. CIV. 3:09-0246, 2010 WL 3782232, at *7 (M.D. Tenn. Sept. 21, 2010) ("Discrimination may injure a plaintiff by stigmatizing the plaintiff as 'innately inferior.'").

In concluding that Plaintiff have established a likelihood of success on the merits, the Court has considered the recent decision of the Fifth Circuit in E.T. v. Paxton, No. 21-51083, 2021 WL 5629045 (5th Cir. Dec. 1, 2021), cited by Defendants in their reply brief.  There, the Fifth Circuit stayed a district court's order enjoining the enforcement of Texas Governor Greg Abbott's Executive Order GA-38 that prohibited local governmental entities from imposing mask mandates.  The Court is unpersuaded by the ruling in E.T. for several reasons.

For one, E.T., being a Fifth Circuit decision, is not binding or precedential in this circuit.  In fact, when Governor Lee appealed the Western District's decision enjoining enforcement of Executive Order No. 84, the Sixth Circuit declined to issue a stay.  G.S., 2021 WL 5411218, at *3.

45

For another, this Court respectfully disagrees with the Fifth Circuit's conclusion that plaintiffs are required to exhaust administrative remedies under the Individuals with Disabilities Education Act ("IDEA") before bringing an ADA claim regarding masking in schools. Such exhaustion is not required for the denial of a free appropriate public education ("FAPE"), which is what Plaintiffs claim; they are not suing for individualized, specific claims under IEPs. That is what this Court held in R.K., 2021 WL 4391640, at *7 , as did the Western District in G.S., 2021 WL 4057812, at *6, and the Eastern District in S.B., 2021 WL 4755619, at *7. In fact, Defendants in this case do not appear to be even arguing that Plaintiffs failed to exhaust administrative remedies.

Finally, and most importantly, it is entirely unclear what evidence was presented to the district court in Texas when it made the decision to issue an injunction. On appeal, the Fifth Circuit stated that "the risks of contracting COVID-19" based on enforcement of Executive Order GA-38 were "abstract" because "the binary choice envisioned by the district court – either stay home or catch COVID-19 – is a false one: it wholly elides the various accommodations available to the plaintiffs (e.g., distancing, voluntary masking, class spacing, plexiglass, and vaccinations) to ensure a safer learning environment, regardless of GA-38's prohibition of local mask mandates." E.T., 2021 WL 5629405, at *3. Here, in contrast, the risk is not abstract. The weight of the evidence before the Court – indeed the only evidence – establishes that mitigation measures must be layered, including the requirement that masks be worn. Having plexiglass shields, social distancing, vaccinations, and masking are all part of the equation, but having only one or some of those things simply will not do, particularly if it does not include masking.

Without question, Plaintiffs have established a likelihood of success on the merits. They have presented overwhelming evidence that Defendants do not even try to refute, perhaps because they cannot.

**B. <u>Irreparable Injury to Plaintiffs</u>**

Plaintiffs have also clearly established that they will be irreparably harmed were the Court not to enjoin Title 14 as it pertains to schools. That harm is two-fold, but interrelated. They (1) cannot attend school without their school's ability to require masking and other measures deemed appropriate based on local COVID-19 conditions because they run the risk of severe illness or death; and (2) being unable to attend schools will led them to be deprived of the in-person public education to which they are entitled. The Court found as much when it temporarily, <u>R.K.</u> 2021 WL 4391650, at *7, and then preliminarily, <u>R.K.</u>, 2021 WL 4942871, at *16, enjoined enforcement of Executive Order No. 84. Passage of Title 14 a mere few weeks later does not change this Court's conclusion.

In arguing that there is now no irreparable harm, Defendants raise three primary point, none of which are persuasive. First, Defendants argue that the new law "[d]oes not preclude [Plaintiffs] from seeking and receiving accommodations from the school." (Doc. No. 42 at 28). For the reasons already stated, the Court finds the potential "accommodations" as unreasonable as they are unrealistic in the COVID-19 world.

Second, Defendants argue that "Plaintiffs claim of actual present harm is also undercut by the distinct downward trend in the number of positive COVID cases in Tennessee," and that "[c]ircumstances of COVID-19 infection have substantially, materially, and favorably changed from the peak infection rates associated with the Delta variant of the virus." (Doc. No. 42 at 28-29). Maybe so, but this argument ignores the undisputed testimony presented to the Court that (1) the highest percent of COVID-19 case in Tennessee presently is in children younger than 18; (2) the virus is unpredictable in terms of rates of transmissions; and (3) infection rates can and do spike for any of a number of reasons. It also ignores that both the CDC and APA still recommend universal masking in schools. And it ignores that there are "rapidly evolving conditions of the COVID-19

47

pandemic," United States v. Bass, 2021 WL 5099583, at *8, -- F. 4th -- (6th Cir., Nov. 3, 2021), as most recently evidenced by the discovery of the Omicron variant.

Third, Defendants argue that Plaintiffs' claims of "actual present harm or a significant possibility of future harm are undermined by Plaintiffs' recent eligibility for vaccination against COVID-19 with the Pfizer-BioNTech pediatric vaccine." (Doc. No. 42 at 30). This argument, too, ignores several things, including that the approval of the Pfizer vaccine for children from five to 11 did not occur until November 5, 2021; it will take some time for the vaccine to roll-out and be administered to children in that age-group; and Tennessee historically is among the lowest states in terms of the number of people who have been vaccinated. It also ignores that the vaccine is not a miracle drug or panacea, and even vaccinated individuals can become sick and pass the coronavirus on to others. For this reason, the CDC recommends masking in high transmission areas, even for those who are vaccinated.

## C. Harm to Other Parties and (D) The Public Interest

With regard to harm to others and the public interest, Defendants argue that eight students in three counties are seeking "a statewide injunction that would essentially put the Court in charge of monitoring all requests for ADA masking accommodations, ensuring proper enforcement of such accommodations, and second-guessing the Commissioner of Health (who is not even a party to these proceedings) as to quarantine decisions." (Doc. No. 42 at 30). They liken the situation here to that presented in Fraihat v. U.S. Immigration & Customs Enforcement, 16 F.4th 613, 644-47 (9th Cir. 2021) where "[t]he Ninth Circuit recently rejected a similarly overbroad request for a nationwide injunction against U.S. Immigration and Customs Enforcement's COVID-19 policies." (Id. at 29-30).

It is more than a tad ironic for Defendants to rely on Fraihat because the problem there was

48

that "circumstances at individual detention facilities could not justify the broad, nationwide relief that plaintiffs pursued." Id. at 645. Quite the opposite is true here. Plaintiffs ask that decisions be made locally. They are not asking for a statewide rule relating to masking or any of the other mitigation measures. Nor would the Court be called upon to monitor ADA requests, any more than it was called upon to monitor requests before Title 14 became law. To the extent that the Fifth Circuit found harm in the statewide injunction in E.T., the Court has already expressed its disagreement with that decision.

When enacting Title 14, the Tennessee General Assembly made numerous findings. Among them was that "Tennessee, as a great southern state within our federal system of government, is free to enact laws to protect the health and safety of its citizens under the police powers inherent to all states of a federal system of government," and "[t]he United States Constitution does not prohibit the states from regulating health and medical practices[.]" Tenn. Code Ann. 14-1-104 (2), (3).

As a part of the federal system, Tennessee certainly has the prerogative to enact laws protecting its citizens, but that right is limited by the Supremacy Clause of the Constitution, which "provides a clear rule that federal law 'shall be the supreme Law of the Land.' " Arizona v. United States, 132 S.Ct. 2492, 2500 (2012) (quoting U.S. Const. art. VI, cl. 2). "To determine whether a state law conflicts with Congress' purposes and objectives, [a court] must first ascertain the nature of the federal interest." Hillman v. Maretta, 569 U.S. 483, 490 (2013). "If the purpose of the [federal] act cannot otherwise be accomplished if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect-the state law must yield to the regulation of Congress within the sphere of its delegated power." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000). Such a conflict occurs when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id.

49

The express purpose of Congress in enacting Title II was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1)–(2). Title 14 of the Tennessee Code stands as an obstacle to enforcement of that national mandate by not allowing school districts the ability to make reasonable modifications in the COVID-19 era that would allow disabled children to safely enter the schoolhouse and receive an education. This harms not only the disabled student, but also society as a whole. Moreover, "[w]hen Congress passes antidiscrimination laws like 'the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to [e]nsure that the mandate of federal law is achieved.'" <u>ARC of Iowa v. Reynolds</u>, No. 4:21-CV-00264, 2021 WL 4166728, at *12 (S.D. Iowa Sept. 13, 2021).

It is also in the public's interest to slow the spread of COVID-19 in Tennessee's schools. Defendants have proffered absolutely nothing to suggest that any harm would come from allowing individual school districts to determine what is best for their schools, just as they did prior to the enactment of Title 14.

As it stands, Title 14 offers no protection to students, let alone those that are disabled. Worse yet, Title 14 honors the ADA and the Rehabilitation Act more in its breach than in its observance. This does not serve the public interest. Allowing children to safely attend school does.

### III. Conclusion

Based upon the foregoing, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction will be granted to the extent that Defendants will be enjoined from enforcing (1) Tenn. Code Ann. § 14-2-104 "Face coverings for schools"; and (2) Tenn. Code Ann. § 14-4-101(b) to the extent that it prohibits local health officials and schools from making quarantining decisions as they relate to public schools.

50

The Court finds that no security is required under Fed. R. Civ. P. 65(c), and none has been requested by Defendants.

An appropriate Order will issue.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

# APPENDIX
## Chapter 2 – Uniform Standards

**14-2-101. COVID-19 vaccine mandates by governmental entities.**

A governmental entity, school, or local education agency shall not mandate that a:

(1) Person receive a COVID-19 vaccine; or

(2) Private business or school require proof of vaccination as a condition to access the private business's or school's premises or facilities or to receive the benefits of the private business's or school's products or services.

**14-2-102. COVID-19 vaccine status.**

(a) A private business, governmental entity, school, or local education agency shall not compel or otherwise take an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason.

(b) Allowing a person to voluntarily provide proof of vaccination or proof of COVID-19 antibodies instead of a negative COVID-19 test in order to gain admission to a place of entertainment, as defined in § 47-25-512 is not a violation of this subsection (a).

(c) Notwithstanding subsection (a), a person is not prohibited from requiring another person to provide proof of vaccination as a condition to entering that person's personal residence for purposes of providing products or services.

**14-2-104. Face coverings for schools.**

(a) Notwithstanding title 49 or any other law to the contrary and except as otherwise provided in subsection (c), a school or a governing body of a school shall not require a person to wear a face covering while on school property unless:

(1) The principal or president of the school submits a written request to the school's governing body for the adoption of a policy requiring all persons on school property to wear a face covering;

(2) Severe conditions exist;

(3) The school's governing body adopts such a policy on a school-by-school or campus-by-campus basis and only:

i

(A) For the school for which a request is submitted by the principal or president pursuant to subdivision (a)(1);

(B) If all other conditions or requirements of this subsection (a) exist at the time the policy is adopted; and

(C) If the policy is in effect for no more than fourteen (14) days;

(4) The school provides face coverings for persons twelve (12) years of age and older that meet the U.S. National Institute for Occupational Safety and Health N95 classification of air filtration, meaning that the face covering filters at least ninety-five percent (95%) of airborne particles, including droplets containing COVID-19; and

(5) The school provides age-appropriate face coverings for persons under twelve (12) years of age, but over five (5) years of age, that provide air filtration similar to the face coverings described in subdivision (a)(4).

(b) A principal or president of a school may submit a written request to the school's governing body to renew the face covering requirement for the school for an additional fourteen day period if the requirements of subsection (a) exist at the time the face covering requirement is renewed. If, at the end of a fourteen-day period, one (1) or more of the requirements or conditions of subsection (a) no longer exist, then a school shall not renew the school's face covering requirement or otherwise require a person to wear a face covering on school property.

(c) Notwithstanding subsection (a), a school shall not require a person to wear a face covering if the person provides documentation from the person's healthcare provider that wearing a face covering is contraindicated for the person, or if the person objects to wearing a face covering because of the person's sincerely held religious belief.

(d) Notwithstanding subsection (a):

(1) A school shall, to the extent practicable, provide a reasonable accommodation pursuant to the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) to a person who provides a written request for a reasonable accommodation to the principal or president of the school. If the person requesting a reasonable accommodation under this subsection (d) is a minor, then the person's parent or legal guardian must provide the written request on the minor's behalf.

ii

(2) The principal or president of the school shall evaluate the request on behalf of the school and, to the extent practicable, provide a reasonable accommodation. The  principal or president shall issue a decision approving or denying the request in writing. If the principal or president denies the request, then the grounds for denial must be provided in the principal's or president's written decision. If the principal or president approves the request, then the school shall place the person in an in-person educational setting in which other persons who may place or otherwise locate themselves within six feet (6') of the person receiving the reasonable accommodation for longer than fifteen (15) minutes are wearing a face covering provided by the school that:

> (A) For persons twelve (12) years of age or older, meets the U.S. National Institute for Occupational Safety and Health N95 classification of air filtration, meaning that the face covering filters at least ninety-five percent (95%) of airborne particles, including droplets containing COVID-19; and
> (B) For persons under twelve (12) years of age, but over five (5) years of age, is age-appropriate and provides air filtration similar to the face coverings described in subdivision (d)(2)(A).

(e) The governing body of a school shall not use state funds to mandate or require students to wear face coverings in violation of this section. If a school's governing body violates this subsection (e), then the commissioner of education may withhold future distributions of school funds from a local education agency in the amount of the state funds used in violation of this section, or the attorney general and reporter may initiate legal proceedings to recover all state funds used in violation of this subsection (e).

(f) This section does not authorize a person to access a school's property or to receive the benefits of a school's services if the person is otherwise prohibited from accessing the school's property, or from receiving the benefits of the school's services.